**Wolters Kluwer**

## Service of Process Transmittal Summary

**TO:**      Janessa Turner
             QBE Regional Companies (N.A.), Inc.
             ONE QBE WAY
             SUN PRAIRIE, WI 53596-0001

**RE:**      **Process Served in Georgia**

**FOR:**     QBE Insurance Corporation  (Domestic State: PA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Peachtree Place Condominium Association, Inc. vs. QBE Insurance Corporation |
| **CASE #:** | 22A091706 |
| **NATURE OF ACTION:** | Insurance Litigation |
| **PROCESS SERVED ON:** | C T Corporation System, Lawrenceville, GA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 10/25/2022 at 13:24 |
| **JURISDICTION SERVED:** | Georgia |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  GSSC Claims  GSSC-ClaimsLegalAdmin.US-BOX@us.qbe.com |
| | Email Notification,  Ruby Remata  Ruby.Remata@us.qbe.com |
| | Email Notification,  Janessa Turner  janessa.turner@us.qbe.com |
| | Email Notification,  Taylor Willemot  taylor.willemot@us.qbe.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 289 S. Culver St. |
| | Lawrenceville, GA 30046 |
| | 800-448-5350 |
| | MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

SHERIFF'S ENTRY OF SERVICE

| | |
|---|---|
| Civil Action No. 22-A-09170-6 | Superior Court ☒    Magistrate Court ☐ |
| | State Court ☐    Probate Court ☐ |
| | Juvenile Court ☐ |
| Date Filed 10/21/2022 | Georgia, Gwinnett _____ COUNTY |
| | Peachtree Place Condominium Association, |
| Attorney's Address | Inc. |
| Huggins Law Firm, LLC | Plaintiff |
| 110 Norcross St. | VS. |
| Roswell, GA 30075 | QBE Insurance Corporation |
| Name and Address of Party to Served | |
| QBE Insurance Corporation | Defendant |
| Registered Agent: C T Corporation System | |
| 289 S. Culver St., Lawrenceville, GA 30046 | |
| | Garnishee |

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _____ personally with a copy of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of defendant.

**CORPORATION**
Served the defendant _____ *Insurance Corporation* _____ a corporation
by leaving a copy of the within action and summons with *Lore Richardson*
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**
Diligent search made and defendant _____
not to be found in the jurisdiction of this Court.

This _25_ day of _Oct_, 20 _22_

DEPUTY _____    _W. Coburly Sol332_

## CLERK'S | DEFENDANT'S | PLAINTIFF'S COPY

E-FILED IN OFFICE - CE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
22-A-09170-6
10/21/2022 4:28 PM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

**Peachtree Place Condominium Association, Inc.**
3777 Peachtree Rd. NE
Brookhaven, GA 30319

| | |
|---|---|
| **PLAINTIFF** | **CIVIL ACTION NUMBER:** ___22-A-09170-6___ |

**VS**

**QBE Insurance Corporation**
**RA: C T Corporation System**
289 S. Culver St.
Lawrenceville, GA 30046

### DEFENDANT

---

## SUMMONS

---

**TO THE ABOVE-NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**J. Remington Huggins**
**Attorney For the Plaintiff**
**THE HUGGINS LAW FIRM, LLC**
**110 Norcross Street**
**Roswell, GA 30075**
**770-913-6229**
**remington@lawhuggins.com**

an Answer to the Complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _____ day of _____, 2022.
    **24th day of October, 2022**

Tiana P. Garner,
Clerk of Superior Court

BY: _Calah Everett_____
Deputy Clerk

E-FILED IN OFFICE - CE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
**22-A-09170-6**
**10/21/2022 4:28 PM**
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

|  |  |  |
|---|---|---|
| **PEACHTREE PLACE CONDOMINIUM ASSOCIATION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION FILE NO.** 22-A-09170-6 |
| **v.** | ) | |
| | ) | |
| **QBE INSURANCE CORPORATION,** | ) | |
| a foreign corporation, | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

**COMES NOW** Plaintiff **Peachtree Place Condominium Association, Inc.**, by and through the undersigned counsel, and files this Complaint for breach of first party property insurance contract and bad faith denial of insurance coverage against Defendant, **QBE Insurance Corporation**, and in support hereof, states as follows:

## PARTIES

1.

Plaintiff is Georgia corporation which is the named insured on the Policy at issue, with its principal place of business in Georgia.

2.

Upon information and belief, Defendant is a foreign insurance company, registered to transact business in, and in fact transacts business in, the State of Georgia. Defendant is in the business of insuring risks and properties located throughout the United States, including Georgia. Defendant maintains an office at 289 S. Culver St., Lawrenceville, GA 30046 where it may be served with process through its registered agent, C T Corporation System, as identified by the state of Georgia Secretary of State registry.

## JURISDICTION AND VENUE

3.

This Court has subject matter jurisdiction over this action for breach of contract and bad faith denial of an insurance claim because the breached contract was entered into, and concerned property in, the state of Georgia and the amount in controversy exceeds $15,000.00. This Court has personal jurisdiction over Defendant because Defendant is transacting business and insuring properties in the state of Georgia and has appointed a registered agent for service of process in Georgia pursuant to O.C.G.A. § 33-4-1 and O.C.G.A. § 33-4-4.

4.

Venue is proper in this Court because Defendant has a registered agent doing business in Gwinnett County pursuant to O.C.G.A. § 33-4-1, O.C.G.A. § 33-4-4.

5.

In addition, by virtue of the express terms of the insurance policy at issue, Defendant has consented to jurisdiction and venue of this Court.

## THE POLICY

6.

Prior to October 29, 2020, and in consideration of the premiums paid to Defendant by the Plaintiff, Defendant issued its Policy No. MC1800000042800 (the "Policy"). A true and accurate copy of the Policy is attached hereto as Exhibit "A."

7.

The Policy provides numerous coverages for the real and personal property located at 3777 Peachtree Rd. NE, Brookhaven, GA 30319 (the "Insured Property" or the "Property"). The Policy

2

likewise insures against loss of Wind/Hail with a deductible of $25,000.00 per occurrence. (*See* Ex. A).

8.

The Policy is an all-perils policy providing coverage for all sudden and accidental direct physical loss to the building and business property. The Policy covers property repairs and business property on a full replacement cost basis. (*See* Ex. A).

9.

The Policy covers various types of expenses, including reasonable and necessary costs incurred for temporary repairs to protect covered property from further imminent covered loss as well as business interruption expenses. (*See* Ex. A).

## **SUDDEN AND ACCIDENTAL DAMAGE TO THE INSURED PROPERTY**

10.

On, or about October 29, 2020, the above-referenced property suffered damage from a sudden and accidental direct physical loss resulting from Wind/Hail. The Policy was in effect at the time of the loss.

11.

Plaintiff promptly and timely notified Defendant of the damage to their property resulting from the loss and made a claim pursuant to the Policy. As a result, Defendant assigned an adjuster ("Adjuster") to investigate Plaintiff's claim for sudden and accidental direct physical loss. The Adjuster was authorized as Defendant's representative and agent for purposes of the claim.

12.

At all times, Plaintiff made themselves and their property available to, and fully cooperated with, the Defendant and its representative and agent to inspect and investigate the damages caused by the loss.

13.

Defendant, through its authorized representative and agent, Adjuster, performed a site inspection of Plaintiff's property.

14.

Defendant's authorized representative and agent, Adjuster, incurred the duty of acting with due diligence in achieving a proper disposition of the Plaintiff's claim when Adjuster undertook the handling of the disposition of the claim.

15.

Defendant, through its authorized representative and agent, Adjuster, grossly underestimated the scope of loss to the Plaintiff as a result of the Wind/Hail event. Defendant failed to properly indemnify the Plaintiff and denied Plaintiff's claim in its entirety. Defendant therefore estimated Plaintiff's covered loss under the Policy to be $0.00. A true and accurate copy of the Defendant's denial letter is attached hereto as Exhibit "B."

16.

As a result of Defendant's denial, Plaintiff requested multiple times that Defendant reconsider its position regarding Defendant's coverage position. Defendant refused to comply with the Plaintiff's requests and continued to frivolously and baselessly deny any payment on Plaintiff's claim. Furthermore, the Defendant continued to ignore the opinions of the Plaintiff's experts as to

the extent of damage and the amount it will cost the Plaintiff to be properly indemnified for their loss.

17.

Plaintiff made repeated requests for payment of the claim, including a written demand sent to Defendant on March 31, 2022. A true and accurate copy of the written demand is attached hereto as Exhibit "C."  Despite this demand for **$3,704,986.25 less previous payments and the applicable deductible**, Defendant continued to frivolously deny Plaintiff's claim without just cause when, under one or more portions of the Policy, the obligation to settle the claim became reasonably clear.

18.

The Plaintiff's March 31, 2022, correspondence (Ex. D) to Defendant was a formal 60-Day demand, pursuant to the guidelines set forth in O.C.G.A. §33-4-6. After putting Defendant on notice of a potential lawsuit, through the formal 60-Day demand, the Defendant continued to deny Plaintiff's claim without just cause.

19.

Defendant did not act fairly or honestly toward the Plaintiff with due regard to the Plaintiff's claim and interests when Defendant, under all circumstances articulated herein, failed to compensate the Plaintiff for their damages in direct breach of the terms and conditions of the Policy.

20.

Plaintiff has fulfilled all conditions precedent and contractual obligations under the Policy prior to this lawsuit, or the same were waived.

21.

There exists a genuine, justifiable controversy between the Plaintiff and Defendant as to whether Defendant is responsible for further indemnification caused by the sudden and accidental direct physical loss that occurred on October 29, 2020. Plaintiff has exhausted every reasonable means possible to resolve this dispute with the Defendant. With no other option, Plaintiff was constrained to hire legal counsel, incurring additional expenses, and file this lawsuit.

22.

Plaintiff has suffered loss under the Policy in an amount to be determined at trial.

## COUNT I: BREACH OF CONTRACT

23.

Plaintiff adopts, re-alleges, and incorporates their allegations set forth in Paragraphs 1-22 of this Complaint as if fully set forth herein.

24.

Plaintiff has performed all conditions to the Defendant's obligation to perform under the Policy, including without limitation, the timely payment of premiums, timely notice of the claim, and post loss obligations, or the Defendant has waived any and all other conditions.

25.

Under the terms of the Policy, Defendant is required to fully indemnify the Plaintiff for the damages sustained as a result of the covered loss.

26.

Despite Plaintiff's timely written demand, Defendant failed to provide full indemnification to the Plaintiff under the terms of the Policy.

6

27.

Defendant failed to act in good faith and fair dealing under the terms of the Policy by refusing to properly investigate and fully indemnify the Plaintiff according to the terms of the Policy.

28.

As a result of the Defendant's denying and delaying payment in Plaintiff's claim, Plaintiff sustained additional covered losses from mitigation and temporary repairs of the direct physical damage to the insured property in an amount to be determined at trial.

29.

The Plaintiff suffered damages as a direct result of Defendant's failure to indemnify the Plaintiff for their loss.

30..

All foregoing conduct constitutes a breach of contract that has resulted in damages to the Plaintiff.

31.

**WHEREFORE,** Plaintiff prays for this Court to enter an award, in Plaintiff's favor, of compensatory damages, attorneys' fees, pre- and post-judgment interest, and such other and further relief as the Court may deem just and proper.

## COUNT II: BAD FAITH PURSUANT TO O.C.G.A. § 33-4-6

32.

Plaintiff adopts, re-alleges, and incorporates their allegations set forth in Paragraphs 1-31 of this Complaint as if fully set forth herein.

33.

7

By failing to achieve a proper disposition of Plaintiff's claim, Defendant acted frivolously, and without a reasonable basis or justification, in contravention of its duty of good faith and fair dealing.

34.

Defendant did not attempt in good faith to settle the Plaintiff's claim when it could have, and should have, done so under all attendant circumstances had it acted fairly and honestly toward the Plaintiff and with due regard for the Plaintiff's interests.

35.

Defendant's failures to adjust Plaintiff's claim in good faith include, but are not limited to:

(1) Knowingly misrepresenting to claimants, and insureds, relevant facts or policy provisions relating to coverages at issue (*see* O.C.G.A. § 33-6-34(1));

(2) Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies (*see* O.C.G.A. § 33-6-34(2));

(3) Failing to adopt and implement procedures for the prompt investigation and settlement of claims arising under its policies (*see* O.C.G.A. § 33-6-34(3));

(4) Not attempting in good faith to effectuate prompt, fair, and equitable settlement of claims submitted in which liability has become reasonable clear (*see* O.C.G.A. § 33-6-34(4));

(5) Compelling insureds or beneficiaries to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them (*see* O.C.G.A. § 33-6-34(5));

(6) Refusing to pay claims without conducting a reasonable investigation (*see* O.C.G.A. § 33-6-34(6));

(7) When requested by the insured in writing, failing to affirm or deny coverage of claims within a reasonable time after having completed its investigation related to such claim or claims (*see* O.C.G.A. § 33-6-34(7)); and

(8) When requested by the insured in writing, failing in the case of payments or offers of compromise to provide promptly a reasonable and accurate explanation of the basis for such action (or, in the case of claims denials, providing said denial to the insured in writing) (*see* O.C.G.A. § 33-6-34(10)).

36.

The above and foregoing actions of Defendant constitute bad faith pursuant to O.C.G.A. § 33-4-6, as the Defendant refused to pay Plaintiff's covered loss within sixty (60) days after Plaintiff's timely written demand (Ex. D) for payment without a reasonable basis for doing so.

37.

Defendant frivolously, and without a reasonable basis, denied indemnification to the Plaintiff for their covered loss.

38.

Defendant's refusal to indemnify the Plaintiff was done frivolously, without a reasonable basis, and in bad faith.

39.

As a result of Defendant's above-referenced bad faith breach of its insurance policy with Plaintiff, and pursuant to O.C.G.A. § 33-4-6(a), Defendant is liable for penalties in the amount of "not more than fifty percent (50%) of the liability of the insurer for the loss, or $5,000.00, whichever is greater, and all reasonable attorneys' fees for the prosecution of the action against the Insurer."

40.

**WHEREFORE,** Plaintiff prays for this Court to enter an award, in Plaintiff's favor, of the statutory award in an amount of fifty percent (50%) of the total compensatory damages awarded or $5,000.00, whichever is greater, along with a statutory allowance for reasonable attorneys' fees in prosecuting this action, pursuant to O.C.G.A. § 33-4-6, for Defendant's unfair claims settlement practices and bad faith refusal to pay Plaintiff's loss claim when it could and should have done so, had it acted fairly and reasonably toward the insured.

## DEMAND FOR JURY TRIAL

41.

Plaintiff requests a trial by Jury on all counts of the Complaint.

## PRAYER FOR RELIEF

42.

**WHEREFORE,** Plaintiff requests that after due proceedings are had, all appropriate penalties be assessed against the Defendant and that the Plaintiff receive any and all damages at law to which they are justly entitled, and thus prays for judgment against the Defendant, as follows:

a.  That this Court grant judgment in favor of the Plaintiff and against Defendant in an amount to be determined at trial for breach of insurance contract.

b.  Compensatory damages, including all damages to the Plaintiff by the Defendant and any resulting expenses and temporary repairs.

c.  Bad faith damages in an amount of fifty percent (50%) of the total compensatory damages awarded or $5,000.00, whichever is greater, for Defendant's bad faith delay, denial, and its

intentional, frivolous failure to conduct a reasonable investigation of the Plaintiff's claim without a reasonable basis;

d.  Plaintiff's attorneys' fees and costs of suit in this action;

e.  Plaintiff's consultant and expert fees;

f.  Pre- and post-judgment interest in the maximum amount allowed by law;

g.  All statutory penalties;

h.  Any and all applicable multipliers; and,

i.  Any and all other relief that the Court may deem just and proper, whether such relief sounds in law or equity.

Dated, this 21st day of October, 2022.

RESPECTFULLY SUBMITTED,

For: The Huggins Law Firm, LLC

**The Huggins Law Firm, LLC**
110 Norcross Street
Roswell, GA 30075
(o) (770) 913-6229
(e) remington@lawhuggins.com
(e) mdturner@lawhuggins.com
(e) fpeebles@lawhuggins.com

_/s/ J. Remington Huggins_____
J. Remington Huggins, Esq.
Georgia Bar No.: 348736
Michael D. Turner, Esq.
Georgia Bar No.: 216414
Foster L. Peebles, Esq.
Georgia Bar No.: 410852
_Attorneys for the Plaintiff_

11

# EXHIBIT A

# Made possible



Insurance claims for risks placed with CONDOPRO and APARTMENTPRO Programs are adjusted by QBE Insurance Corporation.

Claims should be reported as soon as possible after a loss. Claims may be reported by the following options below:

## Claims reporting is available 24/7 using the following options:

**Email: newlossqbe@us.qbe.com**

Email submissions provides an automated response confirming receipt and an identification number can be used to track the submission.

**Phone: 844-QBE-CLAIMS (844-723-2524)**

Phone submissions can provide the caller with a claim or identification number at the conclusion of the call.

**Fax: 888-723-2567**

Fax submissions will be given a claims or reference number when received.  We encourage you to follow-up with a call to confirm we have received your claim and to confirm a identification or claim number.

## QBE® Insurance Corporation
A Stock Company



# Commercial Lines Policy

| Home Office: | Administrative Office: | Servicing Office: |
|---|---|---|
| c/o CT Corporation System | 88 Pine Street | 1 Pierce Place, Suite 650 |
| 116 Pine Street, Suite 320 | Wall Street Plaza | Itasca, Illinois   60143 |
| Harrisburg, Pennsylvania  17101 | New York, New York  10005 | (800) 773-9980 |

QBE and the links logo are registered service marks of QBE Insurance Group Limited.

This policy consists of:

Declarations

Common Policy Conditions

One or more coverage parts.

A coverage part consists of:

— One or more coverage forms

— Applicable forms and endorsements

QBE Insurance Corporation

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Robert V. James
President

Jose Ramon Gonzalez, Jr.
Secretary

# QBE INSURANCE CORPORATION

One General Drive
Sun Prairie, WI 53596

# COMMON POLICY DECLARATIONS

**POLICY NUMBER:** MC1800000042800          **PREVIOUS POLICY NUMBER:** NEW

| COMPANY NAME | PRODUCER NAME | 0190395 |
|---|---|---|
| QBE Insurance Corporation<br>One General Drive<br>Sun Prairie, WI 53596 | McGowan Program Administrators<br>10745 Birmingham Way<br>Woodstock, MD 21163 | |

**NAMED INSURED:** Peachtree Place Condominium Association, Inc

**MAILING ADDRESS:** c/o Heritage Property Management Services, Inc
3777 Peachtree Rd NE
Brookhaven, GA 30319

**POLICY PERIOD: FROM**   05/01/2020   **TO**   05/01/2021
**AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE.**

**BUSINESS DESCRIPTION** Residential Condominium Association

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | |
|---|---|
| | PREMIUM |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $14,983.00 |
| COMMERCIAL PROPERTY COVERAGE PART | $74,825.00 |
| TERRORISM - CERTIFIED ACTS (GENERAL LIABILITY) | $59.00 |
| TERRORISM - CERTIFIED ACTS (PROPERTY) | $0.00 |
| TOTAL: | $89,867.00 |

**POLICY NUMBER:** MC1800000042800

| FORMS APPLICABLE TO ALL COVERAGE PARTS (SHOW NUMBERS): |
|---|
| See Schedule of Forms and Endorsements. |

| Countersigned | 05/26/2020 | By: | |
|---|---|---|---|
| | (Date) | | (Authorized Representative) |

# SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER:<br>MC1800000042800 | EFFECTIVE DATE:<br>05/01/2020 |
|---|---|

**NUMBER**         **TITLE**

### COMMON

| | |
|---|---|
| IL DS 00 (09-08) | Common Policy Declarations |
| IL 00 17 (11-98) | Common Policy Conditions |
| IL 00 21 (09-08) | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL 02 62 (02-15) | Georgia Changes - Cancellation And Nonrenewal |
| IL 09 85 (01-15) | Disclosure Pursuant To Terrorism Risk Insurance Act |
| QBCP 2035 (04-18) | Bridge Endorsement |
| IL P 001 (01-04) | U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice To Policyholders |
| CP 81 33 (07-14) | Nuclear, Biological, Chemical, And Radiological Hazards Exclusion |
| QBIL-0124 (08-09) | Pollutants Definition Amendment |

### PROPERTY

| | |
|---|---|
| CO 1100 (04-02) | Commercial Output Program - Declarations |
| CL 0100 (03-99) | Common Policy Conditions |
| CL 0677 (01-11) | Gerogia - How Much We pay - No Coverage for Diminished Value |
| CO 1073 (03-05) | Equipment Breakdown Schedule |
| CO 1006 (04-02) | Crime Coverage Part - Employee Fraud & Dishonesty - Money & Securities |
| CO 1080 (11-03) | Limited Fungus and Related Perils Schedule - Blanket Limit |
| QBCP 2023 (12-17) | CondoPro Schedule of Coverages |
| CL 0128 (07-18) | Amendatory Endorsement - Georgia |
| CL 0600 (01-15) | Certified Terrorism Loss |
| CL 0605 (01-15) | Certified Terrorism Loss - Disclosure of Premium |
| CL 0700 (10-06) | Virus or Bacteria Exclusion |
| CO 0408 (06-13) | Amendatory Endorsement - Georgia |
| CO 1000 (10-02) | Commercial Output Program - Property Coverage |
| CO 1003 (04-02) | Commercial Output Program - Equipment Breakdown Coverage Part |
| CO 1052 (04-02) | Location Schedule |
| CO 1227 (05-02) | Scheduled Locations Endorsement |
| CO 1054 (04-02) | Crime Schedule - Scheduled Limits & Locations |
| CO 1062 (04-02) | Earthquake Schedule |
| CO 1221 (04-02) | Earthquake Endorsement |
| CO 1063 (04-02) | Flood Schedule |
| CO 1223 (04-02) | Flood Endorsement |
| CO 1293 (11-03) | Limited Fungus and Related Perils |
| QBCP 2022 (12-17) | CondoPro Coverage Enhancement |
| QBCP 2024 (12-17) | Multiple Deductible Schedule - Scheduled Perils & Locations |
| QBCP 2025 (12-17) | Multiple Deductible - Perils Schedule |

### GENERAL LIABILITY

| | |
|---|---|
| CG DS 01 (10-01) | Commercial General Liability Declarations |
| CG 00 01 (04-13) | Commercial General Liability Coverage Form |
| CG 20 04 (11-85) | Additional Insured - Condominium Unit Owners |
| CG 21 06 (05-14) | Exclusion - Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability - With Limited Bodily Injury Exception |
| CG 21 44 (04-17) | Limitation Of Coverage To Designated Premises, Project Or Operation |
| CG 21 47 (12-07) | Employment-Related Practices Exclusion |

## SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER:<br>MC1800000042800 | EFFECTIVE DATE:<br>05/01/2020 |
|---|---|

**NUMBER**     **TITLE**

### GENERAL LIABILITY

| | |
|---|---|
| CG 21 60 (09-98) | Year 2000 Computer-Related And Other Electronic Problems |
| CG 21 65 (12-04) | Total Pollution Exclusion With A Building Heating, Cooling And Dehumidifying Equipment Exception And A Hostile Fire Exception |
| CG 21 67 (12-04) | Fungi or Bacteria Exclusion |
| CG 21 71 (01-15) | Exclusion Of Other Acts Of Terrorism Committed Outside The United States; Cap on Losses From Certified Acts of Terrorism |
| CG 21 96 (03-05) | Silica Or Silica-Related Dust Exclusion |
| CG 24 26 (04-13) | Amendment Of Insured Contract Definition |
| CG 26 57 (04-00) | Georgia Changes - Additional Insured - Condominium Associations |
| QBCG-0100 (08-09) | Exclusion - Asbestos Liability |
| QBCG-0101 (08-09) | Exclusion - Lead Liability |
| QBCG-0151 (08-09) | Hired Auto And Non-Owned Auto Liability |

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007

IL 02 62 02 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. Paragraph **A.1.** of the **Cancellation** Common Policy Condition is replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation stating a future date on which the policy is to be cancelled, subject to the following:

   a. If only the interest of the first Named Insured is affected, the effective date of cancellation will be either the date we receive notice from the first Named Insured or the date specified in the notice, whichever is later. However, upon receiving a written notice of cancellation from the first Named Insured, we may waive the requirement that the notice state the future date of cancellation, by confirming the date and time of cancellation in writing to the first Named Insured.

   b. If by statute, regulation or contract this policy may not be cancelled unless notice is given to a governmental agency, mortgagee or other third party, we will mail or deliver at least 10 days' notice to the first Named Insured and the third party as soon as practicable after receiving the first Named Insured's request for cancellation.

Our notice will state the effective date of cancellation, which will be the later of the following:

   **(1)** 10 days from the date of mailing or delivering our notice; or

   **(2)** The effective date of cancellation stated in the first Named Insured's notice to us.

B. Paragraph **A.5.** of the **Cancellation** Common Policy Condition is replaced by the following:

5. **Premium Refund**

   a. If this policy is cancelled, we will send the first Named Insured any premium refund due.

   b. If we cancel, the refund will be pro rata, except as provided in **c.** below.

   c. If the cancellation results from failure of the first Named Insured to pay, when due, any premium to us or any amount, when due, under a premium finance agreement, then the refund may be less than pro rata. Calculation of the return premium at less than pro rata represents a penalty charged on unearned premium.

   d. If the first Named Insured cancels, the refund may be less than pro rata.

   e. The cancellation will be effective even if we have not made or offered a refund.

© Insurance Services Office, Inc., 2014

**C.** The following is added to the **Cancellation Common Policy Condition** and supersedes any other provisions to the contrary:

If we decide to:

1. Cancel or nonrenew this policy; or

2. Increase current policy premium by more than 15% (other than any increase due to change in risk, exposure or experience modification or resulting from an audit of auditable coverages); or

3. Change any policy provision which would limit or restrict coverage;

then:

We will mail or deliver notice of our action (including the dollar amount of any increase in renewal premium of more than 15%) to the first Named Insured and lienholder, if any, at the last mailing address known to us. Except as applicable as described in Paragraph **D.** or **E.** below, we will mail or deliver notice at least:

a. 10 days before the effective date of cancellation if this policy has been in effect less than 60 days or if we cancel for nonpayment of premium; or

b. 45 days before the effective date of cancellation if this policy has been in effect 60 or more days and we cancel for a reason other than nonpayment of premium; or

c. 45 days before the expiration date of this policy if we decide to nonrenew, increase the premium or limit or restrict coverage.

**D.** The following provisions apply to insurance covering residential real property only provided under the:

Capital Assets Program (Output Policy) Coverage Part;

Commercial Property Coverage Part;

Farm Coverage Part;

if the named insured is a natural person.

With respect to such insurance, the following is added to the **Cancellation** Common Policy Condition and supersedes any provisions to the contrary except as applicable as described in Paragraph **E.:**

1. When this policy has been in effect for 60 days or less and is not a renewal with us, we may cancel for any reason by notifying the first Named Insured at least 10 days before the date cancellation takes effect.

2. When this policy has been in effect for more than 60 days, or at any time if it is a renewal with us, we may cancel for one or more of the following reasons:

a. Nonpayment of premium, whether payable to us or to our agent;

b. Upon discovery of fraud, concealment of a material fact, or material misrepresentation made by or with the knowledge of any person insured under this policy in obtaining this policy, continuing this policy or presenting a claim under this policy;

c. Upon the occurrence of a change in the risk which substantially increases any hazard insured against; or

d. Upon the violation of any of the material terms or conditions of this policy by any person insured under this policy.

We may cancel by providing notice to the first Named Insured at least:

(1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(2) 45 days before the effective date of cancellation if we cancel for any of the reasons listed in **b., c.** or **d.** above.

**E.** With respect to a policy that is written to permit an audit, the following is added to the **Cancellation** Common Policy Condition:

If you fail to submit to or allow an audit for the current or most recently expired term, we may cancel this policy subject to the following:

1. We will make two documented efforts to send you and your agent notification of potential cancellation. After the second notice has been sent, we have the right to cancel this policy by mailing or delivering a written notice of cancellation to the first Named Insured at least 10 days before the effective date of cancellation, but not within 20 days of the first documented effort.

2. If we cancel this policy based on your failure to submit to or allow an audit, we will send the written notice of cancellation to the first Named Insured at the last known mailing address by certified mail or statutory overnight delivery with return receipt requested.

© Insurance Services Office, Inc., 2014  IL 02 62 02 15

POLICY NUMBER: MC1800000042800

IL 09 85 01 15

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)**  $59.00 |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** |
| Certified Acts - General Liability                                    $59.00 |
| |
| **Additional information, if any, concerning the terrorism premium:** |
| See Form CL 0605 (01-15) for terrorism premium. |

| SCHEDULE – PART II |
|---|
| **Federal share of terrorism losses**   80  **% Year: 20**  20 |
| (Refer to Paragraph **B.** in this endorsement.) |
| |
| **Federal share of terrorism losses**   80  **% Year: 20**  21 |
| (Refer to Paragraph **B.** in this endorsement.) |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.



This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# BRIDGE ENDORSEMENT

The following provisions apply to this policy:

1.  Common Policy Conditions

    Common Policy Conditions CL 0100 apply to the Property Coverage Part.

    For all coverages other than those in the Property Coverage Part, including but not limited to the Commercial Output Program Property Coverage Part, Common Policy Conditions IL 00 17 applies.

2.  Amendatory Endorsements

    The applicable state amendatory endorsements will be added for the coverages of this policy and shown on the applicable Declarations, Schedule, or "schedule of coverages".

Includes copyrighted material of American Association of Insurance Services
used with its permission.

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

   © ISO Properties, Inc., 2004

**AAIS**
**CO 1100 04 02**
Page 1 of 1

## COMMERCIAL OUTPUT PROGRAM -- DECLARATIONS

POLICY NUMBER:      MC1800000042800

COMPANY NAME        QBE Insurance Corporation

PRODUCER NAME AND NUMBER  0190395 McGowan Program Administrators

NAME OF INSURED  Peachtree Place Condominium Association, Inc

MAILING ADDRESS  c/o Heritage Property Management Services, Inc
3777 Peachtree Rd NE
Brookhaven, GA 30319

POLICY PERIOD:  From:   05/01/2020    To:    05/01/2021    at
12:01 a.m. Standard Time at your mailing address shown above.

IN RETURN FOR YOUR PAYMENT OF THE PREMIUM, WE PROVIDE THE INSURANCE AS
DESCRIBED IN THIS POLICY.

BUSINESS DESCRIPTION:  Habitational

MORTGAGE HOLDER NAME AND MAILING ADDRESS:         LOCATION ADDRESS:

See Form CO 1052 (04-02)

FORMS APPLICABLE TO ALL COVERAGES:

PREMIUM   $74,825.00          PAYABLE  at inception

COUNTERSIGNATURE _____  DATE  05/26/2020
(Authorized Representative)
Company Officer's Signature

**CO 1100 04 02**

Copyright, American Association of Insurance Services, 2002

CP 81 33 07 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR, BIOLOGICAL, CHEMICAL AND RADIOLOGICAL HAZARDS EXCLUSION

This endorsement modifies insurance provided under the following:

    COMMERCIAL PROPERTY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    ASSET COVERAGE PART
    PREFERRED ASSET COVERAGE PART
    BUILDERS RISK COVERAGE
    COMMERCIAL OUTPUT PROGRAM
    DIFFERENCE IN CONDITIONS PROGRAM

**I.** We will not pay for any loss, damage, cost or expense, whether real or alleged, that is caused, results from, is exacerbated by or otherwise impacted by, either directly or indirectly, any of the following:

  **1)** **Nuclear Hazard** – including, but not limited to, nuclear reaction, nuclear detonation, nuclear radiation, radioactive contamination and all agents, materials, products or substances, whether engineered or naturally occurring, involved therein or released thereby;

  **2)** **Biological Hazard** – including, but not limited to, any biological and/or poisonous or pathogenic agent, material, product or substance, whether engineered or naturally occurring, that induces or is capable of inducing physical distress, illness, or disease;

  **3)** **Chemical Hazard** – including, but not limited to, any chemical agent, material, product or substance;

  **4)** **Radioactive Hazard** – including, but not limited to, any electromagnetic, optical, or ionizing radiation or energy, including all generators and emitters thereof, whether engineered or naturally occurring.

**II.** The provisions of subparagraphs I. 2) and I. 3) will not apply where the agent, material, product or substance at issue is utilized in the course of business by an insured.

**III.** Only if and to the extent required by state law, the following exception to the exclusion in paragraph I. applies:

  If a hazard excluded under paragraph I. results in fire, we will pay for the loss, damage, cost or expense caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. This coverage does not apply to insurance provided under Business Income, Rental Value or Extra Expense coverage forms or endorsements that apply to those coverage forms.

All other terms and conditions of this policy remain unchanged.

AAIS
CL 0100 03 99
Page 1 of 1

# COMMON POLICY CONDITIONS

1. **Assignment** -- This policy may not be assigned without "our" written consent.

2. **Cancellation** -- "You" may cancel this policy by returning the policy to "us" or by giving "us" written notice and stating at what future date coverage is to stop.

   "We" may cancel this policy, or one or more of its parts, by written notice sent to "you" at "your" last mailing address known to "us". If notice of cancellation is mailed, proof of mailing will be sufficient proof of notice.

   If "we" cancel this policy for nonpayment of premium, "we" will give "you" notice at least ten days before the cancellation is effective. If "we" cancel this policy for any other reason, "we" will give "you" notice at least 30 days in advance of cancellation. The notice will state the time that the cancellation is to take effect.

   "Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

3. **Change, Modification, or Waiver of Policy Terms** -- A waiver or change of the "terms" of this policy must be issued by "us" in writing to be valid.

4. **Inspections** -- "We" have the right, but are not obligated, to inspect "your" property and operations at any time. This inspection may be made by "us" or may be made on "our" behalf. An inspection or its resulting advice or report does not warrant that "your" property or operations are safe, healthful, or in compliance with laws, rules, or regulations. Inspections or reports are for "our" benefit only.

5. **Examination of Books and Records** -- "We" may examine and audit "your" books and records that relate to this policy during the policy period and within three years after the policy has expired.

CL 0100 03 99
Copyright, American Association of Insurance Services, 1998

AAIS                      This endorsement changes
CL 0128 01 01                  the policy
Page 1 of 1              -- PLEASE READ THIS CAREFULLY --

# AMENDATORY ENDORSEMENT
## GEORGIA

1.  Under Common Policy Conditions, Cancellation is deleted and replaced by the following:

    **Cancellation and Nonrenewal** -- "You" may cancel this policy by returning the policy to "us" or by giving "us" a written notice and stating at what future date coverage is to stop.

    "We" may cancel or not renew this policy, or one or more of its parts, by written notice sent to "you" at "your" last mailing address known to "us". If notice of cancellation is to be given to a governmental agency, mortgagee, or other third party, "we" will mail or deliver such notice not less than ten days before the cancellation is to take effect. If notice of cancellation or nonrenewal is mailed, proof of mailing will be sufficient proof of notice.

    If "we" cancel a policy that has been in effect for 60 days or less, "we" will give "you" notice at least ten days before cancellation is effective.

    If "we" cancel a policy that has been in effect for more than 60 days:

    a.  for nonpayment of premium, "we" will give "you" notice at least ten days before cancellation is effective.

    b.  for any other reason, "we" will give "you" notice at least 45 days before cancellation is effective.

If "we" decide not to renew this policy, "we" will give "you" notice at least 45 days before the expiration date of the policy.

"Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or on or before the effective date of cancellation, unless the final premium is subject to audit or rate investigation, or the premium was financed by a premium finance company. If the final premium is subject to audit or rate investigation, "we" will refund any return premium within 30 days after the conclusion of the audit or rate investigation. If the premium was financed by a premium finance company, "we" will refund any return premium to the premium finance company within ten working days after cancellation. Payment or tender of the unearned premium is not a condition of cancellation.

2.  Under Common Policy Conditions, the following condition is added:

    **Renewal** -- If "we" decide to renew this policy with an increase in premium rates of more than 15% of the expiring policy premium or with restrictions in the coverage, "we" will give "you" written notice of the changes at least 45 days prior to the effective date of the changes. When the increase in premium exceeds 15% of the expiring policy premium, the notice will indicate the dollar amount of the increase. This provision does not apply to an increase due to audit, change in risk, exposure, or experience modification.

CL 0128 01 01
Copyright, American Association of Insurance Services, 2001

AAIS
CL 0600 01 15
Page 1 of 1

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# CERTIFIED TERRORISM LOSS

1.  The following definitions are added.

    a.  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:

        1) to be an act of terrorism;
        2) to be a violent act or an act that is dangerous to human life, property, or infrastructure;
        3) to have resulted in damage:

            a) within the United States; or
            b) to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

        4) to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and
        5) to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended.

    b.  "Certified terrorism loss" means loss that results from a "certified act of terrorism".

2.  The "terms" of any terrorism exclusion that is part of or that is attached to this Coverage Part are amended by the following provision:

    This exclusion does not apply to "certified terrorism loss".

3.  The following provision is added.

    If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

4.  The following provisions are added.

    a.  Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to this Coverage Part provide coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1) exclusions that address war, military action, or nuclear hazard; or
        2) any other exclusion; and

    b.  the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this Coverage Part under:

        1) exclusions that address war, military action, or nuclear hazard; or
        2) any other exclusion.

**CL 0600 01 15**

Copyright, American Association of Insurance Services, Inc., 2015

| AAIS | This endorsement changes | POLICY NUMBER |
|---|---|---|
| CL 0605 01 15 | the policy | |
| Page 1 of 1 | -- PLEASE READ THIS CAREFULLY -- | |

# CERTIFIED TERRORISM LOSS DISCLOSURE OF PREMIUM AND FEDERAL SHARE OF INSURED LOSSES

(The entries required to complete this endorsement will be shown
below, on the "declarations", or on the "schedule of coverages".)

## SCHEDULE

Certified Terrorism Loss Premium   $ 1,467.00

Additional information, if any, concerning terrorism premium:

1.  The portion of "your" premium that is attributed to coverage for "certified terrorism loss" is shown in the Schedule above.

2.  Coverage for "certified terrorism loss", to the extent that such coverage is provided by this policy or Coverage Part, will be partially reimbursed by the United States Government, Department of Treasury under a federal program. Under that program, the United States pays the following percentage of insured losses for "certified terrorism loss" that exceeds the statutorily established deductible that "we" retain:

    a.  85%, for insured losses occurring before January 1, 2016;

    b.  84%, for insured losses occurring during the 2016 calendar year;

    c.  83%, for insured losses occurring during the 2017 calendar year;

    d.  82%, for insured losses occurring during the 2018 calendar year;

    e.  81%, for insured losses occurring during the 2019 calendar year; and

    f.  80%, for insured losses occurring on or after January 1, 2020.

    However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed one hundred billion dollars in a calendar year (January 1 through December 31), the Treasury will not make payment for any portion of the amount of such losses that exceeds one hundred billion dollars.

    If the Secretary of the Treasury determines that the aggregate amount of "certified terrorism loss" has exceeded one hundred billion dollars in a calendar year (January 1 through December 31), and "we" have met "our" insurer deductible under the Terrorism Risk Insurance Act, as amended, "we" will not pay for any portion of "certified terrorism loss" that exceeds one hundred billion dollars. If the "certified terrorism loss" exceeds one hundred billion dollars in a calendar year (January 1 through December 31), losses up to one hundred billion dollars are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury under the Terrorism Risk Insurance Act, as amended.

CL 0605 01 15

Copyright, American Association of Insurance Services, Inc., 2015

| | |
|---|---|
| **AAIS** | This endorsement changes |
| **CL 0677 01 11** | the policy |
| **Page 1 of 1** | **-- PLEASE READ THIS CAREFULLY --** |

# HOW MUCH WE PAY
## NO COVERAGE FOR DIMINISHED VALUE

### HOW MUCH WE PAY

Under How Much We Pay, the Loss Settlement Terms are amended to include the following provision.

**No Coverage For Diminished Value** -- Regardless of the method used to determine the amount under Valuation or under Valuation Of Property Losses, "we" do not pay for any loss in market value as a result of repairing, replacing, or rebuilding the covered property.

**CL 0677 01 11**

Copyright, American Association of Insurance Services, Inc., 2010

AAIS
CL 0700 10 06
Page 1 of 1

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# VIRUS OR BACTERIA EXCLUSION

## DEFINITIONS

### Definitions Amended --

When "fungus" is a defined "term", the definition of "fungus" is amended to delete reference to a bacterium.

When "fungus or related perils" is a defined "term", the definition of "fungus or related perils" is amended to delete reference to a bacterium.

## PERILS EXCLUDED

The additional exclusion set forth below applies to all coverages, coverage extensions, supplemental coverages, optional coverages, and endorsements that are provided by the policy to which this endorsement is attached, including, but not limited to, those that provide coverage for property, earnings, extra expense, or interruption by civil authority.

1. The following exclusion is added under Perils Excluded, item 1.:

   **Virus or Bacteria --**

   "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

   a. any contamination by any virus, bacterium, or other microorganism; or

   b. any denial of access to property because of any virus, bacterium, or other microorganism.

2. **Superseded Exclusions** -- The Virus or Bacteria exclusion set forth by this endorsement supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

## OTHER CONDITIONS

### Other Terms Remain in Effect --

The "terms" of this endorsement, whether or not applicable to any loss, cost, or expense, cannot be construed to provide coverage for a loss, cost, or expense that would otherwise be excluded under the policy to which this endorsement is attached.

CL 0700 10 06

Copyright, American Association of Insurance Services, Inc., 2006

AAIS                        This endorsement changes
CO 0408 06 13                   the policy
Page 1 of 1            -- PLEASE READ THIS CAREFULLY --

# AMENDATORY ENDORSEMENT
## GEORGIA

1. Under Perils Excluded, Criminal, Fraudulent, Dishonest, or Illegal Acts, item 2.e. of the Property Coverage Part and items 2.a. of the Crime Coverage Parts, if applicable, are amended to include the following:

   However, if the loss is caused by an intentional act of an insured against whom a family violence complaint is brought for the act causing this loss, this exclusion will not apply to an otherwise covered loss suffered by another insured who did not cooperate with or contribute to the act that caused the loss.

   Subject to all other "terms" of this policy, "our" payment to an insured who did not cooperate in or contribute to the act that caused the loss may be limited to that person's insurable interest in the property, less any payment made to a mortgagee or other party with a legal secured interest in the property. "We" retain all rights set forth in the Subrogation condition of this policy with regard to action against the perpetrator of the act that caused the loss.

2. Under Other Conditions, Misrepresentation, Concealment, or Fraud is deleted and replaced by the following:

   **Misrepresentation, Concealment, Or Fraud** — "We" do not provide coverage for "you" or any other insured if, before or after a loss:

   a. "you" or any other insured have willfully concealed or misrepresented:

      1) a material fact or circumstance that relates to this insurance or the subject thereof; or
      2) "your" interest herein; or

   b. there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

CO 0408 06 13

Copyright, American Association of Insurance Services, Inc., 2013

AAIS
CO 1000 10 02
Page 1 of 31

# COMMERCIAL OUTPUT PROGRAM
# PROPERTY COVERAGE PART

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Commercial Output Program. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

Endorsements and schedules may also apply. They are identified on the "schedule of coverages".

Refer to Definitions for words and phrases that have special meaning. These words and phrases are shown in quotation marks or bold type.

## DEFINITIONS

1.  The words "you" and "your" mean the persons or organizations named as the insured on the "schedule of coverages".

2.  The words "we", "us", and "our" mean the company providing this coverage.

3.  "Accident" means direct physical loss as follows:

    a.  mechanical breakdown;

    b.  rupturing or bursting of moving parts of machinery caused by centrifugal force;

    c.  loss caused by arcing or electrical currents other than lightning;

    d.  explosion of steam boilers, steam pipes, steam turbines, or steam engines that "you" own or lease or that are operated under "your" control;

    e.  loss to steam boilers, steam pipes, steam turbines, or steam engines caused by any condition or occurrence within such equipment; or

    f.  loss to hot water boilers or heaters caused by any condition or occurrence within such equipment.

4.  "Business" means the usual business operations occurring at "covered locations" including the tenantability of "covered locations" when the selected coverage option includes "rents".

5.  "Computers" means:

    a.  "hardware" owned by "you" or in "your" care, custody, or control; or

    b.  "software".

6.  "Computer hacking" means an unauthorized intrusion by an individual or group of individuals, whether employed by "you" or not, into a "computer", a Web site, or a "computer" network and that results in but is not limited to:

    a.  deletion, destruction, generation, or modification of "software";

    b.  alteration, contamination, corruption, degradation, or destruction of the integrity, quality, or performance of "software";

    c.  observation, scanning, or copying of "data records", "programs and applications", and "proprietary programs";

Copyright, American Association of Insurance Services, Inc., 2002

d. damage, destruction, inadequacy, malfunction, degradation, or corruption of any "hardware" or "media" used with "hardware"; or

e. denial of access to or denial of services from "computers", "computer" network, or Web site including related "software".

7. "Computer virus" means the introduction into a "computer", "computer" network, or Web site of any malicious, self-replicating electronic data processing code or other code and that is intended to result in, but is not limited to:

a. deletion, destruction, generation, or modification of "software";

b. alteration, contamination, corruption, degradation, or destruction of the integrity, quality, or performance of "software";

c. damage, destruction, inadequacy, malfunction, degradation, or corruption of any "hardware" or "media" used with "hardware"; or

d. denial of access to or denial of services from "computers", "computer" network, or Web site including related "software".

8. "Covered equipment", unless otherwise specified in a schedule, means equipment:

a. that generates, transmits, or utilizes energy; or

b. which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

Such equipment must be covered property, except as specifically provided for under Utility Service Interruption coverage and the Spoilage Coverage Part.

"Covered equipment" does not mean:

a. equipment manufactured by "you" for sale;

b. buildings, structures, or compartments that cover or house "covered equipment";

c. foundations that support "covered equipment";

d. sewage and other underground piping and vessels, water piping, or sprinkler system piping. However, "we" cover:

1) boiler feedwater and condensate return piping; and
2) water piping for heating, air conditioning, or refrigeration systems;

e. "mobile equipment", including but not limited to draglines or other excavation equipment;

f. aircraft or watercraft and their motors, equipment, and accessories;

g. automobiles, motor trucks, tractors, trailers, and similar conveyances and their motors, equipment, and accessories. However, any property that is stationary, permanently installed at a "covered location", and receives electrical power from an external power supplier will not be considered an automobile, motor truck, tractor, or trailer; or

h. "computers".

9. "Covered location" means any location or premises where "you" have buildings, structures, or business personal property covered under this coverage.

However, if the Scheduled Locations Endorsement is added to this policy, "covered location" means a location that is described on the Location Schedule.

"Covered location" does not mean vehicles containing covered property, except vehicles on or within 1,000 feet of the premises of any covered building or structure.

Copyright, American Association of Insurance Services, Inc., 2002

10. "Data records" means files, documents, and information in an electronic format and that are stored on "media".

11. "Dependent locations" means locations that are operated by others and that "your" "business" depends on, as described below. Dependent locations includes but is not limited to:

   a. contributing locations, these are "your" suppliers' locations or locations of suppliers that deliver services or materials to others for "your" account. Contributing locations do not include suppliers of:

      1) water;
      2) telecommunications, including but not limited to Internet service providers; or
      3) power;

   b. recipient locations, these are locations that receive "your" products;

   c. leader locations, these are locations that attract customers to "your" "business"; or

   d. manufacturing locations, these are locations that make products for delivery to "your" customers under contract of sale.

12. "Fine arts" means bona fide works of art of rarity, historical value, or artistic merit, including but not limited to paintings, etchings, pictures, tapestries, and art glass windows.

13. "Flood" means flood, surface water, waves, tidal water, or the overflow of a body of water, all whether driven by wind or not. This includes spray that results from any of these whether driven by wind or not.

14. "Hardware" means a network of electronic machine components (microprocessors) capable of accepting instructions and information, processing the information according to the instructions, and producing desired results. "Hardware" includes but not limited to:

   a. mainframe and mid-range computers and servers;

   b. personal computers and workstations;

   c. laptops, palmtops, notebook PCs, other portable computer devices and accessories including, but not limited to, multimedia projectors; and

   d. peripheral data processing equipment, including but not limited to, printers, keyboards, monitors, and modems.

15. "Limit" means the amount of coverage that applies.

16. "Media" means an instrument that is used with "hardware" and on which "data records", "programs and applications", and proprietary programs can be recorded or stored. "Media" includes, but is not limited to, films, tapes, cards, discs, drums, cartridges, cells, DVDs, or CD-ROMs.

17. "Mobile equipment" means:

   a. contractors' equipment or similar equipment of a mobile or floating nature;

   b. self-propelled vehicles designed and used primarily to carry mounted equipment; or

   c. vehicles designed for highway use that are unlicensed and not operated on public roads.

18. "Money" means currency, bullion, coins, bank notes in current use, and traveler's checks, register checks, and money orders held for sale to the public.

19. "Off-site server" means a server for "your" Web site that is being maintained or operated by and that is located at the premises of:

   a. an independent contractor acting as "your" Web host; or

   b. "your" Internet service provider that is acting as "your" Web host.

Copyright, American Association of Insurance Services, Inc., 2002

20. "One accident" means:

When an initial "accident" causes or results in other "accidents", all of the "accidents" will be considered "one accident". All "accidents" that are the result of the same occurrence will be considered "one accident".

21. "Perishable stock" means personal property preserved and maintained under controlled conditions and susceptible to loss or damage if the controlled conditions change.

22. "Pollutant" means:

a. any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including but not limited to acids, alkalis, chemicals, fumes, smoke, soot, vapor, and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of; and

b. electrical or magnetic emissions, whether visible or invisible, and sound emissions.

23. "Programs and applications" means operating programs and applications that "you" purchase and that are:

a. stored on "media"; or

b. pre-installed and stored in "hardware".

Applications includes, but is not limited to, programs for word processing, spreadsheet calculations, and graphic design.

24. "Proprietary programs" means proprietary operating programs and applications that "you" developed or that "you" had developed specifically for "you" and that are:

a. stored on "media"; or

b. installed and stored in "hardware".

25. "Rents" means "your" actual loss of:

a. rental income from a "covered location" as furnished or equipped by "you", less any expenses that do not continue;

b. the fair rental value of any part of a "covered location" that "you" occupy, less any expenses that do not continue; and

c. other charges for which a tenant is legally obligated and which "you" would otherwise be obligated.

26. "Restoration period" means:

a. The time it should reasonably take to resume "your" "business" to a similar level of service starting from the date of a physical loss of or damage to property at a "covered location" that is caused by a covered peril and ending on the date:

1) the property should be rebuilt, repaired, or replaced; or

2) business is resumed at a new permanent location.

This is not limited by the expiration date of the policy.

b. The "restoration period" also means the increased time required to comply with the enforcement of any ordinance, law, or decree that:

1) regulates the construction, use, or repair of any property; or

2) requires the demolition of any property, in part or in whole, not damaged by a covered peril.

However, except as provided under Supplemental Income Coverage, Pollutant Cleanup and Removal, "we" do not cover the costs associated with the enforcement of any ordinance, law, or decree that requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants".

The ordinance, law, or decree must be in force at the time of loss.

Copyright, American Association of Insurance Services, Inc., 2002

c. Only as regards coverage described under Dependent Locations in the Supplemental Income Coverages, "restoration period" also means the time it should reasonably take to resume "your" "business" starting from the date of direct physical loss of or damage to a "dependent location" caused by a covered peril, and ending on the date:

1) the property at the "dependent location" should be rebuilt, repaired, or replaced; or
2) business is resumed at a new, permanent location.

This is not limited by the expiration date of the policy.

d. Only as regards coverage described under Off Premises Utility Service Interruption; and Property In Transit, On Exhibition, or In the Custody Of Sales Representatives in the Supplemental Income Coverages, "restoration period" also means the time it should reasonably take to resume "your" "business" starting from the date of direct physical loss of or damage caused by a covered peril to:

1) property not located at a "covered location" and that is owned by a utility, a landlord, or another utility supplier;
2) the "off-site server" for "your" Web site or the location that houses the "off-site server" for "your" Web site; or
3) property in transit, on exhibition, or in the custody of sales representatives;

and ending on the date the property should be rebuilt, repaired, or replaced. This is not limited by the expiration date of the policy.

27. "Schedule of coverages" means:

a. all pages labeled schedule of coverages or schedules which pertain to this coverage; and

b. declarations or supplemental declarations which pertain to this coverage.

28. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or other property. This includes, but is not limited to, stock certificates; tokens, tickets, revenue, or stamps (whether represented by actual stamps or unused value in a meter) in current use; and evidences of debt used in connection with charge, credit, or debit cards that are not issued by "you", but does not include "money".

29. "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the covered property into subterranean voids created by the action of water on a limestone or similar rock formation. It does not include the value of the land or the cost of filling sinkholes.

30. "Software" means:

a. "media";

b. "data records";

c. "programs and applications"; and

d. "proprietary programs".

31. "Specified perils" means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

Falling objects does not include loss to:

a. business personal property in the open; or

b. to the interior of buildings or structures, or business personal property inside buildings or structures unless the exterior of the roof or walls are first damaged by a falling object.

Copyright, American Association of Insurance Services, Inc., 2002

Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.

32. "Spoilage" means any detrimental change in physical state of "perishable stock". Detrimental change includes, but is not limited to, thawing of frozen goods, warming of refrigerated goods, solidification of liquid or molten material, chemical reactions to material in process, and reduction in value of time sensitive materials.

33. "Terms" are all provisions, limitations, exclusions, conditions, and definitions that apply.

34. "Theft" means any act of stealing, including burglary or robbery.

35. "Valuable papers" means documents, manuscripts, or records that are inscribed, printed, or written. This includes, but is not limited to, abstracts, books, deeds, drawings, films, maps, or mortgages.

36. "Volcanic action" means airborne volcanic blast or airborne shock waves; ash, dust, or particulate matter; or lava flow. It does not include the cost to remove ash, dust, or particulate matter that does not cause direct physical loss to the covered property.

## PROPERTY COVERED

"We" cover the following property unless the property is excluded or subject to limitations.

"We" cover direct physical loss to covered property at a "covered location" caused by a covered peril.

### BUILDING PROPERTY

1. **Covered Building Property** -- Covered Building Property means buildings and structures and:

a. completed additions;

b. fixtures, machinery, and equipment which are a permanent part of a covered building or structure;

c. outdoor fixtures;

d. personal property owned by "you" and used to maintain or service a covered building or structure or its premises. This includes air-conditioning equipment; fire extinguishing apparatus; floor coverings; and appliances for refrigerating, cooking, dish washing, and laundering;

e. if not covered by other insurance, buildings and additions to buildings under construction, alteration, and repair including:

1) materials, equipment, supplies, and temporary structures, on or within 1,000 feet of a "covered location", intended and designated for use in the construction, alteration, and repair of buildings or additions to buildings; and

2) "your" contractual liability for the interest of contractors and sub-contractors in buildings and additions to buildings under construction, alteration, and repair such as materials, equipment, supplies, and temporary structures, on or within 1,000 feet of a "covered location", intended and designated for use in the construction, alteration, and repair of buildings or additions to buildings;

f. building glass;

g. the following property if it is located on or within 1,000 feet of a covered building or structure:

1) radio and television towers, antennas, satellite dishes, masts, lead-in wiring, and guy wires. This includes foundations and any other property that is permanently attached to any of these types of property;

Copyright, American Association of Insurance Services, Inc., 2002

2) awnings or canopies; and
3) fences;

h. signs, whether or not they are attached to covered buildings, or structures; or

i. foundations of buildings, structures, machinery, or boilers.

2. **Building Property That Is Not Covered --** Except as provided under Supplemental Coverages - Underground Pipes, Pilings, Bridges and Roadways, Covered Building Property does not include:

a. pilings, piers, wharves, docks, or retaining walls;

b. underground pipes, flues, or drains; and

c. bridges, walkways, roadways, and other paved surfaces.

## BUSINESS PERSONAL PROPERTY

1. **Covered Business Personal Property --** Covered business personal property means "your" business personal property in buildings or structures at a "covered location" or in the open (or in vehicles) on or within 1,000 feet of a "covered location". This includes:

a. "your" use interest as a tenant in improvements to the buildings or structures. Improvements are fixtures, alterations, installations, or additions:

1) to a building or structure "you" occupy but do not own; and
2) made or acquired at "your" expense and which cannot be legally removed by "you".

"We" also cover "your" interest as a tenant in undamaged improvements that "you" lose because "your" lease has been canceled by the lessor as a result of damage to the building or structure "you" occupy but do not own. The damage to the building must be caused by a covered peril;

b. leased personal property which "you" have a contractual responsibility to insure;

c. "your" interest in personal property of others to the extent of "your" labor, material, and services;

d. "computers", if not covered by other insurance;

e. personal property which will become a part of "your" installation, fabrication, or erection project while:

1) at the site of installation, fabrication, or erection; or
2) while in temporary storage awaiting installation, fabrication, or erection.

Coverage under this provision is not restricted to buildings or structures at a "covered location" or within 1,000 feet of a "covered location";

f. "mobile equipment", if not covered by other insurance. Coverage under this provision is not restricted to buildings or structures at a "covered location" or within 1,000 feet of a "covered location"; and

g. personal property of others. This means personal property of others that is in "your" care, custody, or control.

Personal property of others includes property that is sold under an installation agreement where "your" responsibility continues until the property is accepted by the buyer.

"Our" payment for loss to personal property of others will only be for the benefit of the owners of the personal property.

2. **Business Personal Property That Is Not Covered --** Covered business personal property does not include:

a. "off-site server"; and

Copyright, American Association of Insurance Services, Inc., 2002

b.  except as provided under Supplemental Marine Coverages;

   1)  personal property in transit as described under Property In Transit;
   2)  "fine arts" as described under Fine Arts;
   3)  "computers" while away from a "covered location" as described under Off Premises Computers;
   4)  property while temporarily on display or exhibit as described under Property On Exhibition;
   5)  samples of "your" stock as described under Sales Representative Samples; and
   6)  duplicate or back-up "software" as described under Software Storage.

## PROPERTY NOT COVERED

1.  **Airborne or Waterborne Property --** "We" do not cover airborne or waterborne personal property unless the property is being transported by regularly scheduled airlines or ferry service.

2.  **Aircraft or Watercraft --** "We" do not cover aircraft or watercraft (and their motors, equipment, and accessories) that are operated principally away from a "covered location". However, "we" do cover:

    a.  aircraft or watercraft (and their motors, equipment, and accessories) that "you" manufacture, process, warehouse, or hold for sale; and

    b.  rowboats or canoes out of water at a "covered location".

3.  **Animals --** "We" do not cover animals, including but not limited to birds and fish, unless owned by others and boarded by "you". "We" do cover animals "you" own and hold for sale while inside of buildings.

4.  **Automobiles and Vehicles --** "We" do not cover automobiles, motor trucks, tractors, trailers, and similar conveyances designed and used for over-the-road transportation of people or cargo.

    "We" do cover:

    a.  "mobile equipment" described under Business Personal Property; and

    b.  automobiles and vehicles that "you" manufacture, process, or warehouse. However, "we" do not cover automobiles or vehicles held for sale, lease, loan or rental.

5.  **Checked Luggage --** "We" do not cover loss resulting from "theft" or disappearance of a laptop, palmtop, notebook PC, or any portable "computer" while in transit as checked luggage.

6.  **Contraband --** "We" do not cover contraband or property in the course of illegal transportation or trade.

7.  **Cost of Excavation --** "We" do not cover the cost of excavations, grading, filling, or backfilling. However, if a covered loss occurs to covered property below the surface of the ground, "we" cover costs that are a necessary part of the repairing, rebuilding, or replacement of the property.

8.  **Crops While Outside of Buildings --** "We" do not cover grain, hay, straw, or other crops while outside of buildings.

9.  **Exports and Imports --** "We" do not cover exported or imported property that is covered under any ocean marine cargo insurance policy or any similar policy that anyone has obtained covering exports and imports.

10. **Land, Water, and Growing Crops --** "We" do not cover:

    a.  land, including but not limited to land on which the covered property is located;

Copyright, American Association of Insurance Services, Inc., 2002

b.   underground or surface water; or

c.   growing crops.

11.  **Money, Securities, Accounts, and Valuable Papers** -- Except as provided elsewhere in this policy, "we" do not cover "money", "securities", accounts, bills, and the cost to reproduce, replace, or restore "valuable papers" and lost information.

12.  **Outdoor Trees, Shrubs, Plants, or Lawns** -- Except as provided under Supplemental Coverages - Trees, Shrubs, and Plants, "we" do not cover trees, shrubs, plants, or lawns (other than stock).

13.  **Property More Specifically Insured** -- "We" do not cover property which is more specifically insured in whole or in part by any other insurance. "We" do cover the amount in excess of the amount due from the more specific insurance whether "you" can collect on it or not.

14.  **Property of Others** -- "We" do not cover property of others for which "you" are responsible as:

a.   a carrier for hire; or

b.   an arranger of transportation. This includes carloaders, consolidators, brokers, freight forwarders, or shipping associations.

15.  **Property You Have Sold** -- "We" do not cover property that "you" have sold after it has been delivered. This does not include property which "you" have sold under an installation agreement.

## COVERAGE EXTENSIONS

The following Coverage Extensions indicate an applicable "limit". This "limit" may also be shown in the "schedule of coverages". If a different "limit" is indicated in the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Coverage Extension, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, the coverages provided below are part of and not in addition to the applicable "limit" for coverage described under Property Covered.

The "limit" provided under a Coverage Extension cannot be combined or added to the "limit" for any other Coverage Extension or Supplemental Coverage including a Coverage Extension or Supplemental Coverage that is added to this policy by endorsement.

The following coverage extensions are not subject to and not considered in applying coinsurance when coinsurance conditions are added to this coverage.

1.   **Consequential Loss** -- "We" pay for "your" consequential loss of undamaged business personal property. Consequential loss means the loss of value of an undamaged part or parts of a product which becomes unmarketable. It must be unmarketable due to a physical loss to another part or parts of the product caused by a covered peril.

2.   **Debris Removal** -- "We" pay the cost to remove the debris of covered property that is caused by a covered peril. This coverage does not include costs to:

a.   extract "pollutants" from land or water; or

b.   remove, restore, or replace polluted land or water.

"We" do not pay any more under this coverage than 25% of the amount "we" pay for the direct physical loss. "We" will not pay more for loss to property and debris removal combined than the "limit" for the damaged property.

Copyright, American Association of Insurance Services, Inc., 2002

However, "we" pay up to an additional $50,000 for debris removal expense when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or when the loss to property and debris removal combined exceeds the "limit" for the damaged property.

"We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss to covered property.

3. **Emergency Removal** -- "We" pay for any direct physical loss to covered property while it is being moved or being stored to prevent a loss caused by a covered peril. This coverage applies for up to 365 days after the property is first moved, but does not extend past the date on which this policy expires.

4. **Emergency Removal Expenses** -- "We" pay up to $5,000 for "your" expenses to move or store covered property to prevent a loss caused by a covered peril. This coverage applies for up to 365 days after the property is first moved, but does not extend past the date on which this policy expires.

The "limit" for Emergency Removal Expenses is separate from, and not part of, the applicable "limit" for coverage described under Property Covered.

5. **Fraud and Deceit** -- "We" pay up to $5,000 for "theft" of covered property when "you", "your" agents, customers, or consignees are fraudulently induced to part with the covered property:

a. to persons who falsely represent themselves as the proper persons to receive the property; or

b. by the acceptance of fraudulent bills of lading or shipping receipts.

6. **Damage From Theft** -- "We" cover direct physical damage caused by "theft" or attempted "theft" to:

a. a building that "you" do not own and that contains "your" business personal property; or

b. personal property not owned by "you" within such building and that is used to maintain or service the building or structure or its premises.

This coverage extension only applies to a location where "you" are a tenant and the terms of "your" lease make "you" liable for damage caused by "theft" or attempted "theft".

7. **Off Premises Utility Service Interruption**

a. **Coverage** -- "We" cover direct physical loss or damage caused by the interruption of an off premises utility service when the interruption:

1) results in the direct physical loss or damage to covered property located at a "covered location"; and

2) is a result of direct physical loss or damage by a covered peril to property that is not located at a "covered location" and that is owned by a utility, a landlord, or another supplier who provides "you" with:

a) power or gas;

b) telecommunications, including but not limited to Internet access; or

c) water, including but not limited to waste water treatment.

Copyright, American Association of Insurance Services, Inc., 2002

b. **Overhead Transmission Lines** -- If the "schedule of coverages" indicates that overhead transmission lines are excluded, coverage under this extension does not include loss to overhead transmission lines that deliver utility service to "you". Overhead transmission lines include, but are not limited to:

   1) overhead transmission and distribution lines;
   2) overhead transformers and similar equipment; and
   3) supporting poles and towers.

c. **Perishable Stock Exclusion** -- Coverage under this extension does not include loss of "perishable stock" due to "spoilage" that results from:

   1) complete or partial lack of electrical power; or
   2) fluctuation of electrical current.

d. **Applicable Limit** -- The most "we" pay in any one occurrence under this Coverage Extension is $50,000.

## SUPPLEMENTAL COVERAGES

The following Supplemental Coverages indicate an applicable "limit". This "limit" may also be shown in the "schedule of coverages". If a different "limit" is indicated in the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered. The "limit" available for coverage described under a Supplemental Coverage:

a. is the only "limit" available for the described coverage; and

b. is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Coverage cannot be combined or added to the "limit" for any other Supplemental Coverage or Coverage Extension including a Supplemental Coverage or Coverage Extension that is added to this policy by endorsement.

Unless otherwise stated, each supplemental coverage:

a. applies to covered property in or on buildings or structures at a "covered location" or in the open (or in vehicles) within 1,000 feet of a "covered location"; and

b. is not subject to and not considered in applying coinsurance when coinsurance conditions are added to this coverage.

1. **Brands or Labels Expense** -- If covered business personal property is damaged and the damage is caused by a covered peril, "we" have the option to take all or any part of the damaged business personal property at the agreed or appraised value. "You" may stamp salvage or remove any brands or labels from the property or its containers. "You" must not damage the property or containers when "you" remove the brands or labels. "You" must re-label the merchandise or its containers if required by law.

   The most "we" pay in any one occurrence for "your" expenses for stamping or removing brands or labels is $50,000.

Copyright, American Association of Insurance Services, Inc., 2002

2. **Expediting Expenses** -- When a covered peril occurs to covered property, "we" pay for reasonable expenses necessary to expedite permanent repairs or replacement and make temporary repairs to damaged covered property. Expediting expenses include additional labor or overtime, and transportation costs.

   The most "we" pay for all expediting expenses in any one occurrence is $50,000.

3. **Fire Department Service Charges** -- "We" pay up to $25,000 to cover "your" liability, assumed by contract or agreement prior to the loss, for fire department service charges.

   This coverage is limited to charges incurred when the fire department is called to save or protect covered property from a covered peril.

   No deductible applies.

4. **Inventory and Appraisal Expense** -- "We" pay up to $50,000 for reasonable expenses, for the taking of inventory and appraisals, incurred by "you" at "our" request to assist "us" in the determination of the amount of a loss caused by a covered peril.

   "We" do not pay for:

   a. any expenses incurred under the Other Conditions, Appraisal section of this coverage; or

   b. any public adjusters' fees or attorneys' fees.

5. **Ordinance or Law (Undamaged Parts of a Building)** -- When a covered peril occurs to a covered building or structure, "we" pay for the value of undamaged parts of a covered building or structure that is required to be demolished as a result of the enforcement of any ordinance, law, or decree that:

   a. requires the demolition of undamaged parts of a covered building or structure that is damaged or destroyed by a covered peril;

   b. regulates the construction or repair of a building or structure, or establishes building, zoning, or land use requirements at a "covered location"; and

   c. is in force at the time of loss.

   "We" do not cover the costs associated with the enforcement of any ordinance, law, or decree that requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants".

   This coverage is part of and not in addition to the applicable "limit" for coverage described under Property Covered.

6. **Ordinance or Law (Increased Cost to Repair and Cost to Demolish and Clear Site)** --

   a. **Increased Cost to Repair** -- When a covered peril occurs to a covered building or structure, "we" cover the:

      1) increased cost to repair, rebuild, or reconstruct damaged portions of a covered building or structure; and

      2) increased cost to repair, rebuild, or reconstruct undamaged portions of a covered building or structure whether or not those undamaged portions need to be demolished;

      as a result of the enforcement of building, zoning, or land use ordinance, law, or decree and is in force at the time when a covered peril occurs to a covered building or structure.

      If a covered building or structure is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by building, zoning, or land use ordinance, law, or decree.

Copyright, American Association of Insurance Services, Inc., 2002

"We" do not cover the increased cost of construction until the covered building or structure is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss, not to exceed two years.

b.   **Cost to Demolish and Clear Site --** "We" cover the cost to demolish and clear the site of undamaged parts of the covered building or structure that is damaged or destroyed by a covered peril. The demolition must be a result of the enforcement of a building, zoning, or land use ordinance, law, or decree that is in force at the time when a covered peril occurs to a covered building or structure.

c.   **We Do Not Cover --** "We" do not cover the costs associated with the enforcement of any ordinance, law, or decree that:

1)   requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants"; or

2)   "you" were required to comply with before the covered peril occurred to a covered building or structure, even if the building or structure was undamaged and "you" failed to comply with the ordinance, law, or decree.

d.   **What We Pay If The Building Is Repaired or Replaced --** If the covered building or structure is repaired or replaced, "we" pay the lesser of:

1)   the amount "you" actually spend to demolish and clear the site, plus the actual increased cost to repair, rebuild, or construct the property but not for more than a building or structure of the same height, floor area, and style; or

2)   $100,000.

e.   **What We Pay If The Building Is Not Repaired or Replaced --** If the covered building or structure is not repaired or replaced, "we" pay the lesser of:

1)   the amount "you" actually spend to demolish and clear the site; plus the cost "you" would have incurred to replace the damaged or destroyed property with other property:

a)   of like kind, and quality;

b)   of the same height, floor area, and style; and

c)   used for the same purpose; or

2)   $100,000.

7.   **Personal Effects --** "We" cover direct physical loss caused by a covered peril to personal effects owned by "you", "your" officers, "your" partners, or "your" employees.

The most "we" pay for loss to personal effects in any one occurrence or at any one "covered location" is $15,000.

8.   **Pollutant Cleanup and Removal --** "We" pay "your" expense to extract "pollutants" from land or water if their discharge, dispersal, seepage, migration, release, or escape of the "pollutants" is caused by a covered peril that occurs during the policy period. The expenses are paid only if they are reported to "us" in writing within 180 days from the date the covered peril occurs.

"We" do not pay the cost of testing, evaluating, observing, or recording the existence, level, or effects of "pollutants". However, "we" pay the cost of testing which is necessary for the extraction of "pollutants" from land or water.

The most "we" pay for each site or "covered location" is $50,000 for the sum of all such expenses arising out of a covered peril occurring during each separate 12 month period of this policy.

Copyright, American Association of Insurance Services, Inc., 2002

9. **Recharge of Fire Extinguishing Equipment** -- "We" pay up to $50,000 to cover "your" incurred expenses to recharge "your" automatic fire extinguishing equipment or hand held fire extinguishing equipment when the equipment is discharged:

   a. to fight a fire;

   b. as a result of a covered peril; or

   c. as a result of an accidental discharge.

   However, "we" do not pay for "your" expenses to recharge equipment as a result of a discharge during testing or installation.

   If it is less expensive to do so, "we" will pay "your" costs to replace "your" automatic fire extinguishing equipment or hand held fire extinguishing equipment rather than recharge the equipment.

10. **Rewards** -- "We" pay up to $10,000 as a reward for information that leads to a conviction for arson, "theft", or vandalism. The conviction must involve a covered loss caused by arson, "theft", or vandalism.

    The amount "we" pay is not increased by the number of persons involved in providing the information.

11. **Sewer Backup and Water Below the Surface** -- "We" cover direct physical loss caused by:

    a. water that backs up through a sewer or drain; or

    b. water below the surface of the ground, including but not limited to water that exerts pressure on or flows, seeps, or leaks through or into a covered building or structure, sidewalk, driveway, foundation, swimming pool, or other structure.

The most "we" pay for loss caused by sewer backup and water below the surface in any one occurrence is $25,000.

12. **Trees, Shrubs, and Plants** -- "We" cover direct physical loss (and debris removal expenses) to outdoor trees, shrubs, plants, and lawns at a "covered location". "We" only cover loss caused by:

    a. fire;

    b. lightning;

    c. explosion;

    d. riot or civil commotion;

    e. falling objects; or

    f. vandalism.

    The most "we" pay for loss to trees, shrubs, and plants in any one occurrence is $50,000.

    Coverage under this supplemental coverage does not apply to property held for sale by "you".

13. **Underground Pipes, Pilings, Bridges, and Roadways** -- "We" cover direct physical loss caused by a covered peril to:

    a. pilings, piers, wharves, docks, or retaining walls;

    b. underground pipes, flues, or drains; and

    c. bridges, walkways, roadways, and other paved surfaces.

    The most "we" pay under this Supplemental Coverage in any one occurrence or at any one "covered location" is $250,000.

Copyright, American Association of Insurance Services, Inc., 2002

# SUPPLEMENTAL MARINE COVERAGES

The following Supplemental Marine Coverages indicate an applicable "limit". This "limit" may also be shown in the "schedule of coverages". If a different "limit" is indicated in the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for a Supplemental Marine Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for a Supplemental Marine Coverage provided below is separate from, and not part of the applicable "limit" for coverage described under Property Covered. The "limit" available for coverage described under a Supplemental Marine Coverage:

a.  is the only "limit" available for the described coverage; and

b.  is not the sum of the "limit" indicated for a Supplemental Marine Coverage and the "limit" for coverage described under Property Covered.

The "limit" provided under a Supplemental Marine Coverage cannot be combined or added to the "limit" for any other Supplemental Marine Coverage, Supplemental Coverage, or Coverage Extension including a Supplemental Marine Coverage, Supplemental Coverage, or Coverage Extension that is added to this policy by endorsement.

The following supplemental marine coverages are not subject to and not considered in applying coinsurance when coinsurance conditions are added to this coverage.

1.  **Accounts Receivable** -- "We" pay up to $50,000 to cover losses and expenses that "you" incur as a result of a direct physical loss caused by a covered peril to "your" records of accounts receivable.

    Losses and expenses under this coverage means:

    a.  all sums due "you" from customers, provided "you" are unable to effect collection;

    b.  interest charges on any loan used to offset impaired collections pending "our" payment of such sums;

    c.  collection expenses in excess of normal collection costs made necessary because of loss or damage; and

    d.  other reasonable expenses incurred by "you" in recreating records of accounts receivable following such loss or damage.

2.  **Electrical or Magnetic Disturbance of Computers** -- "We" cover direct physical loss to "computers" caused by electrical or magnetic disturbance that results in electrical or magnetic damage to "computers" and damage to, disturbance of, or erasure of electronic records.

    This coverage is part of and not in addition to the applicable "limit" for coverage described under Property Covered.

3.  **Power Supply Disturbance of Computers** -- "We" cover direct physical loss to "computers" caused by power supply disturbance such as interruption of power supply, power surge, blackout, or brownout.

    This coverage is part of and not in addition to the applicable "limit" for coverage described under Property Covered.

Copyright, American Association of Insurance Services, Inc., 2002

4. **Virus and Hacking Coverage** -- "We" cover direct physical loss to covered "computers", "your" "computer" network and "your" Web site caused by a "computer virus" or by "computer hacking". However, "we" do not cover:

   a. loss of exclusive use of any "data records" or "proprietary programs" that have been copied, scanned, or altered;

   b. loss of or reduction in economic or market value of any "data records" or "proprietary programs" that have been copied, scanned, or altered;

   c. theft from "your" "data records" or "proprietary programs" of confidential information through the observation of the "data records" or "proprietary programs" by accessing covered "computers", "your" computer network, or "your" Web site without any alteration or other physical loss or damage to the records or programs.

      Confidential information includes, but is not limited to, customer information, processing methods, or trade secrets; and

   d. except as provided under the Supplemental Income Coverages section of the Commercial Output Program - Income Coverage Part (if attached to this policy), denial of access to or services from "computers", "your" "computer" network, or "your" Web site.

   The most "we" pay in any one occurrence under this Supplemental Marine Coverage is $25,000.

   The most "we" pay for all covered losses under this Supplemental Marine Coverage during each separate 12-month period of this policy is $50,000.

5. **Fine Arts** -- "We" cover direct physical loss caused by a covered peril to "your" "fine arts" at a "covered location". "We" also cover "your" "fine arts" while:

   a. temporarily on display or exhibit away from a "covered location"; or

   b. in transit between a "covered location" and a location where the "fine arts" will be temporarily on display or exhibit.

   The most "we" pay for loss to "fine arts" in any one occurrence or at any one "covered location" is $100,000.

6. **Off Premises Computers** -- "We" cover direct physical loss caused by a covered peril to "computers" in the custody of "you", "your" officers, "your" partners, or "your" employees, while:

   a. away from a "covered location"; or

   b. in transit between a "covered location" and "you", "your" officers, "your" partners, or "your" employees.

   The most "we" pay in any one occurrence for loss to off premises "computers" is $25,000.

7. **Property on Exhibition** -- "We" cover direct physical loss caused by a covered peril to business personal property while temporarily on display or exhibit at locations "you" do not regularly occupy.

   The most "we" pay in any one occurrence for loss to property on exhibition is $50,000.

8. **Property in Transit** -- "We" cover direct physical loss caused by a covered peril to business personal property while in transit, regardless if the loss involves one or more vehicles, conveyances, containers, trailers, or any combination of these.

Copyright, American Association of Insurance Services, Inc., 2002

a. **Property You Have Sold** -- "We" also cover direct physical loss caused by a covered peril to business personal property that "you" have sold and are shipping at the owner's risk. "We" only pay for loss to business personal property that "you" have sold when the shipment has been rejected by the owner because:

  1) the property is damaged; and
  2) the owner of the property has refused to pay "you".

b. **Rejected Shipments** -- "We" also cover direct physical loss caused by a covered peril to rejected shipments while in due course of transit back to "you" or while awaiting return shipment to "you".

c. **Bills of Lading** -- "You" may accept bills of lading or shipping receipts issued by carriers for hire that limit their liability to less than the actual cash value of the covered property.

d. **Perishable Stock** -- "We" do not cover loss to "perishable stock" resulting from a breakdown of refrigeration equipment on any vehicle, conveyance, container, or trailer.

The most "we" pay in any one occurrence for loss to property in transit is $50,000.

9. **Sales Representative Samples** -- "We" cover direct physical loss caused by a covered peril to samples of "your" stock in trade (and containers) and similar property of others.

"We" cover samples of "your" stock in trade while the property is:

a. in the custody of "your" sales representatives and agents;

b. in "your" custody while acting as a sales representative; or

c. in transit between a "covered location" and "your" sales representatives.

The most "we" pay in any one occurrence for loss to samples of "your" stock in trade is $50,000.

10. **Software Storage** -- "We" cover direct physical loss caused by a covered peril to duplicate and back-up "software" stored at a "software" storage location. Each "software" storage location must be in a separate building which is at least 100 feet away from a "covered location".

The most "we" pay in any one occurrence for loss to duplicate and back-up "software" is $50,000.

11. **Valuable Papers** -- "We" pay up to $100,000 for the cost of research or other expenses necessary to reproduce, replace, or restore lost information that results from a direct physical loss caused by a covered peril to "your" "valuable papers".

## PERILS COVERED

"We" cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 18 of 31

a. **Ordinance or Law** -- Except as provided under Supplemental Coverages - Ordinance or Law, "we" do not pay for loss or increased cost caused by enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure; or requiring the demolition of any building or structure including the cost of removing its debris.

"We" do not pay for loss regardless if the loss is caused by or results from the:

1) enforcement of any code, ordinance, or law even if a building or structure has not been damaged; or
2) increased costs that "you" incur because of "your" compliance with a code, ordinance, or law during the construction, repair, rehabilitation, remodeling, or razing of a building or structure, including the removal of debris, following a direct physical loss to the property.

b. **Earth Movement** -- "We" do not pay for loss caused by any earth movement (other than "sinkhole collapse") or caused by eruption, explosion, or effusion of a volcano. Earth movement includes, but is not limited to: earthquake; landslide; mudflow; mudslide; mine subsidence; or sinking, rising, or shifting of earth.

"We" do cover direct loss by fire, explosion, or "volcanic action" resulting from either earth movement or eruption, explosion, or effusion of a volcano.

This exclusion does not apply to "computers", "mobile equipment", and the Supplemental Marine Coverages.

c. **Civil Authority** -- "We" do not pay for loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

"We" do cover loss resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this coverage.

d. **Nuclear Hazard** -- "We" do not pay for loss caused by or resulting from a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke. Direct loss by fire resulting from the nuclear hazard is covered.

e. **War and Military Action** -- "We" do not pay for loss caused by:

1) war, including undeclared war or civil war; or
2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or
3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War and Military Action Exclusion will apply in place of the Nuclear Hazard Exclusion.

Copyright, American Association of Insurance Services, Inc., 2002

f.  **Flood** -- "We" do not pay for loss caused
by "flood". However, "we" do cover the
resulting loss if fire, explosion, or
sprinkler leakage results.

This exclusion does not apply to
"computers", "mobile equipment", and the
Supplemental Marine Coverages.

g.  **Utility Failure** -- Except as provided
under Coverage Extensions - Off
Premises Utility Service Interruption, "we"
do not pay for loss caused by or resulting
from the failure of a utility to supply
electrical power or other utility service to
a "covered location", however caused, if
the failure takes place away from the
"covered location".

But if failure of a utility to supply electrical
or other utility service to a "covered
location" results in a covered peril, "we"
cover the loss or damage caused by that
covered peril.

This exclusion does not apply to
"computers", "mobile equipment", and the
Supplemental Marine Coverages.

h.  **Sewer Backup and Water Below the
Surface** -- Except as provided under
Supplemental Coverages - Sewer
Backup and Water Below the Surface,
"we" do not pay for loss caused by or
resulting from:

1)  water that backs up through a sewer
or drain; or
2)  water below the surface of the
ground, including but not limited to
water that exerts pressure on or
flows, seeps, or leaks through or into
a covered building or structure,
sidewalk, driveway, foundation,
swimming pool, or other structure.

But if sewer backup and water below the
surface results in fire, explosion, or
sprinkler leakage, "we" cover the loss or
damage caused by that fire, explosion, or
sprinkler leakage.

This exclusion does not apply to
"computers", "mobile equipment", and the
Supplemental Marine Coverages.

2.  "We" do not pay for loss or damage that is
caused by or results from one or more of the
following excluded causes or events:

a.  **Animal Nesting, Infestation, or
Discharge** -- "We" do not pay for loss
caused by nesting, infestation, discharge,
or release of waste products or
secretions by animals, including but not
limited to, birds, insects, or vermin.

But if nesting, infestation, discharge, or
release of waste products or secretions
by animals results in a "specified peril" or
breakage of building glass, "we" cover
the loss or damage caused by that
"specified peril" or breakage of building
glass.

b.  **Collapse** -- "We" do not pay for loss
caused by collapse, except as provided
under the Other Coverages, Collapse.
But if collapse results in a covered peril,
"we" cover the loss or damage caused by
that covered peril.

This exclusion does not apply to
"computers", "mobile equipment", and the
Supplemental Marine Coverages.

c.  **Computer Virus or Computer Hacking**
-- Except as provided under
Supplemental Marine Coverages - Virus
and Hacking Coverage, "we" do not pay
for:

1)  any direct or indirect loss or damage;
or
2)  loss of access, loss of use, or loss of
functionality

caused by a "computer virus" or by
"computer hacking".

Copyright, American Association of Insurance Services, Inc., 2002

d. **Contamination or Deterioration** -- "We" do not pay for loss caused by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust, or any quality, fault, or weakness in covered property that causes it to damage or destroy itself.

But if contamination or deterioration results in a "specified peril" or breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or breakage of building glass.

This exclusion does not apply to loss caused by corrosion, decay, fungus, mildew, mold, rot, or rust to "computers" that results from direct physical damage by a covered peril to the air conditioning system that services "your" "computers".

e. **Criminal, Fraudulent, Dishonest, or Illegal Acts** -- "We" do not pay for loss caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by:

1) "you";
2) others who have an interest in the property;
3) others to whom "you" entrust the property;
4) "your" partners, officers, directors, trustees, joint adventurers; or
5) the employees or agents of 1), 2), 3), or 4) above, whether or not they are at work.

This exclusion does not apply to acts of destruction by "your" employees, but "we" do not pay for "theft" by employees.

This exclusion does not apply to covered property in the custody of a carrier for hire.

f. **Defects, Errors, and Omissions** -- "We" do not pay for loss which results from one or more of the following:

1) an act, error, or omission (negligent or not) relating to:

   a) land use;
   b) the design, specification, construction, workmanship, installation, or maintenance of property;
   c) planning, zoning, development, siting, surveying, grading, or compaction; or
   d) maintenance of property (such as land, structures, or improvements);

   whether on or off a "covered location";

2) a defect, weakness, inadequacy, fault, or unsoundness in materials used in construction or repair, whether on or off a "covered location";
3) the cost to make good an error in design; or
4) a data processing error or omission in programming or giving improper instructions.

In addition, "we" do not pay for loss to business personal property caused by deficiencies or defects in design, specifications, materials, or workmanship, or caused by latent or inherent defects.

But if a defect, error, or omission as described above results in a covered peril, "we" cover the loss or damage caused by that covered peril.

Copyright, American Association of Insurance Services, Inc., 2002

g. **Electrical Currents** -- "We" do not pay for loss caused by arcing or by electrical currents other than lightning. But if arcing or electrical currents other than lightning result in fire, "we" cover the loss or damage caused by that fire.

"We" do cover the direct loss by a covered peril which occurs at "covered locations" as a result of any power interruption or other utility services.

This exclusion does not apply to "computers".

h. **Steam Boiler Explosion** -- "We" do not pay for loss caused by an explosion of steam boilers, steam pipes, steam turbines, or steam engines that "you" own or lease or that are operated under "your" control.

But if an explosion of steam boilers, steam pipes, steam turbines, or steam engines results in a fire or combustion explosion, "we" cover the loss or damage caused by that fire or combustion explosion. "We" also cover loss or damage caused by or resulting from the explosion of gas or fuel in a firebox, combustion chamber, or flue.

i. **Increased Hazard** -- "We" do not pay for loss occurring while the hazard has been materially increased by any means within "your" knowledge or "your" control.

j. **Loss of Use** -- "We" do not pay for loss caused by loss of use, delay, or loss of market.

k. **Mechanical Breakdown** -- "We" do not pay for loss caused by mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force.

But if a mechanical breakdown or rupturing or bursting of moving parts of machinery caused by centrifugal force results in a "specified peril", the breakage of building glass, or an elevator collision, "we" cover the loss or damage caused by that "specified peril", breakage of building glass, or elevator collision.

This exclusion does not apply to "computers".

l. **Neglect** -- "We" do not pay for loss caused by "your" neglect to use all reasonable means to save covered property at and after the time of loss.

"We" do not pay for loss caused by "your" neglect to use all reasonable means to save and preserve covered property when endangered by a covered peril.

m. **Pollutants** -- "We" do not pay for loss caused by or resulting from release, discharge, seepage, migration, dispersal, or escape of "pollutants":

1) unless the release, discharge, seepage, migration, dispersal, or escape is caused by a "specified peril" or

2) except as specifically provided under the Supplemental Coverages, Pollutant Cleanup and Removal.

"We" do pay for any resulting loss caused by a "specified peril".

n. **Seepage** -- "We" do not pay for loss caused by continuous or repeated seepage or leakage of water or steam that occurs over a period of 14 days or more.

Copyright, American Association of Insurance Services, Inc., 2002

o.  **Settling, Cracking, Shrinking, Bulging, or Expanding** -- "We" do not pay for loss caused by settling, cracking, shrinking, bulging, or expanding of pavements, footings, foundations, walls, ceilings, or roofs. But if settling, cracking. shrinking, bulging, or expanding results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

This exclusion does not apply to "computers" and "mobile equipment".

p.  **Smoke, Vapor, or Gas** -- "We" do not pay for loss caused by smoke, vapor, or gas from agricultural smudging or industrial operations.

This exclusion does not apply to "computers" and "mobile equipment".

q.  **Smog** -- "We" do not pay for loss caused by smog . But if smog results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

This exclusion does not apply to "computers" and "mobile equipment".

r.  **Temperature/Humidity** -- "We" do not pay for loss to:

1)  personal property, except as provided under Coverage Extensions - Off Premises Utility Service Interruption; or
2)  "perishable stock";

caused by dryness, dampness, humidity, or changes in or extremes of temperature.

But if dryness, dampness, humidity, or changes in or extremes of temperature, as described above, results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

"We" do pay for loss to "computers" that results from direct physical damage by a covered peril to the air conditioning system that services "your" "computers".

s.  **Wear and Tear** -- "We" do not pay for loss caused by wear and tear, marring, or scratching.

But if wear and tear, marring, or scratching results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

t.  **Weather** -- "We" do not pay for loss caused by weather conditions if the weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss or damage.

But if weather conditions result in a covered peril, "we" cover the loss or damage caused by that covered peril.

u.  **Voluntary Parting** -- Except as provided under Coverage Extensions - Fraud and Deceit, "we" do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense.

## ADDITIONAL PROPERTY NOT COVERED OR SUBJECT TO LIMITATIONS

1.  **Accounts Receivable** -- "We" do not cover loss to accounts receivables that is a result of:

a.  an error or omission in bookkeeping, accounting, or billing; or

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 23 of 31

b. "your" discovery of a discrepancy in "your" books or records if an audit or inventory computation is necessary to prove the factual existence of the discrepancy.

2. **Animals** -- "We" do not cover loss to animals, including but not limited to birds and fish, except death or destruction of animals held for sale caused by "specified perils" or breakage of building glass.

3. **Boilers** -- "We" do not cover loss to steam boilers, steam pipes, steam turbines, or steam engines caused by any condition or occurrence within such equipment. "We" do cover loss to such equipment caused by the explosion of gas or fuel in a firebox, combustion chamber, or flue.

   "We" do not cover loss to hot water boilers or heaters caused by any condition or occurrence within such equipment other than explosion. This exclusion includes bursting, cracking, or rupturing.

4. **Contamination of Perishable Stock Due to Release of Refrigerant** -- "We" do not pay for loss of "perishable stock" due to contamination from the release of a refrigerant, including but not limited to ammonia.

5. **Furs** -- "We" do not cover furs or fur garments for loss by "theft" for more than $10,000 total in any one occurrence.

6. **Glassware/Fragile Articles** -- "We" do not cover breakage of fragile articles such as glassware and porcelains, except as a result of "specified perils" or breakage of building glass.

   This exclusion does not apply to:

   a. glass that is a part of a building or structure;

   b. bottles or other containers held for sale;

   c. lenses of photographic and scientific instruments; or

d. "fine arts" as described under Supplemental Marine Coverages.

7. **Jewelry, Watches, and Precious Stones** -- "We" do not cover more than $10,000 total in any one occurrence for loss by "theft" of jewelry, watches, and precious stones, including but not limited to watch movements, jewels, pearls, and semi-precious stones. This limitation does not apply to items of jewelry, watches, or precious stones worth $100 or less.

8. **Missing Property** -- "We" do not cover missing property when the only proof of loss is unexplained or mysterious disappearance, or shortage discovered on taking inventory, or other instance where there is no physical evidence to show what happened to the property.

   This exclusion does not apply to property in the custody of carriers for hire.

9. **Personal Property in the Open** -- "We" do not cover loss to personal property in the open caused by rain, snow, ice, or sleet.

   This exclusion does not apply to "mobile equipment" or to property in the custody of carriers for hire.

10. **Stamps, Tickets, and/or Letters of Credit** -- "We" do not cover more than $5,000 total in any one occurrence for loss by "theft" to stamps, tickets (such as lottery tickets held for sale), or letters of credit.

11. **Unauthorized or Fraudulent Transfer** -- Except as provided under Coverage Extensions - Fraud and Deceit, "we" do not cover loss of, or loss caused by the transfer or delivery of covered property from a "covered location" or "your" "computer" to a person or place outside of a "covered location" on the basis of unauthorized or fraudulent instructions, including but not limited to instructions transmitted:

    a. by a computer, whether or not owned by "you", or

Copyright, American Association of Insurance Services, Inc., 2002

b. via any telecommunications transmission method.

12. **Valuable Papers** -- "We" do not cover loss to "valuable papers" caused by errors or omissions in processing or copying.

## OTHER COVERAGES

1. **Collapse** -- "We" pay for loss caused by direct physical loss involving collapse as described in a., b., and c. below.

   a. Collapse of a building or structure, any part of a building or structure, or personal property inside a building or structure, if the collapse is caused by one or more of the following:

      1) "specified perils" or breakage of building glass all only as insured against in this Coverage Part;
      2) hidden decay, unless "you" know of the presence of the decay prior to the collapse;
      3) hidden insect or vermin damage, unless "you" know of the damage prior to the collapse;
      4) weight of people or personal property;
      5) weight of rain that collects on a roof; or
      6) use of defective material or methods in construction, remodeling, or renovation if the collapse occurs during the course of the construction, remodeling, or renovation.

      However, if the collapse occurs after construction, remodeling, or renovation is complete and is caused in part by a peril listed in 1) through 5) above, "we" will pay for the loss or damage even if the use of defective material or methods in construction, remodeling, or renovation, contributes to the collapse.

   b. The following property is covered for loss involving collapse only if the collapse is of a building or structure or any part of a building or structure and is caused by one or more of the causes listed above in 1.a. or collapse caused by "specified perils" or breakage of building glass all only as insured against in this Coverage Part:

      1) outdoor radio or television antennas (and satellite dishes) and their lead-in wiring, masts, or towers;
      2) awnings, gutters, and down spouts;
      3) yard fixtures;
      4) outdoor swimming pools;
      5) fences;
      6) bulkheads, piers, wharves, and docks;
      7) beach or diving platforms or appurtenances;
      8) retaining walls that are not part of buildings; and
      9) bridges, walkways, roadways, and other paved surfaces.

   c. Collapse means a sudden and unexpected falling in or caving in of a building or structure or any portion of a building or structure with the result that the building or portion of the building cannot be occupied for its intended purpose.

   d. The following are not considered to be in a state of collapse:

      1) a building or structure that is standing or any portion of a building that is standing even if it displays evidence of bending, bulging, cracking, expansion, leaning, sagging, settling, or shrinkage;
      2) a building or structure or any portion of a building structure in danger of falling in or caving; and
      3) a portion of a building or structure that is standing even if it has separated from another portion of the building or structure.

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 25 of 31

2. **Tearing Out and Replacing** -- When "we" cover buildings or structures and a loss caused by water, other liquids, powder, or molten material is covered, "we" also pay the cost of tearing out and replacing any part of the covered building or structure to repair damage to the system or appliance from which the water or other substance escapes.

   "We" also pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage results in discharge of any substance from an automatic fire protection system; or is directly caused by freezing.

## WHAT MUST BE DONE IN CASE OF LOSS

1. **Notice** -- In case of a loss, "you" must:

   a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice);

   b. give notice to the police when the act that causes the loss is a crime; and

   c. give notice to the credit card company if the loss involves a credit card.

2. **Protect Property** -- "You" must take all reasonable steps to protect covered property at and after an insured loss to avoid further loss. "We" will pay the reasonable costs incurred by "you" for necessary repairs or emergency measures performed solely to protect covered property from further damage by a peril insured against if a peril insured against has already caused a loss to covered property. "You" must keep an accurate record of such costs. However "we" will not pay for such repairs or emergency measures performed on property which has not been damaged by a peril insured against. This does not increase "our" "limit".

3. **Proof of Loss** -- "You" must send "us", within 60 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in title or occupancy of the covered property during the policy period;

   e. detailed estimates for repair or replacement of covered property; and

   f. an inventory of damaged and undamaged covered property showing in detail the quantity, description, cost, actual cash value, and amount of the loss. "You" must attach to the inventory copies of all bills, receipts, and related documents that substantiate the inventory.

4. **Examination** -- "You" must submit to examination under oath in matters connected with the loss as often as "we" reasonably request and give "us" sworn statements of the answers. If more than one person is examined, "we" have the right to examine and receive statements separately and not in the presence of others.

5. **Records** -- "You" must produce records, including tax returns and bank microfilms of all canceled checks relating to value, loss, and expense and permit copies and extracts to be made of them as often as "we" reasonably request.

6. **Damaged Property** -- "You" must exhibit the damaged and undamaged property as often as "we" reasonably request and allow "us" to inspect or take samples of the property.

Copyright, American Association of Insurance Services, Inc., 2002

7. **Volunteer Payments** -- "You" must not, except at "your" own expense, voluntarily make any payments, assume any obligations, pay or offer any rewards, or incur any other expenses except as respects protecting property from further damage.

8. **Abandonment** -- "You" may not abandon the property to "us" without "our" written consent.

9. **Cooperation** -- "You" must cooperate with "us" in performing all acts required by the Commercial Output Program coverages.

# VALUATION

1. **Replacement Cost** -- The value of covered property will be based on replacement cost without any deduction for depreciation unless Actual Cash Value is indicated on the "schedule of coverages".

   The replacement cost is limited to the cost of repair or replacement with similar materials on the same site and used for the same purpose. The payment will not exceed the amount "you" spend to repair or replace the damaged or destroyed property.

   Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced. "You" may make a claim for actual cash value before repair or replacement takes place, and later for the replacement cost if "you" notify "us" of "your" intent within 180 days after the loss.

   This replacement cost provision does not apply to paragraphs 3. through 13. below.

2. **Actual Cash Value** -- When Actual Cash Value is indicated on the "schedule of coverages" for covered property, the value of covered property will be based on the actual cash value at the time of the loss (with a deduction for depreciation) except as provided in paragraphs 3. through 13. below.

3. **Fine Arts** -- The value of "fine arts" will be based on the fair market value at the time of loss.

4. **Glass** -- The value of glass will be based on the cost of safety glazing material where required by code, ordinance, or law.

5. **Hardware** -- The following is the value of "hardware":

   a. **Hardware That Is Replaced** — The value of "hardware" that is replaced will be based on the cost of replacing the "hardware" with new equipment that is functionally comparable to the "hardware" that is being replaced.

   b. **Hardware That Is Not Replaced** -- The value of "hardware" that is not repaired or replaced will be based on the actual cash value at the time of loss (with a deduction for depreciation).

   c. **Partial Loss** -- In no event will "we" pay more than the reasonable cost of restoring partially damaged "hardware" to its condition directly prior to the damage.

6. **Software** — The following is the value of "software":

   a. **Programs and Applications** -- The value of "programs and applications" will be based on the cost to reinstall the "programs or applications" from the licensed discs that were originally used to install the programs or applications.

      If the original licensed discs are lost, damaged, or can no longer be obtained, the value of "programs and applications" will be based on the cost of the most current version of the "programs or applications".

Copyright, American Association of Insurance Services, Inc., 2002

b. **Proprietary Programs** -- The value of "proprietary programs" will be based on the cost of reproduction from duplicate copies. The cost of reproduction includes, but is not limited to, the cost of labor to copy or transcribe from duplicate copies.

If duplicate copies do not exist, the value of "proprietary programs" will be based on the cost of research or other expenses necessary to reproduce, replace, or restore lost "proprietary programs".

c. **Data Records** -- The value of "data records" will be based on the cost of reproduction from duplicate copies. The cost of reproduction includes, but is not limited to, the cost of labor to copy or transcribe from duplicate copies.

If duplicate copies do not exist, the value of "data records" will be based on the cost of research or other expenses necessary to reproduce, replace, or restore lost files, documents, and records.

d. **Media** -- The value of "media" will be based on the cost to repair or replace the "media" with material of the same kind or quality.

7. **Merchandise Sold** -- The value of merchandise that "you" have sold but not delivered will be based on the selling price less all discounts and unincurred expenses.

8. **Manufactured Stock** -- The value of stock manufactured by "you" will be based on the price that such stock would have been sold for, less all discounts and unincurred expenses.

9. **Pair or Set** -- The value of a lost or damaged article which is part of a pair or set is based on a reasonable proportion of the value of the entire pair or set. The loss is not considered a total loss of the pair or set.

10. **Loss to Parts** -- The value of a lost or damaged part of an item that consists of several parts when it is complete is based on the value of only the lost or damaged part or the cost to repair or replace it.

11. **Tenant's Improvements** -- The value of lost or damaged tenant's improvements and the loss of undamaged tenant's improvements due to the cancellation of a lease will be based on the replacement cost if repaired or replaced at "your" expense within 24 months.

The value of lost or damaged tenant's improvements and the loss of undamaged tenant's improvements due to the cancellation of a lease on a portion of "your" original cost if not repaired or replaced within 24 months. This portion is determined as follows:

a. divide the number of days from the date of the loss to the expiration date of the lease by the number of days from the date of installation to the expiration date of the lease; and

b. multiply the figure determined in 11.a. above by the original cost.

If "your" lease contains a renewal option, the expiration of the lease in this procedure will be replaced by the expiration of the renewal option period.

Lost or damaged tenant's improvements and the loss of undamaged tenant's improvements due to the cancellation of a lease are not covered if repaired or replaced at another's expense

12. **Valuable Papers** -- The value of "valuable papers" will be based on their actual cash value at the time of loss.

13. **Accounts Receivable** -- The value of accounts receivable will be based on the total sum of accounts receivable due. From this total "we" will deduct:

a. all amounts due from the records of accounts receivable that are not lost;

Copyright, American Association of Insurance Services, Inc., 2002

b.  all amounts due that can be established by other means;

c.  all amounts due that "you" have collected from the records that are lost;

d.  all unearned interest and service charges; and

e.  an amount to allow for bad debts.

If a loss occurs and "you" cannot establish the actual accounts receivable due, it will be determined as follows:

a.  "We" will determine the total of the average monthly accounts receivable amounts for the 12 month period that directly precedes the month in which the loss occurred.

b.  "We" will adjust the total for any normal variance in the accounts receivable amount for the month in which the loss occurred.

## HOW MUCH WE PAY

1.  **Insurable Interest** -- "We" do not cover more than "your" insurable interest in any property.

2.  **Deductible** -- "We" pay only that part of "your" loss over the deductible amount stated on the "schedule of coverages" in any one occurrence. The deductible applies to the loss before application of any coinsurance or reporting provisions.

3.  **Earthquake Period** -- All earthquakes or volcanic eruptions that occur within a 168-hour period will be considered a single event. This 168-hour period is not limited by the policy expiration.

4.  **Loss Settlement Terms** -- Subject to paragraphs 1., 2., 3., 5., 6., and 7. under How Much We Pay and coinsurance provisions (if applicable), "we" pay the lesser of:

a.  the amount determined under Valuation;

b.  the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

c.  the "limit" that applies to covered property.

5.  **Insurance Under More Than One Coverage** -- If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

6.  **Insurance Under More Than One Policy** -- "You" may have another policy subject to the same plan, "terms", conditions, and provisions as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

If there is another policy covering the same loss, other than that described above, "we" will pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" will not pay more than the applicable "limit".

7.  **Automatic Increase** -- The "limit" on the "schedule of coverages" or the Scheduled Locations Endorsement is automatically increased annually by the annual percentage shown on the "schedule of coverages" or Scheduled Locations Endorsement for Automatic Increase.

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 29 of 31

## LOSS PAYMENT

1. **Our Options** -- In the event of loss covered by this coverage form, "we" have the following options:

   a. pay the value of the lost or damaged property;

   b. pay the cost of repairing or replacing the lost or damaged property;

   c. rebuild, repair, or replace the property with other property of equivalent kind and quality, to the extent practicable, within a reasonable time; or

   d. take all or any part of the property at the agreed or appraised value.

   "We" must give "you" notice of "our" intent to rebuild, repair, or replace within 30 days after receipt of a duly executed proof of loss.

2. **Your Losses** -- "We" will adjust all losses with "you". Payment will be made to "you" unless another loss payee is named in the policy. An insured loss will be payable 30 days after a satisfactory proof of loss is received, and the amount of the loss has been established either by written agreement with "you" or the filing of an appraisal award with "us".

3. **Property of Others** -- Losses to property of others may be adjusted with and paid to:

   a. "you" on behalf of the owner; or

   b. the owner.

   If "we" pay the owner, "we" do not have to pay "you". "We" may also choose to defend any suits arising from the owners at "our" expense.

## OTHER CONDITIONS

In addition to the "terms" which are contained in other sections of the Commercial Output Program coverages, the following conditions apply.

1. **Appraisal** -- If "you" and "we" do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

   If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

   The appraisers will then determine and state separately the amount of each loss.

   The appraisers will also determine the value of covered property items at the time of the loss, if requested.

   If the appraisers submit a written report of any agreement to "us", the amount agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three sets the amount of the loss.

   Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us".

Copyright, American Association of Insurance Services, Inc., 2002

2. **Benefit to Others** -- Insurance under the Commercial Output Program coverages will not directly or indirectly benefit anyone having custody of "your" property.

3. **Conformity With Statute** -- When a condition of this coverage is in conflict with an applicable law, that condition is amended to conform to that law.

4. **Control of Property** -- The Commercial Output Policy coverages are not affected by any act or neglect beyond "your" control.

5. **Death** -- If "you" die, "your" rights and duties will pass to "your" legal representative but only while acting within the scope of duties as "your" legal representative. Until "your" legal representative is appointed, anyone having proper temporary custody of "your" property will have "your" rights and duties but only with respect to that property.

6. **Liberalization** -- If a revision of a form or endorsement which broadens Commercial Output Program coverages without additional premium is adopted during the policy period, or within six months before this coverage is effective, the broadened coverage will apply.

7. **Misrepresentation, Concealment, or Fraud** -- These Commercial Output Program coverages are void as to "you" and any other insured if, before or after a loss:

   a. "you" or any other insured have willfully concealed or misrepresented:

      1) a material fact or circumstance that relates to this insurance or the subject thereof, or
      2) "your" interest herein; or

   b. there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

8. **Policy Period** -- "We" pay for a covered loss that occurs during the policy period.

9. **Recoveries** -- If "we" pay "you" for the loss and lost or damaged property is recovered, or payment is made by those responsible for the loss, the following provisions apply:

   a. "you" must notify "us" promptly if "you" recover property or receive payment;

   b. "we" must notify "you" promptly if "we" recover property or receive payment;

   c. any recovery expenses incurred by either are reimbursed first;

   d. "you" may keep the recovered property, but "you" must refund to "us" the amount of the claim paid, or any lesser amount to which "we" agree; and

   e. if the claim paid is less than the agreed loss due to a deductible or other limiting "terms" of this policy, any recovery will be prorated between "you" and "us" based on "our" respective interest in the loss.

10. **Restoration of Limits** -- Except as indicated under Supplemental Coverages - Pollutant Cleanup and Removal and Supplemental Marine Coverages - Virus and Hacking Coverage, any loss "we" pay under the Commercial Output Program coverages does not reduce the "limits" applying to a later loss.

11. **Subrogation** -- If "we" pay for a loss, "we" may require "you" to assign to "us" "your" right of recovery against others. "You" must do all that is necessary to secure "our" rights. "We" will not pay for a loss if "you" impair this right to recover.

    "You" may waive "your" right to recover from others in writing before a loss occurs.

12. **Suit Against Us** -- No one may bring a legal action against "us" under this coverage unless:

    a. all of the "terms" of the Commercial Output Program coverages have been complied with; and

Copyright, American Association of Insurance Services, Inc., 2002

AAIS
CO 1000 10 02
Page 31 of 31

b. the suit has been brought within two years after "you" first have knowledge of the loss.

If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by the law.

13. **Territorial Limits** -- "We" cover property while in the United States of America, its territories and possessions, Canada, and Puerto Rico.

However, "we" do cover foreign shipments as described under Overseas Transit.

14. **Mortgage Provisions** -- If a mortgagee (mortgage holder) is named in this policy, loss to building property will be paid to the mortgagee and "you" as their interest appears. If more than one mortgagee is named, they will be paid in order of precedence.

The insurance for the mortgagee continues in effect even when "your" insurance may be void because of "your" acts, neglect, or failure to comply with the coverage "terms". The insurance for the mortgagee does not continue in effect if the mortgagee is aware of changes in ownership or substantial increase in risk and does not notify "us".

If "we" cancel this policy, "we" will notify the mortgagee at least ten days before the effective date of cancellation if "we" cancel for "your" nonpayment of premium, or 30 days before the effective date of cancellation if "we" cancel for any other reason.

"We" may request payment of the premium from the mortgagee if "you" fail to pay the premium.

If "we" pay the mortgagee for a loss where "your" insurance may be void, the mortgagee's right to collect that portion of the mortgage debt from "you" then belongs to "us". This does not affect the mortgagee's right to collect the remainder of the mortgage debt from "you".

As an alternative, "we" may pay the mortgagee the remaining principal and accrued interest in return for a full assignment of the mortgagee's interest and any instruments given as security for the mortgage debt.

If "we" choose not to renew this policy, "we" will give written notice to the mortgagee at least ten days before the expiration date of this policy.

15. **Vacancy - Unoccupancy** -- "We" do not pay for loss caused by attempted "theft"; breakage of building glass; sprinkler leakage (unless "you" have protected the system against freezing); "theft"; vandalism; or water damage occurring while the building or structure has been:

a. vacant for more than 60 consecutive days; or

b. unoccupied for more than:

   1) 60 consecutive days; or
   2) the usual or incidental unoccupancy period for a "covered location";

   whichever is longer.

The amount "we" will pay will be reduced by 15% for any loss by a covered peril, not otherwise excluded above, if the building or structure is vacant or unoccupied, as described above.

Unoccupied means that the customary activities or operations at a "covered location" are suspended, but business personal property has not been removed. The building or structure will be considered vacant and not unoccupied when the occupants have moved, leaving the building or structure empty or containing only limited business personal property. Buildings or structures under construction are not considered vacant or unoccupied.

CO 1000 10 02

Copyright, American Association of Insurance Services, Inc., 2002

# EQUIPMENT BREAKDOWN COVERAGE PART

Coverage provided under this coverage part is also subject to the "terms" and conditions in the Commercial Output Program - Property Coverage Part under the sections titled Agreement, Definitions, Property Not Covered, What Must Be Done In Case Of Loss, Loss Payment, and Other Conditions.

Reference to Equipment Breakdown Schedule or schedule in this coverage part means the Equipment Breakdown Schedule or the "schedule of coverages".

## ADDITIONAL DEFINITIONS

Some of the following definitions may not appear elsewhere in this coverage part, but may appear in the Equipment Breakdown Schedule.

1. "Boilers and vessels" means:

    a. Boilers, including attached steam, condensate, and feedwater piping; and

    b. Fired or unfired pressure vessels subject to vacuum or internal pressure other than the static pressure of its contents.

2. "Production machinery" means machines or apparatus that process or produce a product intended for eventual sale. This includes all component parts of such machine or apparatus and any other equipment used exclusively with such machine or apparatus.

3. "Suit" means a judicial proceeding that has been set up to determine liability and damages for loss to property of others consisting of covered property that is in "your" care, custody, or control. Judicial proceedings also includes arbitration proceedings that "you" may be required to submit to.

## COVERAGE

**Property Damage** -- "We" cover direct physical loss to covered property caused by or resulting from an "accident" to "covered equipment" at "covered locations" .

The term covered property as used in this coverage part means the types of property described under the Property Covered section of the Commercial Output Program - Property Coverage Part as well as the covered property described in the Supplemental and Supplemental Marine Coverages.

## ADDITIONAL PROPERTY NOT COVERED

In addition to the property identified under the Property Not Covered in the Commercial Output Program - Property Coverage Part, the following additional property is not covered:

1. **Animals** -- "We" do not cover animals, including but not limited to:

    a. birds and fish;

    b. animals owned by others and boarded by "you"; and

    c. animals "you" own and hold for sale.

2. **Perishable Stock** -- "We" do not pay for loss of "perishable stock" due to:

    a. "spoilage" that results from an "accident" to "covered equipment";

    b. contamination from the release of a refrigerant, including but not limited to ammonia;

c. "spoilage" that results from a complete or partial lack of electrical power; or

d. "spoilage" that results from a fluctuation of electrical current.

## COVERAGE EXTENSIONS

If indicated on the Equipment Breakdown Schedule, the following additional coverages also apply to loss caused by or resulting from an "accident" to "covered equipment". The most that "we" will pay for loss arising from any "one accident" is the amount indicated on the schedule for the applicable Coverage Extension.

If two or more "limits" apply to the same portion of a loss, "we" will only pay the smaller "limit" for that portion of the loss.

Except as otherwise provided, the "limits" for the additional coverages are a part of, and not in addition to, the Property Damage Limit.

1. **Income Coverages** --

   a. **Coverage** -- If a "limit" is indicated on the Equipment Breakdown Schedule, "we" provide the coverages described below during the "restoration period" when "your" "business" is necessarily wholly or partially interrupted as a result of an "accident" to "covered equipment".

   This coverage applies only when the "accident" to "covered equipment" occurs at "covered locations" or in the open (or in vehicles) within 1,000 feet thereof.

   If "you" lease, rent, or do not own the building "you" occupy, for the purposes of determining an Income Coverage loss, "your" location is the space that "you" lease, rent, or occupy, including but not limited to:

   1) all passageways to "your" location within the building; and

   2) "your" business personal property in the open (or in a vehicle) within 1,000 feet.

   b. **Coverage Options** -- Coverage options include:

   1) Earnings, "rents", and extra expense.
   2) Earnings and extra expense.
   3) "Rents" and extra expense.
   4) Extra expense only

   Earnings includes "rents" when option 1. is selected. Earnings means only "rents" when option 3. is selected.

   c. **Earnings** -- "We" cover "your" actual loss of net income (net profit or loss before income taxes) that would have been earned or incurred and continuing operating expenses normally incurred by "your" "business", including but not limited to payroll expense.

   The net sales value of goods that would have been produced is included in net income for manufacturing risks.

   d. **Extra Expense** -- "We" cover only the extra expenses that are necessary during the "restoration period" that "you" would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from an "accident" to "covered equipment".

   "We" cover any extra expense to avoid or reduce the interruption of "business" and continue operating at a "covered location", replacement location, or a temporary location. This includes expenses to relocate and costs to outfit and operate a replacement or temporary location.

   "We" will also cover any extra expense to reduce the interruption of "business" if it is not possible for "you" to continue operating during the "restoration period".

To the extent that they reduce a loss otherwise payable under this Coverage Part, "we" will cover any extra expenses to:

1) repair, replace, or restore any property; and
2) research, replace, or restore information on damaged "valuable papers" or "data records".

e. **Period of Loss Extension After Business Resumes** -- "We" extend "your" coverage for earnings to cover loss from the date the covered property that incurred the loss is rebuilt, repaired, or replaced until:

1) the end of 30 consecutive days (unless otherwise indicated on the schedule); or
2) the date "you" could reasonably resume "your" "business" to the conditions that would generate the earnings amount or "rents" that would have existed had no loss or damage occurred,

whichever is earlier. This does not increase the "limit".

2. **Expediting Expenses** -- "We" pay the reasonable extra costs to expedite permanent repairs or replacement and make temporary repairs to damaged covered property.

3. **Pollutants** -- "We" pay for the additional cost to repair or replace covered property because of contamination by "pollutants". This includes the additional expenses to clean up or dispose of such property.

Additional expenses mean those beyond what would have been required had no "pollutants" been involved.

"We" will also pay for additional loss as described under Income Coverages caused by contamination by "pollutants", if this coverage is also indicated on the Equipment Breakdown Schedule.

4. **Ordinance or Law** --

a. **Undamaged Parts of a Building** -- When an "accident" to "covered equipment" at a "covered location" occurs, "we" pay for the value of undamaged parts of a covered building or structure that is required to be demolished as a result of the enforcement of any ordinance, law, or decree that:

1) requires the demolition of undamaged parts of a covered building or structure that is damaged or destroyed by an "accident" to "covered equipment";
2) regulates the construction or repair of a building or structure, or establishes building, zoning, or land use requirements at a "covered location"; and
3) is in force at the time of loss.

"We" do not cover the costs associated with the enforcement of any ordinance, law, or decree that requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants".

b. **Increased Cost to Repair and Cost to Demolish and Clear Site** --

1) **Increased Cost to Repair** -- When an "accident" occurs to "covered equipment" at a "covered location", "we" cover the:

a) increased cost to repair, rebuild, or reconstruct damaged portions of a covered building or structure; and

b) increased cost to repair, rebuild, or reconstruct undamaged portions of a covered building or structure whether or not those undamaged portions need to be demolished;

as a result of the enforcement of building, zoning, or land use ordinance, law, or decree and is in force at the time when the "accident" to covered equipment occurs at a covered location.

If a covered building or structure is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by building, zoning, or land use ordinance, law, or decree.

"We" do not cover the increased cost of construction until the covered building or structure is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss, not to exceed two years.

2) **Cost to Demolish and Clear Site --** "We" cover the cost to demolish and clear the site of undamaged parts of the covered building or structure that is damaged or destroyed by an "accident" to "covered equipment". The demolition must be a result of the enforcement of a building, zoning, or land use ordinance, law, or decree that is in force at the time when the "accident" occurs to "covered equipment".

3) **We Do Not Cover --** "We" do not cover the costs associated with the enforcement of any ordinance, law, or decree that:

a) requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of "pollutants"; or

b) "you" were required to comply with before the occurrence of an "accident" to "covered equipment" at a "covered location", even if the building or structure was undamaged and "you" failed to comply with the ordinance, law, or decree.

4) **What We Pay If The Building Is Repaired or Replaced --** If the covered building or structure is repaired or replaced, "we" pay the lesser of:

a) the amount "you" actually spend to demolish and clear the site, plus the actual increased cost to repair, rebuild, or construct the property but not for more than a building or structure of the same height, floor area, and style; or

b) the "limit" indicated on the Schedule.

5) **What We Pay If The Building Is Not Repaired or Replaced --** If the covered building or structure is not repaired or replaced, "we" pay the lesser of:

a) the amount "you" actually spend to demolish and clear the site, plus the cost "you" would have incurred to replace damaged or destroyed property with other property of like kind, and quality; of the same height, floor area, and style; and used for the same purpose; or

b) the "limit" indicated on the schedule.

5. **Off Premises Utility Service Interruption --** "We" extend Income Coverages to loss of earnings or extra expenses that "you" incur during the "restoration period" when "your" "business" is interrupted due to the interruption of an off premises utility service when the interruption is a result of an "accident" to "covered equipment" that is not located at a "covered location" and that is owned by a utility, a landlord, or another supplier who provides "you" with:

   a. power or gas;

   b. telecommunications, including but not limited to Internet access; or

   c. water, including but not limited to waste water treatment.

6. **Defense Costs --** "We" have the right and duty to defend any "suit" brought against "you" as a result of damage to property of others that is in "your" care, custody, or control and is caused by an "accident" to "covered equipment". "We" may investigate and settle a claim or "suit". "We" do not have to provide a defense after "we" have paid the "limit" as a result of a judgment or written settlement.

"You" must not admit liability for a loss, settle a claim, or incur expense without "our" written consent. "You" must not interfere with "our" negotiation for a settlement.

"We" will pay the following additional expenses associated with any "suit" "we" defend:

   a. Expenses which "we" incur while investigating and defending the "suit".

   b. Actual loss of "your" salary, up to $250 per day, for "your" time spent away from work at "our" request.

   c. Expenses that "you" incur at "our" request.

   d. All costs that "you" are required to pay as a result of any "suit" "we" defend.

   e. Interest that accrues after entry of a judgment, until "we" tender, deposit in court, or pay "our" part of the judgment.

   f. Interest that is awarded against "you" before the entry of a judgment. If "we" make an offer to settle the "suit", "we" will not pay any interest that accrues after the offer to settle.

   g. Cost of a bond for the release of attachments. "We" are not required to furnish a bond itself.

This Coverage Extension will not reduce the available Property Damage Limit and does not have to be indicated on the schedule.

## PERILS COVERED

"We" cover risks of direct physical loss caused by or resulting from an "accident" to "covered equipment" unless the loss is limited or caused by a peril that is excluded.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

   a. **Ordinance or Law --** Except as provided under Coverages Extensions - Ordinance or Law, "we" do not pay for loss or increased cost caused by enforcement of any code, ordinance, or law regulating the use, construction, or repair of any building or structure; or requiring the demolition of any building or structure including the cost of removing its debris.

b. **Earth Movement or Volcanic Eruption** -- "We" do not pay for loss caused by any earth movement or caused by eruption, explosion, or effusion of a volcano. Earth movement includes, but is not limited to: earthquake; landslide; mudflow; mudslide; mine subsidence; or sinking, rising, shifting of earth, or "sinkhole collapse".

c. **Civil Authority** -- "We" do not pay for loss caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

d. **Nuclear Hazard** -- "We" do not pay for loss caused by or resulting from a nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means).

e. **War and Military Action** -- "We" do not pay for loss caused by:

   1) war, including undeclared war or civil war; or
   2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or
   3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

   With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War and Military Action Exclusion will apply in place of the Nuclear Hazard Exclusion.

f. **Water** -- "We" do not pay for loss caused by water. This means:

   1) "flood";

   2) water that backs up through a sewer or drain; and
   3) water below the surface of the ground. This includes water that exerts pressure on or flows, seeps, or leaks through or into a building or structure, sidewalk, driveway, foundation, swimming pool, or other structure.

   However, if electrical "covered equipment" requires drying out as a result of the above described peril, "we" pay for the direct expenses for drying out the electrical "covered equipment".

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following excluded causes or events:

a. **Wear, Tear, Deterioration, and Corrosion** -- "We" do not pay for loss caused by wear and tear, marring, scratching, deterioration, erosion, or corrosion.

   "We" do pay for any resulting loss caused by an "accident".

b. **Animals** -- "We" do not pay for loss caused by animals, including birds, insects, or vermin. "We" do pay for any resulting loss caused by an "accident".

c. **Windstorm and Hail** --"We" do not pay for loss caused by windstorm or hail.

d. **Fire and Combustion Explosion** -- "We" do not pay for loss caused by fire or combustion explosion whether or not caused by or resulting from an "accident".

e. **Discharge of Water** -- "We" do not pay for loss caused by the discharge of water or other extinguishing agent to fight a fire.

f. **Breakage of Glass, Freezing, Collapse, and Molten Material** -- "We" do not pay for loss caused by breakage of glass, weather related freezing, collapse, or molten materials.

AAIS
CO 1003 04 02
Page 7 of 10

g. **Specified Perils** -- "We" do not pay for loss caused by "specified perils". However, this exclusion does not apply to explosion of steam boilers, steam pipes, steam turbines, or steam engines.

3. "We" do not pay for "your" loss of earnings or extra expenses that "you" incur if one or more of the following excluded causes or events apply.

a. **Leases, Licenses, Contracts, or Orders** -- "We" do not pay for any increase in loss of earnings or extra expenses due to the suspension, lapse, or cancellation of leases, licenses, contracts, or orders. However, "we" do cover loss during the "restoration period" if the suspension, lapse, or cancellation results directly from the interruption of "your" "business".

"We" do not cover any loss of earnings or extra expense beyond the "restoration period" caused by the suspension, lapse, or cancellation of leases, licenses, contracts, or orders.

b. **Due Diligence to Resume Your Business** -- "We" do not pay for any increase in loss of earnings or extra expenses due to "your" failure to use due diligence and dispatch and all reasonable means to resume "your" "business".

# VALUATION

1. **Covered Property** -- Unless otherwise indicated on the Equipment Breakdown Schedule, the value of covered property will be determined in accordance with:

a. replacement cost provisions; and

b. items 3. through 9;

as described in the Valuation section of the Commercial Output Program - Property Coverage Part and is subject to the provisions described below for Environmental, Safety, and Efficiency Improvements and Equipment Utilizing CFC Refrigerants.

2. **Environmental, Safety, and Efficiency Improvements** -- If "covered equipment" requires replacement due to an "accident", "we" will pay your additional cost to replace with equipment that "we" agree is better for the environment, safer for people, or more energy efficient than the equipment being replaced, subject to the following conditions:

a. "we" will not pay more than 125% of what the cost would have been to replace with like kind and quality;

b. "we" will not pay to increase the size or capacity of the equipment;

c. this provision only applies to Property Damage coverage;

d. this provision does not increase any of the applicable limits;

e. this provision does not apply to any property valued on an Actual Cash Value basis; and

f. this provision does not apply to the replacement of component parts.

3. **Equipment Utilizing CFC Refrigerants** -- Air conditioning or refrigeration equipment that utilizes a refrigerant containing CFC (chlorofluorocarbon) substances will be valued at the cost to do the least expensive of the following:

a. repair or replace the damaged property and replace any lost CFC refrigerant;

b. repair the damaged property, retrofit the system to accept a non-CFC refrigerant, and charge the system with a non-CFC refrigerant; or

c.  replace the system with one using a non-CFC refrigerant.

In determining the least expensive option, "we" will include any associated Income or Extra Expense loss. If option b. or c. is more expensive than a., but you wish to retrofit or replace anyway, "we" will consider this better for the environment and therefore eligible for valuation under paragraph 2., Environmental, Safety, and Efficiency Improvements. In such case, a. of that section is amended to read: "We" will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality.

## HOW MUCH WE PAY

1.  **Insurable Interest** -- "We" do not cover more than "your" insurable interest in any property.

2.  **Deductible** -- If deductibles vary by type of "covered equipment" and more than one type of equipment is involved in any "one accident", the highest deductible will apply. Unless the Equipment Breakdown Schedule indicates that a single deductible applies to all Equipment Breakdown coverages, multiple deductibles may apply to any "one accident".

    a.  Property and Income Coverages -- Unless otherwise indicated on the Equipment Breakdown Schedule, the Property Coverage Deductible applies to all loss covered by this coverage part, with the exception of those coverages subject to the Income Coverage Deductible as described below.

        Unless more specifically indicated on the Equipment Breakdown Schedule, the Income Coverage Deductible applies to

        1)  earnings, "rents", and extra expense; and
        2)  service interruption.

    b.  Application of Deductibles --

        1)  Dollar Deductibles -- "We" will not pay for loss resulting from any "one accident" until the amount of loss exceeds the applicable deductible indicated on the Equipment Breakdown Schedule. "We" will then pay the amount of loss in excess of the applicable deductible or deductibles, subject to the applicable "limit" indicated on the schedule.
        2)  Multiple of Average Daily Value Deductibles -- If a deductible is expressed as a number times Average Daily Value (ADV), the deductible will be calculated as follows:

            The ADV will be the operating expenses that would have been normally earned or incurred during the "restoration period" by "your" "business" had no "accident" occurred divided by the number of working days in that period.

            Operating expenses includes net income (net profit or loss before income taxes), payroll expense, interest, and other continuing operating expenses.

            No reduction will be made:

            a)  for operating expenses not being earned;
            b)  in the number of working days because of the "accident"; or
            c)  for any other scheduled or unscheduled shutdowns during the "restoration period".

            The ADV applies to all "covered locations" included in the valuation of the loss. The number indicated on the Equipment Breakdown Schedule will be multiplied by the ADV as determined above. The result will be used as the applicable deductible.

3) Time Deductibles -- If a time deductible is indicated on the Equipment Breakdown Schedule, "we" will not be liable for any loss occurring during the specified number of hours or days immediately following the "accident". If a time deductible is expressed in days, each consecutive day will mean twenty-four consecutive hours.

3. **Loss Settlement Terms** -- Subject to paragraphs 1., 2., 4., 5., and 6. under How Much We Pay, "we" pay the lesser of:

a. the amount determined under Valuation;

b. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable subject to the Valuation provisions under:

1) Environmental, Safety and Efficiency Improvements; and
2) Equipment Utilizing CFC Refrigerants; or

c. the "limit" that applies to covered property.

4. **Coinsurance** -- If indicated on the Equipment Breakdown Schedule, specified coverages may be subject to coinsurance.

a. Property Damage -- "We" will not pay for the full amount of "your" loss if the applicable "limit" is less than the product of the specified coinsurance percentage times the value of the property subject to the coverage at the time of the loss. Instead, "we" will determine what percentage this calculated product is compared to the applicable "limit" and apply that percentage to the loss after application of the Deductible. The resulting amount or the applicable "limit" is the most "we" will pay. "We" will not pay for the remainder of the loss.

b. Income Coverage -- "We" pay only a part of the loss if the "limit" is less than the coinsurance percentage multiplied by the sum of "your" net income (net profit or loss before income taxes), payroll expense, interest, and other continuing operating expenses projected for the 12 months following the inception, or last previous anniversary date of this policy (whichever is later), normally earned by "your" "business". "Our" part of the loss is determined using the following steps:

1) multiply the coinsurance percentage by the sum of "your" net income (net profit or loss before income taxes), payroll expense, interest, and other continuing operating expenses projected for the 12 months following the inception, or last previous anniversary date of this policy;
2) divide the "limit" by the figure determined in 1. above;
3) multiply the total amount of loss by the figure determined in 2) above.

"We" pay the amount determined in 3) above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

Coinsurance does not apply to coverage for extra expense.

5. **Insurance Under More Than One Coverage** -- If more than one coverage of this policy insures the same loss, "we" pay no more than the actual claim, loss, or damage sustained.

6. **Insurance Under More Than One Policy** -- "You" may have another policy subject to the same plan, "terms", conditions, and provisions as this policy. If "you" do, "we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

If there is another policy covering the same loss, other than that described above, "we" will pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" will not pay more than the applicable "limit".

## ADDITIONAL CONDITIONS

1. **Suspension** -- When any "covered equipment" is discovered to be in, or exposed to a dangerous situation or condition, any representative of "ours" may immediately suspend the insurance coverage against loss from an "accident" to that equipment. The suspension will not apply to any other covered peril under any other coverage part.

"We" can do this by mailing or delivering a written notice of suspension to "your" address as shown in the declarations, or at the address where the "covered equipment" is located.

Once so suspended, "your" insurance can be reinstated only by written notice from "us". If "your" insurance is so suspended, "you" will get a pro rata premium refund. But the suspension is effective even if "we" have not yet offered or made a refund.

2. **Jurisdictional Inspections** -- If any property that is "covered equipment" under the Equipment Breakdown Coverage requires inspection to comply with state or municipal boiler and pressure vessel regulations, "we" agree to perform such inspection on "your" behalf.

**CO 1003 04 02**
Copyright, American Association of Insurance Services, 2002

AAIS
CO 1073 03 05
Page 1 of 2

# EQUIPMENT BREAKDOWN SCHEDULE

(The information required below may be indicated on the
"schedule of coverages".)

## EQUIPMENT BREAKDOWN COVERAGE

|  | LIMITS | COINSURANCE |
|---|---|---|
| Property Damage | $ See CO 1052 | _____ % |
| Income Coverages | $ See CO 1052 | _____ % |

**INCOME COVERAGES**

Period of Loss Extension          90_____ days

Coverage Options (check one)

[X ]  Earnings, Rents, and Extra Expense

[ ]  Earnings and Extra Expense

[ ]  Rents and Extra Expense

[ ]  Extra Expense Only

**COVERAGE EXTENSIONS**

|  | Limit |
|---|---|
| -- Expediting Expense | $ 100,000 _____ |
| -- Pollutants | $ 100,000 _____ |
| — Ordinance or Law (Undamaged Parts of Buildings) | $ 100,000 _____ |
| — Ordinance or Law (Increased Cost to Repair/Cost to Demolish and Clear Site) | $ 100,000 _____ |

Copyright, American Association of Insurance Services, Inc., 2005

**AAIS**
**CO 1073 03 05**
**Page 2 of 2**

### COVERAGE EXTENSIONS (CONT.)

**Limit**

-- Off Premises Utility
   Service Interruption         $ 100,000

-- Defense Costs                    covered

### DEDUCTIBLES

Property Coverages                          As Per QBCP 2023

Income Coverages ($, hrs., ADV, or Combined)

Other (describe)


### INCOME COVERAGE OPTIONS (describe)


### OTHER CONDITIONS (describe)


**CO 1073 03 05**

Copyright, American Association of Insurance Services, Inc., 2005

**AAIS**
**CO 1052 04 02**

# LOCATION SCHEDULE

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

Coverage provided by the Commercial Output Program coverage parts applies
only to the "covered locations" described below. Refer to "schedule of
coverages" for applicable "limits", additional coverages, and applicable
coinsurance percentage.

## SCHEDULE

**Loc.**
**No.    Covered Location (describe):**

   **01  3777 Peachtree Road NE**
        **Atlanta, GA  30319**

        **Covered Property/**
        **Coverage Provided** (describe)                    **Limit**

        Building                              $ 46,779,100
        Business Personal Property            $      100,000
        Loss of Income (Rents)                $        0

**MORTGAGE HOLDER NAME AND MAILING ADDRESS:**

**CO 1052 04 02**

Copyright, American Association of Insurance Services, 2002

**AAIS**
**CO 1227 05 02**
**Page 1 of 3**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# SCHEDULED LOCATIONS ENDORSEMENT

## PROPERTY COVERED

The following provision is added to Property Covered.

**Scheduled Locations** -- Coverage provided by the Commercial Output Program coverages applies only to the "covered locations" described on the Location Schedule.

## ADDITIONAL COVERAGES

The following Additional Coverages indicate an applicable "limit". This "limit" may also be shown on the "schedule of coverages". If a different "limit" is indicated on the "schedule of coverages", that "limit" will apply instead of the "limit" shown below.

However, if no "limit" is indicated for an Additional Coverage, coverage is provided up to the full "limit" for the applicable covered property unless a different "limit" is indicated on the "schedule of coverages".

Unless otherwise indicated, a "limit" for an Additional Coverage provided below is separate from, and not part of, the applicable "limit" for coverage described under Property Covered. The "limit" available for coverage described under an Additional Coverage:

    a.   is the only "limit" available for the described coverage; and

    b.   is not the sum of the "limit" indicated for an Additional Coverage and the "limit" for coverage described under Property Covered.

Unless otherwise stated, each additional coverage:

    a.   applies to loss caused by a covered peril;

    b.   is not subject to and not considered in applying coinsurance when coinsurance conditions are added to this coverage; and

    c.   does not extend coverage to personal property at fairs or exhibitions.

1.   **Newly Built or Acquired Buildings** -- "We" cover direct physical loss to "your" buildings or structures:

    a.   being built at "covered locations" or while being built at other than "covered locations"; or

    b.   that "you" acquire during the policy period.

This additional coverage applies for 120 days from the date "you" acquire or begin to construct the building or structure or until "you" report the property to "us", whichever occurs first. This coverage does not go beyond the end of the policy period.

"You" must pay any additional premium due from the date construction is started or from the date "you" acquire the property.

The most "we" pay in any one occurrence for each newly built or acquired building or structure is $500,000.

2.   **Business Personal Property - Acquired Locations** -- "We" cover direct physical loss to "your" business personal property at locations that "you" acquire during the policy period.

This coverage applies for 120 days from the date "you" acquire the location or until "you" report the acquired location to "us", whichever occurs first. This coverage does not go beyond the end of the policy period.

"You" must pay any additional premium due from the date "you" acquire the location.

The most "we" pay in any one occurrence for business personal property at each location "you" acquire is $250,000.

3. **Locations "You" Elect Not To Describe --** "We" cover direct physical loss to "your" building property and business personal property at locations that are not described on the Location Schedule.

   The "limit" provided under this additional coverage cannot be combined or added to the "limits" for Newly Acquired Buildings and Personal Property - Acquired Locations.

   The most "we" pay in any one occurrence for each unscheduled location is $50,000.

4. **Newly Built or Acquired Locations - Income Coverage --** If the Commercial Output Program - Income Coverage Part is attached to this policy, "we" extend "your" coverage for earnings and extra expense to include direct physical loss to "your" covered property while at any location being built or at locations that "you" acquire during the policy period.

   If a loss occurs at a location being built and the loss delays the start of "your" "business", the "restoration period" starts from the time "your" "business" would have begun had no loss occurred.

   This coverage applies for 120 days from the date the location is acquired or construction begins or until "you" report the location to "us", whichever occurs first. This coverage does not go beyond the end of the policy period.

   "You" must pay any additional premium due from the date construction is started or "you" acquire the location.

   The most "we" pay in any one occurrence for loss of earnings and incurred extra expense at each newly acquired or built location is $250,000.

## HOW MUCH WE PAY

The following provisions are added to How Much We Pay if a coinsurance percentage is indicated on the "schedule of coverages".

1. **Coinsurance, Property Coverage Part --** "We" pay only a part of the loss if the "limit" is less than the value of the covered property at the time of the loss multiplied by the coinsurance percentage. "Our" part of the loss is determined using the following steps:

   a. multiply the value of the covered property at the time of the loss by the coinsurance percentage;

   b. divide the "limit" for covered property by the result determined in a. above;

   c. multiply the total amount of loss, after the application of any deductible, by the result determined in b. above.

   "We" pay the amount determined in c. above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

   If there is more than one "limit" indicated on the "schedule of coverage", this procedure applies separately to each covered property for which a "limit" is shown.

   If there is only one "limit" indicated on the "schedule of coverage", this procedure applies to the total of all covered property to which the "limit" applies.

2. **Coinsurance, Income Coverage Part --** If the Commercial Output Program - Income Coverage Part is attached to this policy, "we" pay only a part of the loss if the "limit" is less than the coinsurance percentage multiplied by the sum of "your" net income (net profit or loss before income taxes) and continuing operating expenses projected for the 12 months following the inception of this policy or the last previous anniversary date of this policy (whichever is later), normally earned by "your" "business".

AAIS
CO 1227 05 02
Page 3 of 3

"Our" part of the loss is determined using the following steps:

a.  multiply the coinsurance percentage by the sum of "your" net income and continuing operating expenses projected for the 12 months following the inception of this policy or the last previous anniversary date of this policy;

b.  divide the "limit" by the figure determined in a. above;

c.  multiply the total amount of loss by the figure determined in b. above.

"We" pay the amount determined in c. above or the "limit", whichever is less. "We" do not pay any remaining part of the loss.

If there is more than one "limit" indicated on the "schedule of coverage" for the Income Coverage Part, this procedure applies separately to each "limit".

Coinsurance does not apply to coverage for extra expense.

CO 1227 05 02
Copyright, American Association of Insurance Services, 2002

**AAIS**
**CO 1054 04 02**
**Page 1 of 2**

# CRIME SCHEDULE
## BLANKET LIMITS

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

**LIMITS** (check if coverage is applicable)

**[ x ] Employee Fraud and Dishonesty Coverage**

| | |
|---|---|
| Limit - The most "we" pay for loss in any one occurrence is: | $25,000 |
| Deductible Amount: | $500 |

**[x ] Money and Securities Coverage**

| | |
|---|---|
| Limit - The most "we" pay for loss in any one occurrence at "covered locations" is: | $25,000 |
| Limit - The most "we" pay for loss in any one occurrence away from "covered locations" is: | $10,000 |
| Deductible Amount: | $500 |

**LOCATION COVERAGE** (check one)

[ x ] Blanket Location Coverage -- Coverage(s) indicated above under Limits
applies to all "covered locations".

[  ] Schedule Location Coverage  -- Refer to Crime Schedule - Covered
Locations

**COVERAGE EXTENSIONS**

| | **Limit** |
|---|---|
| Employee Fraud and Dishonesty -- Outside the Coverage Territory | Subject to full Employee Fraud & Dishonesty Limit   90 days |
| Money and Securities -- Conveyance by Armored Vehicle | $10,000 |

**SUPPLEMENTAL COVERAGE**

| | **Limit** |
|---|---|
| Inventory and Proof of Loss Expense: | $_____ _____ |
| Loss Sustained Prior To The Policy Period: | _____covered_____ |

AAIS
CO 1054 04 02
Page 2 of 2

**COVERAGE OPTIONS** (check if applicable)

[ ]  Actual Cash Value - "Other Covered Property"

**EMPLOYEE WELFARE OR PENSION BENEFIT PLAN**

Named Plan:

_____

_____

_____

_____

**CANCELLATION OF PRIOR INSURANCE**

By acceptance of this Policy which includes a Crime Coverage Part, "you" give "us" notice canceling prior Policy or Bond numbers, the cancellation to be effective at the time this Policy becomes effective.

**OPTIONAL ENDORSEMENTS**

_____

_____

_____

_____

_____

CO 1054 04 02

Copyright, American Association of Insurance Services, 2002

AAIS
CO 1006 04 02
Page 1 of 10

# CRIME COVERAGE PART
## EMPLOYEE FRAUD AND DISHONESTY
## MONEY AND SECURITIES

## AGREEMENT

In return for "your" payment of required premium, "we" provide the coverage described herein subject to all the "terms" in this coverage part and in the "schedule of coverages", Common Policy Conditions, Definitions, What Must Be Done In Case Of Loss, Loss Payment, and Other Conditions of the Commercial Output Program - Property Coverage Part.

## DEFINITIONS

1. "Computer fraud" means the fraudulent transfer, payment, or delivery of covered property:

   a. from a "covered location", "your" "computer", or a banking premises to a person or place outside of a "covered location"; and

   b. directly related to the use of any "hardware", "software" or peripheral equipment whether or not owned by "you" or in "your" care, custody, or control.

2. "Employee" means any natural person while in "your" service (and for 30 days after termination of service); whom "you" compensate directly by salary, wages, or commissions; and whom "you" have the right to direct and control while performing services for "you". "Employee" also means any natural person:

   a. who is employed by an employment contractor while that person is subject to "your" direction and control and performing services for "you" on a:

      1) long term basis; or

      2) short-term or temporary basis;

      excluding, however, any such short-term or temporary employee while having care and custody of property outside the "covered locations";

   b. who is a non-compensated volunteer while performing services for "you" excluding, however, any non-compensated persons while performing fund raising services;

   c. who is a student intern receiving practical work experience at "your" facility for course credit while acting within the scope of the usual duties of an "employee";

   d. who is:

      1) "your" director;
      2) "your" trustee; or
      3) any officer with an ownership interest of 25% or greater in any one or more of the entities named as insureds;

      while handling funds or "other covered property" of any employee welfare or pension benefit plan insured under this coverage part; or

   e. who is an administrator, employee, manager, officer, or trustee of any employee welfare or pension benefit plan insured under this coverage part with the exception of a plan administrator or manager who is an independent contractor.

   "Employee" does not mean any:

   a. agent, broker, factor, commission merchant, consignee, independent contractor, or similar representative; or

b.   director, trustee or "manager" except while performing acts coming within the scope of the usual duties of an "employee".

3.   "Forgery" means the fabricating or altering of any signature of the name of another person or organization with intent to deceive. A signature which consists in whole or in part of one's own name signed, with or without authority, in any capacity and for any purpose does not, in and of itself, constitute a forgery. "We" will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

4.   "Manager" means a person serving in a position that provides direction for "your" limited liability company.

5.   "Other covered property" means "your" tangible property or the tangible property of others not otherwise excluded under this coverage part.

## COVERAGE

"We" cover the property described in the following coverages unless the property is excluded or subject to limitations. "We" only cover a loss under a described coverage when the loss occurs during the policy period as shown in the declarations.

"We" cover loss caused by a peril described in the following coverages when a specific "limit" is indicated on the Crime Schedule for the coverage. If Not Covered is inserted opposite any specified coverage, such coverage and any other reference to that coverage in this coverage part will be deemed to be deleted from this policy.

1.   **Employee Fraud and Dishonesty** -- "We" cover direct physical loss of and direct loss from damage to:

a.   "money";

b.   "securities"; and

c.   "other covered property"

that "you" own, hold, or for which "you" are legally liable including, property inside the premises of a customer of "yours", that results from dishonest or fraudulent acts committed by any of "your" "employees", whether identified or not, while acting alone or in collusion with other individuals.

Dishonest or fraudulent acts includes, but is not limited to, "theft", "computer fraud", and "forgery" or alteration.

The most "we" will pay in any one occurrence is the applicable Employee Fraud and Dishonesty "limit" indicated in the Crime Schedule. As respects Employee Fraud and Dishonesty coverage, an occurrence means all loss which results from one or a series of fraudulent or dishonest acts caused by one or more "employees"

2.   **Money and Securities** -- "We" cover loss caused by "theft", disappearance, or destruction of "money", "securities", bullion, and lottery tickets that "you" own, hold, or for which "you" are legally liable while:

a.   at "covered locations" or premises of a bank or savings institution; or

b.   away from "covered locations" while:

1)   in the care, custody, or control of:

a)   "you";
b)   "your" partners, officers, directors, "managers", "employees"; or
c)   members with ownership interest in any limited liability company named as an insured; or

2)   temporarily within "your" residence or the residence of:

a)   "your" partners, officers, directors, "managers", "employees"; or
b)   members with ownership interest in any limited liability company named as an insured.

The most "we" will pay in any one occurrence is the applicable Money and Securities "limit" indicated in the Crime Schedule. As respects Money and Securities coverage, an occurrence means an act or event or a series of related acts or events without regard to the number of persons involved in causing the loss.

## COVERAGE EXTENSIONS

The "limits" applicable to the following Coverage Extensions are shown in the Crime Schedule. However, if no "limit" is indicated for a Coverage Extension, coverage is provided up to the full "limit" for the applicable coverage, unless a different "limit" is indicated in the Crime Schedule.

1.  **Employee Fraud and Dishonesty** -- The coverage provided below is part of, and not in addition to, the applicable Employee Fraud and Dishonesty "limit".

    **Outside Coverage Territory** -- "We" cover direct physical loss of, and direct loss to:

    a.  "money";

    b.  "securities"; and

    c.  "other covered property";

    that results from dishonest or fraudulent acts committed by any of "your" "employees" while the "employee" was temporarily outside of the Territorial Limits for not more than 90 days.

    Dishonest or fraudulent acts includes, but is not limited to, "theft", "computer fraud", and "forgery" or alteration.

    Loss payment is subject to the Employee Fraud and Dishonesty deductible.

2.  **Money and Securities** -- The coverage provided below is part of, and not in addition to, the applicable Money and Securities "limit".

    **Conveyance By Armored Vehicle** -- "We" cover loss caused by "theft", disappearance, or destruction to "money", "securities", bullion, and lottery tickets that "you" own, hold, or for which "you" are legally liable while in the care, custody, or control of an armored vehicle company.

    "We" pay only for the amount of "your" loss that "you" cannot recover:

    a.  under "your" contract with the armored vehicle company; and

    b.  from any insurance or indemnity coverage carried by the armored vehicle for the benefit of customers.

    The most "we" will pay in any one occurrence is the Money and Securities Conveyance By Armored Vehicle "limit" indicated in the "schedule of coverages". Loss payment is subject to the applicable Money and Securities deductible.

## SUPPLEMENTAL COVERAGES

Unless otherwise indicated, the "limit" for a Supplemental Coverage is separate from, and not part of, the applicable "limit" for the coverages described under Coverage. However, if no "limit" is indicated for a Supplemental Coverage, coverage is provided up to the full "limit" for the applicable coverage. The "limit" available for coverage described under a Supplemental Coverage:

a.  is the only "limit" available for the described coverage; and

b.  is not the sum of the "limit" indicated for a Supplemental Coverage and the "limit" for the coverages described under Coverage.

1. **Inventory Fees and Proof of Loss Expense** -- "We" will pay for the reasonable expenses "you" incur, at "our" request, to prove "your" claim and to determine the amount of the loss or damage covered under this coverage part.

   "We" will not pay expenses:

   a. incurred in conjunction with the Appraisal Provision; or

   b. public adjuster fees.

   "We" will pay up to $5,000 under this Supplemental Coverage unless a different "limit" is indicated in the Crime Schedule. If a different "limit" is indicated in the Crime Schedule, that "limit" will apply instead of the "limit" shown above.

   No deductible applies to this Supplemental Coverage.

2. **Loss Sustained Prior To The Policy Period Of This Insurance** --

   a. If "you" sustained loss prior to the policy period of this insurance that "you" could have recovered under prior insurance except that the time within which to discover the loss under the prior insurance had expired, "we" will cover "your" loss under this Crime Coverage Part, provided:

      1) the effective date of this insurance corresponds with the date of cancellation or termination of the prior insurance; and
      2) this insurance would have covered "your" loss had it been in force at the time when the act or event causing the loss took place or was performed.

   b. The amount "you" can recover is limited to the lesser of the applicable "limit" for:

      1) insurance under the Crime Coverage Part as of its effective date; or
      2) the prior insurance.

This Supplemental Coverage is part of, and not in addition to, the applicable "limits" for coverage described under Coverage.

If a loss is covered by the Crime Coverage Part and would have been covered under prior insurance with a lower applicable deductible than the deductible that applies to the Crime Coverage Part, the lower deductible will apply.

## PERILS EXCLUDED

1. "We" do not pay for loss or damage caused directly or indirectly by one or more of the following excluded causes or events. Such loss or damage is excluded regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

   a. **Civil Authority** -- "We" do not pay for loss caused by any civil authority, including seizure, confiscation, destruction, or quarantine of property.

   b. **Nuclear Hazard** -- "We" do not pay for loss caused by or resulting from nuclear reaction, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled; whether caused by natural, accidental, or artificial means). Loss caused by nuclear hazard is not considered loss caused by fire, explosion, or smoke.

   c. **War and Military Action** -- "We" do not pay for loss caused by:

      1) war, including undeclared war or civil war; or
      2) a warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

3) insurrection, rebellion, revolution, or unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contamination, this War and Military Action Exclusion will apply in place of the Nuclear Hazard Exclusion.

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following excluded causes or events:

a. **Criminal, Fraudulent, Dishonest, or Illegal Acts** -- "We" do not pay for loss caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another person by:

1) "you";
2) "your" partners;
3) members with ownership interest in any limited liability company named as an insured; or
4) officers with ownership interest of 25% or greater in any one or more of the entities named as insureds.

b. **Discovery After the Policy Period** -- "We" do not pay for any loss that is not discovered within one year of the end of the policy period. In the event of cancellation or termination of:

1) this policy;
2) any of the coverages described under this coverage part; or
3) any of the coverages described under this coverage part, as respects any insured or "employee";

"we" do not pay for any loss that is not discovered within one year from the date of the cancellation or termination.

c. **Indirect Loss** -- "We" do not pay for any loss that is an indirect result of any act or event covered under this coverage part including, but not limited to, loss resulting from:

1) "Your" ability to realize income, dividends, and interest that "you" would have realized had there been no loss of, or loss from damage to, property described under this coverage part.
2) Payment of damages of any type for which "you" are legally liable. But, "we" will pay compensatory damages arising directly from a covered loss described under this coverage part.
3) Payment of costs, fees or other expenses "you" incur to prove "your" claim and to determine the amount of loss or damage under this coverage part. However, this exclusion does not apply to:

a) the Appraisal provision described under the Commercial Output Program - Property Coverage Part; and
b) the provisions described under Supplemental Coverages - Inventory Fees and Proof of Loss Expense.

d. **Intangible Property or Trade Secrets** -- "We" will not pay for loss of confidential information or processing methods, trade secrets, or intangible property of any kind.

e. **Inventory Shortage or Profit/Loss Computation** -- "We" do not pay for loss or damage when the only proof of the loss or amount of the loss is dependent upon an inventory or a profit and loss computation.

However, where "you" establish that "you" have sustained a loss described under coverage for Employee Fraud and Dishonesty based on information separate from an inventory computation or profit and loss computations, then "you" may offer "your" inventory computation and/or profit and loss computations along with an actual physical count of inventory to support the other evidence as to the loss amount claimed.

f. **Legal Expenses** -- "We" do not pay for loss due to expenses related to the defense or prosecution of a legal proceeding or claim.

g. **Trading** -- "We" do not pay for loss resulting directly or indirectly from trading whether in "your" name or in a genuine or fictitious account including, but not limited to, trading in commodities, futures, stocks, bonds, or other financial instruments.

3. **Employee Fraud and Dishonesty** -- Unless otherwise noted, the following additional exclusions apply only to coverage described under Employee Fraud and Dishonesty.

"We" do not pay for loss or damage that is caused by or results from one or more of the following excluded causes or events:

a. **Discovery of Dishonest Acts** -- "We" do not pay for fraudulent or dishonest acts committed by any "employee" if:

1) "you";
2) any of "your" partners;
3) "your" officers, directors, or "managers"; or
4) members with ownership interest in any limited liability company named as an insured

have knowledge of any fraudulent or dishonest act committed by the "employee" whether before or after being employed by "you". This includes discovery by "you" or by any of "your" partners, officers, directors, "managers", or such members not in collusion with the "employee".

b. **Employee Canceled Under Prior Insurance** -- "We" do not pay for any loss caused by:

1) "your" "employee"; or
2) an "employee" of a predecessor in interest of "yours";

for whom similar prior insurance has been canceled and not reinstated since the last such cancellation.

c. **Vandalism** -- "We" do not pay for any loss or damage caused by vandalism, including but not limited to, any loss or damage to "your" "computers", "your" "computer" network, or "your" web site or denial of access to or services from such equipment caused by or resulting from a "computer virus" or by "computer hacking".

4. **Money and Securities** -- Unless otherwise noted, the following additional exclusions apply only to coverage described under Money and Securities.

"We" do not pay for loss or damage that is caused by or results from one or more of the following excluded causes or events:

a. **Criminal, Fraudulent, Dishonest, or Illegal Acts** -- "We" do not pay for loss caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another person by:

1) "your" "employees"; or
2) "your" directors, trustees, "managers" or authorized representatives.

b. **Errors or Omissions** -- "We" do not pay for loss resulting from accounting or arithmetical errors or omissions.

c. **Exchanges or Purchases** -- "We" do not pay for loss caused by or resulting from the giving or surrendering of property in any exchange or purchase

d. **Money Operated Devices** – "We" do not pay for loss of property contained in a "money" operated device unless the "money" deposited is recorded by a continuous recording instrument in the device.

e. **Property Surrender or Transfer** – "We" do not pay for loss of property after it has been surrendered or transferred to a person or place outside:

   1) a "covered location"; or
   2) the premises of a banking or saving institution;

   on the basis of unauthorized instructions or as a result of a threat to do bodily harm to any person or damage to any property.

   However, in the event of a threat to do bodily harm to any person or damage to any property, this exclusion does not apply to loss of property while outside a "covered location" or the premises of a bank or savings institution in the care and custody of "you", "your" partners, officers, directors, "managers", "employees", or members with ownership interest in any limited liability company named as an insured, if "you":

   1) had no knowledge of any threat at the time the transfer began; or
   2) had knowledge of a threat at the time the transfer began, but the loss was not related to the threat.

f. **Vandalism or Malicious Mischief** -- "We" do not pay for:

   1) loss from damage to a "covered location" or its exterior; or

   2) loss of, or damage to any cash box, cash drawer, cash register, safe, vault, or similar receptacle;

   caused by vandalism or malicious mischief.

g. **Voluntary Parting** -- "We" do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense. This exclusion applies whether the parting was by:

   1) "you"; or
   2) anyone acting on "your" express or implied authority.

## WHAT MUST BE DONE IN CASE OF LOSS

Notice For Crime Coverage and Proof Of Loss For Crime Coverage as described below replaces the Notice and Proof of Loss provisions under What Must Be Done In Case Of Loss in the Commercial Output Program - Property Coverage Part.

1. **Notice For Crime Coverage** -- In case of a loss, "you" must:

   a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice); and

   b. give notice to the:

      1) police when the act that causes the loss may have been a crime, except for acts that cause loss under Employee Fraud and Dishonesty;
      2) charge or credit card company if the loss involves a charge or credit card; and
      3) bank or savings institution if the loss involves a debit card.

2. **Proof Of Loss - Crime Coverage** -- "You" must send "us", within 120 days after "our" request, a signed, sworn proof of loss. This must include the following information:

   a. the time, place, and circumstances of the loss;

   b. other policies of insurance that may cover the loss;

   c. "your" interest and the interests of all others in the property involved, including all mortgages and liens;

   d. changes in title or occupancy of the covered property during the policy period;

   e. detailed estimates for repair or replacement of covered property; and

   f. an inventory of damaged and undamaged covered property showing in detail the quantity, description, cost, actual cash value, and amount of the loss. "You" must attach to the inventory copies of all bills, receipts, and related documents that substantiate the inventory.

## ADDITIONAL CRIME CONDITIONS

The following conditions apply in addition to those stipulated in the Common Policy Conditions and the Commercial Output Program - Property Coverage Part.

1. **Acquisition Of Employees Or Additional Locations** -- Insurance under the Crime Coverage Part is extended to additional persons who become "employees" and additional "covered locations" that "you" attain the control and use of through the:

   a. consolidation or merger with; or

   b. purchase of the assets of;

another entity.

"We" cover "your" additional "employees" and "covered locations", for acts committed or events occurring within 90 days from the date of the merger, consolidation, or purchase, provided that "you":

   a. furnish "us" with written notice of the merger, consolidation, or purchase within 90 days; and

   b. "you" pay "us" any additional premium from the date of the merger, consolidation, or purchase to the end of the policy period.

Acquisition of Employee Welfare or Pension Benefit Plans through a merger, consolidation, or purchase and that is sponsored solely by "you" or any named insured under this policy will be included as insureds under Employee Fraud and Dishonesty coverage.

2. **Discovery Period Extension** -- Insurance under the Crime Coverage Part is extended to cover any loss that is discovered up to one year from the end of the policy period. In the event of cancellation or termination of the Crime Coverage Part or any crime coverage, as to any insured, "we" cover any loss that is discovered up to one year from the date of that cancellation or termination.

3. **Multiple Named Insureds** -- The following provisions are applicable to this policy whenever there is more than one named insured.

   a. **Duty of First Named Insured** -- If more than one insured is named in the declarations, the first insured named in the declarations will act for itself and for all other insureds for every purpose related to insurance under this coverage part. If coverage for the first named insured ends, the next named insured listed will become the first named insured.

   b. **Employee Status** -- An "employee" of any named insured is considered to be an "employee" of all named insureds.

c.  **Pertinent Knowledge** -- If any insured or partner or officer of that insured has knowledge of any information pertinent to insurance under this coverage part, that knowledge is considered as known by each insured.

d.  **Payment to the First Named Insured** -- When "we" make payment for a loss to the first named insured, "we" no longer have any liability for that loss to any other named insured. When payment is made to a named insured other than the first named insured, the payment will be treated as though it was made to the first named insured.

4.  **Employee Welfare or Pension Benefit Plans** -- In compliance with the provisions of the Employee Retirement Income Security Act of 1974 (ERISA):

    a.  Any Employee Welfare or Pension Benefit Plan, hereafter called Plan, named in the Crime Schedule will be included as insureds under Employee Fraud and Dishonesty coverage.

    b.  If any Plan is insured together with any other named insured under this policy, "you" or the administrator of the Plan must select a "limit" under the coverage for Employee Fraud and Dishonesty that is sufficient to provide a "limit" of insurance for each Plan that is at least equal to the amount that would be required if each Plan were insured separately.

    c.  If both a Plan and another entity are named in the declarations as insureds, any payment "we" make to a named insured, other than a Plan, for loss sustained by a Plan must be held by the other entity for use by the Plan(s) that sustain the loss.

d.  If "money", "securities", or "other covered property" are commingled for two or more Plans, any payment for loss to such property will be shared by each Plan on a pro rata basis in accordance with the amount of coverage each Plan is required to carry by the Employee Retirement Income Security Act.

e.  The deductible provision does not apply to any loss sustained by a Plan.

5.  **Records Pertaining to Money and Securities** -- "You" must keep records of covered "money" and "securities" so "we" can verify the amount of loss.

## VALUATION

The following valuation provisions apply in addition to those stipulated in the Commercial Output Program - Property Coverage Part.

1.  **Bullion** -- Bullion is valued at the average cost for replacement that is published by the London Metals Market during the period of 14 days immediately preceding the discovery date of the loss or the actual amount paid for replacement, whichever is less.

2.  **Money** -- "Money" will be valued at its face value. At "our" option, "we" may pay for loss of "money" issued by any country other than the United States of America at face value in the "money" issued by that country or in the United States of America dollar equivalent as determined by the rate of exchange as reported by the Wall Street Journal, published in New York, on the day the loss was discovered.

3.  **Other Covered Property** -- The value of "other covered property" will be based on Replacement Cost as described under the Valuation section of the Commercial Output Program - Property Coverage Part.

If actual cash value is indicated in the Crime Schedule, the value of "other covered property" will be based on Actual Cash Value as described under the Valuation section of the Commercial Output Program - Property Coverage Part.

4. **Securities** -- The value of "securities" will be based on their value at the close of business on the day the loss was discovered. At "our" option, "we" may pay the value of the "securities" or replace them.

## HOW MUCH WE PAY

The following provisions for How Much We Pay apply in addition to those stipulated in the Commercial Output Program - Property Coverage Part.

1. **Limit of Insurance** -- The payment of loss under this coverage part will not reduce the "limit" of insurance for other losses provided, however, that the maximum "limit" does not exceed the dollar amount applicable to each coverage indicated in the Crime Schedule.

2. **Deductible** -- "We" pay only that part of "your" loss over the deductible amount in any one occurrence as stated on the Crime Schedule opposite each Coverage. If more than one deductible amount could apply to the same loss, only the highest deductible amount will be applied.

3. **Prior Insurance That We Issued Or Any Affiliate Issued** -- When a covered loss is covered in part by this coverage part and prior insurance that "we" issued or any of "our" affiliates issued, the most that "we" pay for a covered loss is the greater of the amount recoverable under:

   a. the Crime Coverage Part; or

   b. any prior coverage that was cancelled or terminated and that "we", or any of "our" affiliates had issued to "you".

4. **Insurance Under More Than One Policy** -- If "you" have another policy covering the same loss, "we" will pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. However, "we" will not pay more than the applicable "limit" of this coverage part.

5. **Limits and Multiple Years of Coverage** -- Regardless of the number of years the Crime Coverage Part remains in force the "limits" will not accumulate nor can they be added together from year to year or policy period to policy period.

6. **Payment of Loss Sustained By More Than One Named Insured** -- "We" will not pay more for loss sustained by more than one named insured than the amount "we" would pay if one insured had sustained the entire loss.

CO 1006 04 02
Copyright, American Association of Insurance Services. 2002

**AAIS**
**CO 1062 04 02**

---

# EARTHQUAKE SCHEDULE

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

Refer to "schedule of coverages" for applicable "catastrophe limit" and earthquake deductible.

---

## SCHEDULE

---

**Loc.**
**No.**     **Location** (describe)
            SEE FORM CO 1052 (04 02) LOCATION SCHEDULE

**Covered Property/Coverage Provided** (describe)

BUILDINGS, BUSINESS PERSONAL PROPERTY AND INCOME AS PER
LOCATION SCHEDULE CO1052.

**Limits**

"Occurrence Limit"     $1,000,000

"Aggregate Limit"      $1,000,000

---

**CO 1062 04 02**

Copyright, American Association of Insurance Services, 2002

AAIS
CO 1221 05 02
Page 1 of 2

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

# EARTHQUAKE ENDORSEMENT

Provisions under this endorsement do not apply to "mobile equipment" and the Supplemental Marine Coverages. Unless described on the Earthquake Schedule, this endorsement does not apply to "computers".

## ADDITIONAL DEFINITIONS

1. "Aggregate limit" means the amount of coverage that applies to loss at each location during each separate 12-month period of this policy; this is limited to the expiration or anniversary date.

2. "Occurrence limit" means the amount of coverage that applies to loss in any one occurrence at each location.

3. "Catastrophe limit" means the amount of coverage that applies to all losses at all locations during each separate 12-month period of this policy; this is limited to the expiration or anniversary date.

## PERILS COVERED

Volcanic eruption means the eruption, explosion, or effusion of a volcano.

**Scheduled Earthquake Coverage** -- When scheduled earthquake coverage is indicated on the "schedule of coverages", "we" cover direct physical loss caused by earthquake and volcanic eruption to property and locations described on the Earthquake Schedule.

**Blanket Earthquake Coverage** -- When blanket earthquake coverage is indicated on the "schedule of coverages", "we" cover direct physical loss to covered property at "covered locations" caused by earthquake and volcanic eruption.

## PERILS EXCLUDED

Under Perils Excluded, Earth Movement is replaced by the following:

**Earth Movement or Volcanic Eruption** -- "We" do not pay for loss caused by:

1. earthquake or volcanic eruption that begins before the inception date of this coverage;

2. blasting (other than volcanic explosion); and

3. landslide, mine subsidence, mudflow, or mudslide even if caused by earthquake or volcanic eruption.

## HOW MUCH WE PAY

The following are added to How Much We Pay:

1. **Deductible --** "We" pay only that part of "your" loss over the earthquake deductible indicated on the "schedule of coverages" in any one occurrence. The deductible may be shown as either an amount or a percentage. When shown as a percentage, the deductible is that percentage of the value of the covered property at the time of the loss.

   This deductible replaces any other deductible for the perils of earthquake and volcanic eruption.

   However, in the event of a total loss to a building or structure, the deductible does not apply.

AAIS
CO 1221 05 02
Page 2 of 2

2. **Limits That Apply To Scheduled Earthquake Coverage** -- When scheduled earthquake coverage is indicated on the "schedule of coverages", the following "limits" apply to loss to covered property caused by earthquake and volcanic eruption, subject to the provisions under Loss Settlement Terms:

   a. The most "we" pay for loss caused by earthquake and volcanic eruption in any one occurrence at a location described on the Earthquake Schedule is the "occurrence limit" indicated on the schedule.

   b. The most "we" pay for loss caused by earthquake and volcanic eruption at a location described on the Earthquake Schedule during a 12-month period is the "aggregate limit" indicated on the schedule.

   c. The most "we" pay for all losses caused by earthquake and volcanic eruption at all locations described on the Earthquake Schedule during a 12-month period is the "schedule of coverages".

3. **Limits That Apply To Blanket Earthquake Coverage** -- When blanket earthquake coverage is indicated on the "schedule of coverages", the following "limits" apply to loss to covered property caused by earthquake and volcanic eruption, subject to the provisions under Loss Settlement Terms:

   a. The most "we" pay for loss caused by earthquake and volcanic eruption in any one occurrence at a "covered location" is the "occurrence limit" indicated on the "schedule of coverages".

   b. The most "we" pay for loss caused by earthquake and volcanic eruption at a "covered location" during a 12-month period is the "aggregate limit" indicated on the "schedule of coverages".

   c. The most "we" pay for all losses caused by earthquake and volcanic eruption at all "covered locations" during a 12-month period is the "catastrophe limit" indicated on the "schedule of coverages".

4. **Excess Insurance** -- "You" may purchase insurance in excess of the applicable "limit" for earthquake coverage. Such excess insurance will not be considered in applying Insurance Under More Than One Policy nor will it be considered in the application of any pro rata or apportionment provision.

CO 1221 05 02
Copyright, American Association of Insurance Services, 2002

**AAIS**
**CO 1063 04 02**

# FLOOD SCHEDULE

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

Refer to "schedule of coverages" for applicable "catastrophe limit" and flood
deductible.

## SCHEDULE

**Loc.**
**No.**                          **Location** (describe)

SEE FORM CO 1052 (04 02) LOCATION SCHEDLE

**Covered Property/Coverage Provided** (describe)

BUILDINGS, BUSINESS PERSONAL PROPERTY AND INCOME AS PER
LOCATION SCHEDULE CO1052.

**Limits**

"Occurrence Limit"      $1,000,000
"Aggregate Limit"       $1,000,000

**CO 1063 04 02**

Copyright, American Association of Insurance Services, 2002

| AAIS | This endorsement changes |
|---|---|
| CO 1223 04 02 | the policy |
| Page 1 of 2 | -- PLEASE READ THIS CAREFULLY -- |

# FLOOD ENDORSEMENT

Provisions under this endorsement do not apply to "mobile equipment" and the Supplemental Marine Coverages. Unless described on the Scheduled Flood Endorsement, this endorsement does not apply to "computers".

## ADDITIONAL DEFINITIONS

1. "Aggregate limit" means the amount of coverage that applies to all losses at each location during each separate 12 month period of this policy; this is limited to the expiration or anniversary date.

2. "Occurrence limit" means the amount of coverage that applies to a loss in any one occurrence at each location.

3. "Catastrophe limit" means the amount of coverage that applies to all losses at all locations during each separate 12 month period of this policy; this is limited to the expiration or anniversary date.

## PERILS COVERED

**Scheduled Flood Coverage** -- When scheduled flood coverage is indicated on the "schedule of coverages", "we" cover direct physical loss caused by "flood" to covered property at-locations described on the Flood Schedule.

**Blanket Flood Coverage** -- When blanket flood coverage is indicated on the "schedule of coverages", "we" cover direct physical loss to covered property at "covered locations" caused by "flood".

## PERILS EXCLUDED

Under Perils Excluded, the exclusion for Flood is deleted.

## HOW MUCH WE PAY

The following are added to How Much We Pay:

1. **Deductible** -- "We" pay only that part of "your" loss over the flood deductible indicated on the "schedule of coverages" in any one occurrence. The deductible may be shown as either an amount or a percentage. When shown as a percentage, the deductible is that percentage of the value of the covered property at the time of the loss.

   This deductible replaces any other deductible for the peril of "flood".

2. **Limits That Apply To Scheduled Flood Coverage** -- When scheduled flood coverage is indicated on the "schedule of coverages", the following "limits" apply to loss to covered property caused by "flood", subject to the provisions under Loss Settlement Terms:

   a. The most "we" pay for loss caused by "flood" in any one occurrence at a location described on the Flood Schedule is the "occurrence limit" indicated on the schedule.

   b. The most "we" pay for loss caused by "flood" at a location described on the Flood Schedule during a 12 month period is the "aggregate limit" indicated on the schedule.

c.  The most "we" pay for all losses caused by "flood" at all locations described on the Flood Schedule during a 12 month period is the "catastrophe limit" indicated on the "schedule of coverages".

3.  **Limits That Apply To Blanket Flood Coverage** -- When blanket flood coverage is indicated on the "schedule of coverages", the following "limits" apply to loss to covered property caused by "flood", subject to the provisions under Loss Settlement Terms:

    a.  The most "we" pay for loss caused by "flood" in any one occurrence at a "covered location" is the "occurrence limit" indicated on the "schedule of coverages".

    b.  The most "we" pay for loss caused by "flood" at a "covered location" during a 12 month period is the "aggregate limit" indicated on the "schedule of coverages".

c.  The most "we" pay for all losses caused by "flood" at all "covered locations" during a 12 month period is the "catastrophe limit" indicated on the "schedule of coverages".

4.  **Excess Insurance And Other Insurance** -- "You" may purchase insurance in excess of the applicable "limit" for flood coverage. "You" may also use insurance under this endorsement as excess insurance over another policy. Such excess or other insurance will not be considered in applying Insurance Under More Than One Policy nor will it be considered in the application of any pro rata or apportionment provision.

CO 1223 04 02
Copyright, American Association of Insurance Services, 2002

**AAIS**
**CO 1080 11 03**
**Page 1 of 1**

# LIMITED FUNGUS AND RELATED PERILS SCHEDULE
## BLANKET LIMIT

(The information required below may be indicated
on the "schedule of coverages".)

## PROPERTY COVERAGE EXTENSION

**Limited Fungus And Related Perils
Property Coverage**

|  | Limit |
|---|---|
| The most "we" pay for all losses at all covered locations is: | $15,000 |

## INCOME COVERAGE EXTENSION

**Limited Fungus And Related Perils
Income Coverage**

Time Limitation:                                    _____days

**CO 1080 11 03**

Copyright, American Association of Insurance Services, Inc., 2003

AAIS
CO 1293 11 03
Page 1 of 4

This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --

## LIMITED FUNGUS AND RELATED PERILS COVERAGE

This policy is amended to include the following "terms". All other "terms" of the policy apply, except as amended by this endorsement.

## DEFINITIONS

The following definition is added:

"Fungus or related perils" means:

a.  a fungus, including but not limited to mildew and mold;

b.  a protist, including but not limited to algae and slime mold;

c.  wet rot;

d.  dry rot;

e.  a bacterium; or

f.  a chemical, matter, or compound produced or released by a fungus, a protist, wet rot, dry rot, or a bacterium, including but not limited to toxins, spores, fragments, and metabolites such as microbial volatile organic compounds.

## PERILS EXCLUDED

1.  The following exclusion is added under Perils Excluded, item 1:

    **Fungus or Related Perils --**

    a.  Except as provided under the Limited Fungus and Related Perils Property and Income Coverage in this endorsement, "we" do not pay for loss, cost, or expense caused by or relating to the existence of or any activity of "fungus or related perils".

But if "fungus or related perils" results in a "specified peril", we cover loss or damage caused by that "specified peril".

b.  This exclusion does not apply to:

1)  loss that results from fire or lightning; or

2)  collapse caused by hidden decay, to the extent that such loss is covered under Other Coverages, Collapse.

2.  Under Perils Excluded, the exclusion for Contamination Or Deterioration and Seepage are deleted and replaced by the following:

    a.  **Contamination Or Deterioration --** "We" do not pay for loss caused by contamination or deterioration including corrosion, decay, rust, or any quality, fault, or weakness in covered property that causes it to damage or destroy itself.

    But if contamination or deterioration results in a "specified peril" or breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or breakage of building glass.

    This exclusion does not apply to loss caused by corrosion, decay, or rust to "computers" that results from direct physical damage by a covered peril to the air conditioning system that services "your" "computers".

    b.  **Seepage --** "We" do not pay for loss caused by continuous or repeated seepage or leakage of water or steam or the presence of moisture, humidity, or vapor that occurs over a period of 14 days or more.

Copyright, American Association of Insurance Services, Inc., 2003

AAIS
CO 1293 11 03
Page 2 of 4

## COVERAGE EXTENSIONS

The following coverage is added to Coverage Extensions:

**Limited Fungus And Related Perils Property Coverage --**

1. **Coverage** -- "We" pay for direct physical loss to covered property caused by or relating to the existence of or any activity of "fungus or related perils".

2. **Coverage Limitation** -- "We" only cover loss caused by "fungus or related perils":

   a. when the "fungus or related peril" is the result of:

      1) a "specified peril" other than fire or lightning; or
      2) "flood" (if the Flood Endorsement applies to the affected location);

      that occurs during the policy period; and

   b. if all reasonable steps were taken to protect the property from additional damage at and after the time of the occurrence.

3. **Blanket Limit** -- If Blanket Limit is indicated on the Limited Fungus and Related Perils Schedule, the most "we" pay for all losses at all "covered locations" is $15,000, unless another "limit" is indicated on the schedule. The Blanket Limit applies regardless of the number of claims made.

   The Blanket Limit applies regardless of the number of locations or buildings insured under this policy.

   The Blanket Limit is the most that "we" pay for the total of all loss or damage arising out of all occurrences of "specified perils", other than fire or lightning, or "flood" (if applicable) during each separate 12-month period beginning with the inception date of this policy.

4. **Location Limit** -- If Location Limit is indicated on the Limited Fungus and Related Perils Schedule, the most "we" pay for all losses at each location described on the Limited Fungus and Related Perils Schedule is $15,000, unless another "limit" is indicated on the schedule. The Location Limit applies regardless of the number of claims made at a described location.

   The Location Limit is the most that "we" pay at each location for the total of all loss or damage arising out of all occurrences of "specified perils" other than fire or lightning or "flood" (if applicable) during each separate 12-month period beginning with the inception date of this policy.

5. **If The Policy Period Is Extended** -- If the policy period is extended for an additional period of less than 12 months, this additional period will be considered part of the preceding period for the purpose of determining the Blanket Limit or Location Limit.

6. **Recurrence And Continuation of Fungus Or Related Perils** -- The Blanket Limit or Location Limit is the most that "we" pay with respect to a specific occurrence of a loss which results in "fungus or related perils" even if such "fungus or related perils" recur or continue to exist during this or any future policy period.

7. **Limit Applies To Other Costs Or Expenses** -- The Blanket Limit or Location Limit also applies to any cost or expense to:

   a. clean up, contain, treat, detoxify, or neutralize "fungus or related perils" on covered property or remove "fungus or related perils" from covered property;

   b. remove and replace those parts of covered property necessary to gain access to "fungus or related perils"; and

Copyright, American Association of Insurance Services, Inc., 2003

AAIS
CO 1293 11 03
Page 3 of 4

c.  test for the existence or level of "fungus or related perils" following the repair, replacement, restoration, or removal of damaged property if it is reasonable to believe that "fungus or related perils" are present.

8.  **Loss Caused In Total Or In Part By Fungus Or Related Perils** -- The "terms" of this coverage extension do not apply to covered loss or damage to covered property that is not caused, in total or in part, by "fungus or related perils" except to the extent that "fungus or related perils" causes an increase in the loss. When "fungus or related perils" cause an increase in such a loss, that increase is subject to the "terms" of this coverage.

## SUPPLEMENTAL COVERAGES

The following provision is added under the Supplemental Coverages, Ordinance or Law (Undamaged Parts of a Building) and Ordinance or Law (Increased Cost to Repair and Cost to Demolish and Clear Site):

**We Do Not Pay** -- "We" do not pay for:

1.  loss or increased cost caused by the enforcement of any ordinance, law, or decree that requires the reconstruction, repair, replacement, remodeling, remediation, or razing of property due to the existence of or any activity of "fungus or related perils"; or

2.  costs associated with the enforcement of any ordinance, law, or decree that requires "you" or anyone else to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of "fungus or related perils".

## INCOME COVERAGE EXTENSIONS

Coverage provided under the Income Coverage Part - Coverage Extensions, if applicable, is amended by the following provision.

**Limited Fungus And Related Perils Income Coverage** --

1.  **Coverage** -- Coverage for earnings and/or extra expense is extended to loss of earnings or extra expenses caused by "fungus or related perils".

2.  **Coverage Limitation** -- "We" only cover loss of earnings and/or extra expense caused by "fungus or related perils":

    a.  when the "fungus or related peril" is the result of:

        1)  a "specified peril" other than fire or lightning; or
        2)  "flood" (if the Flood Endorsement applies to the affected location);

        that occurs during the policy period; and

    b.  if all reasonable steps were taken to protect the property from additional damage at and after the time of the occurrence.

3.  **Time Limitation** --

    a.  "We" will pay up to 30 days (unless otherwise indicated on the Limited Fungus and Related Perils Schedule) for loss of earnings and/or extra expense if a loss which resulted in "fungus or related perils" does not in itself interrupt "your" "business", but such interruption is necessary due to the loss or damage to property caused by "fungus or related perils". The days need not be successive.

Copyright, American Association of Insurance Services, Inc., 2003

AAIS
CO 1293 11 03
Page 4 of 4

b. If a covered "business" interruption was caused by loss or damage other than "fungus or related perils" but remediation of "fungus and related perils" lengthens the "restoration period", "we" will pay up to 30 days (unless otherwise indicated on the Limited Fungus and Related Perils Schedule) for loss of earnings and/or expense sustained during the delay (regardless of when such delay for remediation occurs during the "restoration period"). The days need not be successive.

## OTHER COVERAGES

The "terms" of the Limited Fungus And Related Perils Property and Income Coverages do not increase or decrease the coverages under Other Coverages:

1. Collapse; or

2. Tearing Out and Replacing.

## OTHER CONDITIONS

The conditions described under Restoration Of Limits do not apply to the coverages provided under this endorsement.

CO 1293 11 03

Copyright, American Association of Insurance Services, Inc., 2003



**QBE.**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CONDOMINIUM PRO
# COVERAGE ENHANCEMENT

| | |
|---|---|
| **Name of Parent Company:** | |
| **Policy Number:** | MC1800000042800 |
| **Endorsement Number:** | |
| **Effective Date of Endorsement:** | 05/01/2020 |
| **Name of Insurer:** | QBE Insurance Corporation |

This endorsement modifies insurance provided under the following:

COMMERCIAL OUTPUT PROGRAM PROPERTY COVERAGE PART

I.  For the coverage provided by this endorsement, the Commercial Output Program Property Coverage Part is amended as follows:

A.  Under PROPERTY COVERED, BUILDING PROPERTY, the Covered Building Property provision is deleted and replaced with the following:

1.  **Covered Building Property** -- Covered Building Property means buildings and structures and:

a.  completed additions;

b.  fixtures, machinery and equipment which are a permanent part of a covered building or structure and not part of or within an individual unit;

c.  outdoor fixtures outside of individual units;

d.  personal property owned by "you" and used to maintain or service a covered building or structure or its premises. This includes air-conditioning, venting and heating equipment; fire extinguishing apparatus and security systems; floor coverings; and appliances for refrigerating, cooking, dish washing, and laundering;

e.  if not covered by other insurance, buildings and additions to buildings under construction, alteration, and repair including:

1)  materials, equipment, supplies, and temporary structures, on or within 1,000 feet of a "covered location", intended and designated for use in the construction, alteration, and repair of buildings or additions to buildings; and

2)  "your" contractual liability for the interest of contractors and subcontractors in buildings and additions to buildings under construction, alteration, and repair such as materials, equipment, supplies, and temporary structures, on or within 1,000 feet of a "covered location", intended and designated for use in the construction, alteration, and repair of buildings or additions to buildings;

f.  building glass;

g.  the following property if it is located on or within 1,000 feet of a covered building or structure:

Includes copyrighted material of American Association of Insurance Services used with its permission.

QBCP-2022 (12-17)      Includes copyrighted material of Insurance Services Office, Inc., with its permission.      Page 1 of 12

1) radio and television towers, antennas, satellite dishes, masts, lead-in wiring, and guy wires. This includes foundations and any other property that is permanently attached to any of these types of property;

2) awnings or canopies; and

3) balconies; indoor or rooftop swimming pools; porches; decks; patios;

h. signs, whether or not they are attached to covered buildings, or structures;

i. foundations of buildings, structures, machinery, or boilers;

j. clubhouses, meeting centers, boat houses, attached garages and carports, buildings housing sewage treatment facilities, and buildings housing heating and air conditioning plants;

k. other structures not described in the "schedule of coverages" and used in whole as cabanas, recreation courts and fixtures, pool houses, gates, gate houses, storage sheds, shelters, mailboxes, gazebos, pump houses, fences, walkways, roadways, other paved surfaces, outdoor fixtures, outdoor swimming pools, flagpoles, light poles, fountains, outside statues, detached signs, temporary seasonal structures, and freestanding walls, other than retaining walls; or

l. any of the following types of property contained within a unit, regardless of ownership if "your" Condominium Association Agreement requires you insure it:

1) fixtures, improvements, alterations, machinery, and equipment which are a permanent part of a covered building or structure; and

2) appliances for refrigerating, ventilating, cooking, dish washing, laundering, security or housekeeping;

However, if one or both of the following options are selected on the "schedule of coverages" and such selection provides broader coverage than the coverage that is required by the Condominium Association's governing documents in Paragraph l. above, losses shall be adjusted according to the selected coverage(s):

(a) Single Entity:

Property within units, regardless of ownership, which was installed at the time of the original construction according to the condominium's plans and specifications, or the replacement of such property with materials of like kind and quality, including appliances used for refrigeration, freezing, cooking, dishwashing, ventilating, laundering, security or housekeeping.

(b) Inclusive:

Improvements and betterments made by the unit-owner to property within the unit, including appliances used for refrigeration, freezing, cooking, dishwashing, ventilating, laundering, security or housekeeping.

If neither Single Entity Coverage nor Inclusive Coverage is shown on the "schedule of coverages", losses to the unit shall be adjusted per the Condominium Association's governing documents.

Covered Building Property does not include the personal property owned by, used by, or in the care, custody and control of a unit-owner except for the personal property listed in A.1.l. above.

B. Under PROPERTY COVERED, BUILDING PROPERTY, the Building Property That Is Not Covered provision is deleted and replaced with the following:

2. **Building Property That Is Not Covered** -- Except as provided under

QBCP-2022 (12-17)

Includes copyrighted material of American Association of Insurance Services used with its permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 2 of 12

Supplemental Coverages - Underground Pipes, Pilings, Bridges and Roadways, Covered Building Property does not include:

a. pilings, piers, wharves, docks, or retaining walls;

b. underground pipes, flues, or drains; and

c. bridges.

C. Under PROPERTY COVERED, BUSINESS PERSONAL PROPERTY, the Business Personal Property That Is Not Covered provision is deleted and replaced with the following

2. **Business Personal Property That Is Not Covered --** Covered business personal property does not include:

a. "off-site server";

b. except as provided under Supplemental Marine Coverages;

1) personal property in transit as described under Property In Transit;

2) "fine arts" as described under Fine Arts;

3) "computers" while away from a "covered location" as described under Off Premises Computers;

4) property while temporarily on display or exhibit as described under Property On Exhibition; and

5) duplicate or back-up "software" as described under Software Storage; and

c. Personal property owned by a unit-owner only.

D. PROPERTY NOT COVERED is amended as follows:

1. The Animals provision is deleted and replaced with the following:

3. **Animals --** "We" do not cover animals, including but not limited to birds and fish, unless owned by others and boarded by "you".

2. The Property More Specifically Insured provision is deleted in its entirety.

E. SUPPLEMENTAL COVERAGES is amended as follows:

1. No deductible applies to the Inventory and Appraisal Expense provision.

2. The Underground Pipes, Pilings, Bridges and Roadways is deleted and replaced with the following:

13. **Underground Pipes, Pilings, and Bridges --** "We" cover direct physical loss caused by a covered peril to:

a. pilings, piers, wharves, docks, or retaining walls;

b. underground pipes, flues, or drains; and

c. bridges.

The most "we" pay under this Supplemental Coverage in any one occurrence or at any one "covered location" is the amount shown in the "schedule of coverages".

F. Under SUPPLEMENTAL MARINE COVERAGES, the Sales Representative Samples provision is deleted in in its entirety.

G. VALUATION is amended as follows:

1. The Replacement Cost provision is replaced by the following:

1. **Replacement Cost --** The value of covered property will be based on replacement cost without any deduction for depreciation unless Actual Cash Value is indicated on the "schedule of coverages".

The replacement cost is limited to the cost of repair or replacement with similar materials on the same site and used for the same purpose. The payment will not exceed the amount "you" spend to repair or replace the damaged or destroyed property. If Single Entity coverage is shown in the "schedule of coverages", "we" will not pay more than local builder's grade costs for damaged or destroyed property within units if the

Includes copyrighted material of American Association of Insurance Services used with its permission.

QBCP-2022 (12-17)      Includes copyrighted material of Insurance Services Office, Inc., with its permission.      Page 3 of 12

original plans and specifications for the unit cannot be documented or determined.

Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced. "You" may make a claim for actual cash value before repair or replacement takes place, and later for the replacement cost if "you" notify "us" of "your" intent within 200 days after the loss.

This replacement cost provision does not apply to paragraphs 3. through 13. below.

2. The following provisions are added:

**Guaranteed Replacement Cost** — When the "schedule of coverages" indicates that coverage is provided on a Guaranteed Replacement Cost basis:

a. Loss Settlement Terms under How Much We Pay is deleted and replaced with the following:

   4. **Loss Settlement Terms** Subject to paragraphs 1., 2., 3., 5., 6., and 7. Under How Much We Pay and coinsurance provisions (if applicable), "we" pay the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable.

b. Guaranteed Replacement Cost will apply if the following conditions are met:

   (1) "you" notify "us" within 120 days following the completion of:

      (a) any alteration, addition or improvement to property covered under Property Covered, Building Property or Units; or

      (b) any alteration, addition, improvement to or acquisition of property covered under Property Covered, Business Personal Property,

which increases the value by 10% or greater of the original applicable "limit"; and

(2) "you" have paid or agreed to pay any additional premium due for the increase in coverage limits.

All other provisions of the Replacement Cost provision in Valuation apply.

**Extended Replacement Cost** — When the "schedule of coverages" indicates that coverage is provided on an Extended Replacement Cost basis, Loss Settlement Terms under How Much We Pay is deleted and replaced with the following:

4. **Loss Settlement Terms** — Subject to paragraphs 1., 2., 3., 5., 6., and 7. Under How Much We Pay and coinsurance provisions (if applicable) "we" pay the lesser of:

   a. the cost to repair, replace, or rebuild the property with material of like kind and quality to the extent practicable; or

   b. 125% of the "limit" that applies to the covered property subject to Replacement Cost Valuation provided that:

      (1) "you" notify "us" within 120 days following the completion of:

         (a) any alteration, addition or improvement to property covered under Property Covered, Building Property or Units; or

         (b) any alteration, addition, improvement to or acquisition of property covered under Property Covered, Business Personal Property,

         which increases the value by 10% or greater of the original applicable "limit"; and

      (2) "you" have paid or agreed to pay any additional premium

Includes copyrighted material of American Association of Insurance Services used with its permission.

QBCP-2022 (12-17)        Includes copyrighted material of Insurance Services Office, Inc., with its permission.        Page 4 of 12

due for the increase in coverage limits.

All other provisions of the Replacement Cost provision in Valuation apply.

3. The Manufactured Stock and Tenant's Improvements provisions are deleted in their entirety.

H. HOW MUCH WE PAY is amended as follows:

1. The Deductible provision is deleted and replaced by the following:

2. **Deductible**

Per Occurrence Deductible

"We" pay only that part of "your" loss over the deductible amount stated on the "schedule of coverages" in any one occurrence up to the "limit" on the "schedule of coverages". The deductible applies to the loss before application of any coinsurance or reporting provisions. When any occurrence is subject to more than one deductible, only the highest deductible will be applied.

2. The following provision is added:

**Unit-owner's Insurance** – If a unit-owner has other insurance that covers the same property as the insurance provided under this policy, the insurance under this policy will be primary and the unit-owners insurance will apply on an excess basis.

I. The following is added to LOSS PAYMENT, Your Losses:

If "you" name an insurance trustee, we will adjust losses with "you", but "we" will pay the insurance trustee. If "we" pay the trustee, the payments will satisfy "your" claims against "us".

J. OTHER CONDITIONS is amended as follows:

1. The Vacancy provision is deleted in its entirety.

2. The following provisions are added:

**Acts or Omissions by Unit-Owners or Holders of a Security Interest** – No act or omission by a unit-owner or holder of a security interest will void this policy or otherwise be a condition to recovery under this policy. This condition does not apply if the unit-owner or holder of a security interest is acting within their authority on behalf of the Condominium Association that is the named insured shown in the "schedule of coverages".

**Waiver of Rights of Recovery** – "We" waive our rights of recovery against:

a. any unit-owner of the Condominium Association shown as the named insured in the "schedule of coverages";

b. the Condominium Association listed as the named insured in the "schedule of coverage"; and

c. directors, officers or members of the Board of Directors listed as named insureds on the "schedule of coverages".

However, "we" reserve the right to recover damages for acts or omissions which the builder or developer may be held liable for in their capacity as a builder or developer.

**Unintentional Errors and Omissions** – Any unintentional error or omission "you" make in determining or reporting values, or describing the premises, location or property will not void or impair the coverage provided by this policy. "You" must report any error or omission in writing as soon as it is discovered. However, "we" will only cover the loss or damage to the extent "we" would have provided coverage had such unintentional error or omission not been made.

"We" will correct our records and the policy and charge "you" any additional premium due. "You" agree to pay any additional premium generated by such corrections.

II. **ADDITIONAL COVERAGE EXTENSIONS**

The following coverage is added to Coverage Extensions in the Commercial Output Program Property Coverage Part:

Includes copyrighted material of American Association of Insurance Services used with its permission.

QBCP-2022 (12-17)     Includes copyrighted material of Insurance Services Office, Inc., with its permission.     Page 5 of 12

**Business Personal Property Off-Premises**

a.  "You" may extend the insurance provided by this coverage form to apply to "your" covered business personal property while it is away from "covered location" if it is:

   1) temporarily at a location "you" do not own, lease or operate; or

   2) in storage at a location "you" lease, provided the lease was executed after the beginning of the current policy period.

b.  This coverage extension does not apply to covered business personal property:

   1) in transit;

   2) in the care, custody or control of "your" salespersons; or

   3) at any trade show, fair, seminar, symposium or exhibition.

c.  The most "we" will pay for loss or damage under this coverage extension is the amount shown in the "schedule of coverages" per temporary location not specifically described in the "schedule of coverages".

   If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

## III. SUPPLEMENTAL COVERAGES

### A. Personal Effects And Property Of Others

Paragraph 1.g. of Business Personal Property is deleted and the Personal Effects provision under Supplemental Coverages in the Commercial Output Program Property Coverage Part is replaced by the following:

   7. **Personal Effects and Property of Others** -- "We" cover direct physical loss caused by a covered peril to:

   a.  personal effects owned by "your" directors, officers or members of the board of directors while acting in the scope of their duties as such, "you", "your" partners, or "your" employees; and

   b.  personal property of others that is in "your" care, custody, or control.

"Our" payment for loss to personal property of others will only be for the benefit of the owners of the personal property.

The most "we" pay for loss to personal effects or personal property of others in any one occurrence or at any one "covered location" is the amount shown in the "schedule of coverages".

When **Personal Effects And Property Of Others** applies:

If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

B.  The following Supplemental Coverages are added to the Commercial Output Program Property Coverage Part:

**Additional Claim Expenses** -- "We" will pay up to the amount shown in the "schedule of coverages" for the reasonable and necessary expenses "you" incur for "your" community manager to assist "you" in preparing and certifying details regarding loss or damage to covered property caused by or resulting from a covered peril.

"We" will not pay for:

a.  expenses incurred, directed or billed by or payable to a public or independent adjuster;

b.  expenses incurred by "you" under the Appraisal provision under Other Conditions; or

c.  expenses payable under the Cost To Prepare Inventory And Appraisal Expense provision under Supplemental Coverages.

No deductible applies.

**Alternate Key Systems** -- "We" will pay for loss or damage to "alternate key systems", including card programmers, card readers, computers, transceivers, related alarm systems, power supplies and any other electronic or mechanical apparatus needed to make the key system work if a master key

Includes copyrighted material of American Association of Insurance Services used with its permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

or grand master key is lost or damaged due to a covered peril.

With respect to this coverage, "alternate key systems" means programmable keying systems that utilize mechanically or electronically coded key cards or key fobs

For the purposes of this coverage only, Paragraph **8. Missing Property** under Additional Property Not Covered Or Subject To Limitations does not apply.

The most "we" will pay under this Supplemental Coverage in any one occurrence is the amount shown in the "schedule of coverages".

No deductible applies.

When **Alternate Key Systems** applies:

If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

**Crisis Management Coverage --**

a. "We" pay for the "crisis management emergency response expenses" "you" incur as a result of an "incident" which occurs during the policy period at a "covered location" that gives rise to a "crisis" to which this coverage applies.

   The "incident" must be reported to "us" within six months of the "crisis".

b. For the purposes of this supplemental coverage only, the following definitions apply:

   1) "Crisis" means a public announcement that an "incident" occurred on or at a "covered location" or at any event sponsored by "you".

   2) "Crisis management emergency response expenses" means the reasonable and necessary expenses for services provided by a "crisis management firm", but does not include "your" compensation, fees, benefits, overhead, charges or expenses by "you", "your" employees, or unit-owners.

   3) "Crisis management firm" means a provider of crisis management emergency response services.

   4) "Incident" means an occurrence or accident, including accidental discharge of pollutants, which results in death or serious bodily injury to three or more persons.

c. The most "we" will pay under this Supplemental Coverage for any one "incident" is the amount shown in the "schedule of coverages".

**Emergency Real Estate Consulting Fees -** - "We" pay for the reasonable and necessary fees of a realtor or real estate consultant for "your" need to relocate due to damage to a "covered location" resulting from a "covered peril".

The most "we" will pay under this Supplemental Coverage in any one occurrence is the amount shown in the "schedule of coverages".

No deductible applies.

When **Emergency Real Estate Consulting Fees** applies:

If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

**Emergency Vacating Expense --**

a. "We" will pay for the reasonable and necessary expenses "you" incur in the evacuation of unit-owners or tenants from a "covered location" as a result of an "emergency".

   "We" do not pay for any evacuation expenses that are due to:

   1) a planned drill simulating an evacuation; or

   2) strike.

b. For the purposes of this supplemental coverage only, "emergency" means an unforeseeable event which affects "your" covered location that puts "your" unit owners or tenants in danger of direct

Includes copyrighted material of American Association of Insurance Services used with its permission.

QBCP-2022 (12-17)      Includes copyrighted material of Insurance Services Office, Inc., with its permission.      Page 7 of 12

physical harm, including possible loss of life. "Emergency" also means events for which a government body or official, whether federal, state, or local, issues an emergency evacuation order.

c.  Loss of business income is not covered under this Supplemental Coverage.

The most "we" will pay under this Supplemental Coverage in any one occurrence for any one location is the amount shown in the "schedule of coverages".

When **Emergency Vacating Expense** applies:

If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

**Extra Expense** – If the Commercial Output Program Income Coverage Part is not attached to this policy, "we" will pay the actual and necessary "extra expense" "you" sustain due to direct physical loss of or damage to property at a "covered location" including damage to personal property in the open (or in a vehicle) within 1000 feet, caused by or resulting from any covered peril.

If "you" occupy only part of a building, "your" covered location means:

a.  the space that "you" rent, lease or occupy;

b.  the area within 1000 feet of the building or within 1000 feet of the "covered location", whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

c  any area within the building or at the "covered location", if that area services, or is used to gain access to, the space which "you" rent, lease or occupy.

"Extra Expense" means the necessary expenses "you" incur during the "restoration period" that "you" would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a covered peril. "Extra Expense" does not include any cost, fee or expense incurred

by, paid to, or owed to any attorney, public adjuster or consultant retained by "you" for the purpose of negotiating with "us" or preparing or adjusting a claim.

Coverage pertains to "extra expenses" (other than the expense to repair or replace property) which are incurred to:

1)  avoid or minimize the "suspension" of "business" and to continue "operations" at the "covered location" or at replacement premises or at temporary locations, including relocation expenses and costs to equip and operate the replacement or temporary locations;

2)  minimize the "suspension" of "business" if "you" cannot continue "operations"; and

3)  replace or restore the information on "valuable papers" and "data records" which exist as electronic data to the extent it reduces the amount of loss that otherwise would have been payable under this Supplemental Coverage.

"We" will also pay "extra expense" to repair or replace property but only to the extent it reduces the amount of loss that otherwise would have been payable under this Supplemental Coverage.

The most "we" will pay under this Supplemental Coverage is the amount shown in the "schedule of coverages" for all loss sustained in each 12-month period of this policy, regardless of the number of interruptions or the number of "covered locations", locations or "computer" systems involved. If loss payment related to the first interruption does not exhaust this amount, then the balance is available for loss sustained as a result of subsequent interruptions in that 12-month policy period. A balance remaining at the end of the policy period does not increase the amount of insurance in the next policy period. With respect to any interruption which begins in one policy period and continues or results in additional loss in a subsequent policy period(s), all loss is deemed to be sustained in the policy period in which the interruption began.

This coverage does not apply to loss sustained after the end of the "restoration period", even if the amount of insurance stated above has not been exhausted.

Includes copyrighted material of American Association of Insurance Services
used with its permission.

QBCP-2022 (12-17)     Includes copyrighted material of Insurance Services Office, Inc., with its permission.     Page 8 of 12

With respect to this Supplemental Coverage only, "restoration period" means the period of time that:

a. begins with the date of direct physical loss or damage caused by or resulting from any covered peril at the described premises; and

b. ends on the earlier of:

1) the date the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

2) the date when "business" is resumed at a new permanent location.

"Restoration period" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

a. regulates the construction, use or repair, or requires the tearing down of any property; or

b. requires insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

"Suspension" means the slowdown or cessation of "your" "business".

"Operations" means "your" "business" occurring at the "covered location".

When **Extra Expense** applies:

If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

No deductible applies.

**Identity Theft Expenses** --

a. "We" will reimburse up to the amount shown in the "schedule of coverages" during the 12-month period of this policy for "expenses" incurred by an "identity theft insured" as the direct result of any "identity theft" first discovered during the policy period and reported during the policy period provided that such "identity

theft" commenced after the effective date of "your" first policy covering such type of loss with "us".

b. Any act or series of acts committed by one or more persons, or in which such person or persons are aiding and abetting others against an "identity theft insured", is considered to be one "identity theft", even if a series of acts continues into a subsequent policy period.

c. For the purposes of this Supplemental Coverage only, the following definitions are added:

1) "Expenses" means:

a) costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

b) cost for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors;

c) lost wages as a result of time taken off from work to meet with, or talk to, law enforcement agencies and/or legal counsel, or to complete fraud affidavits, up to a maximum payment of $1,000 per week for a maximum period of four weeks;

d) loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;

e) reasonable attorney fees incurred, with "our" prior consent for:

(1) defense of lawsuits brought against an "identity theft insured" by merchants, financial institutions or their collection agencies;

(2) the removal of any criminal or civil judgments wrongly entered against an "identity theft insured"; and

Includes copyrighted material of American Association of Insurance Services used with its permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(3) challenging the accuracy or completeness of any information in a consumer credit report; and

(4) charges incurred for long distance telephone calls to merchants, law enforcement agencies, financial institutions or similar credit grantors, or credit agencies to report or discuss an actual Identity Theft.

2) "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of an "identity theft insured" with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or any applicable state or local law.

3) "Identity theft insured" means:

   a) the first named insured shown in the "schedule of coverages";

   b) directors, officers or members of the Board of Directors listed as named insureds on the "schedule of coverages";

   c) an individual sole proprietor if "you" are a sole proprietorship;

   d) a partner if "you" are a partnership; or

   e) any individual having an ownership position of 20% or more of the business if "you" are a corporation, Limited Liability Company, or other organization.

d. "We" will not pay for "expenses" under this Supplemental Coverage:

1) incurred due to fraudulent, dishonest or criminal act by an "identity theft insured" or any person aiding or abetting an "identity theft insured" or by any authorized representative of an "identity theft insured" whether acting alone or in collusion with others.

2) arising from any "identity theft" by or with the knowledge of any relation or former relation of an "identity theft insured".

e. The following condition is added to Other Conditions:

   **Duties In The Event Of An Identity Theft Expenses Loss**

   "You" must provide receipts, bills or other records that support "your" claim for "expenses" under the Supplemental Coverages - Identity Theft Expenses.

f. When **Identity Theft Expenses** applies:

   If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

g. No deductible applies.

**Lost Key** -- "We" cover direct physical loss caused by a covered peril to a master key or grand master key that results in consequential loss to other keys and locks. "We" pay the cost to replace keys, adjustment of locks to accept new keys, or, if required, new locks and the installation of new locks.

For the purposes of this coverage only, Paragraph 8. Missing Property under Additional Property Not Covered Or Subject To Limitations does not apply.

The most "we" will pay under this Supplemental Coverage in any one occurrence is the amount shown in the "schedule of coverages".

No deductible applies.

When **Lost Key** applies:

If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

**Unit-Owner Relocation Coverage** --

Includes copyrighted material of American Association of Insurance Services used with its permission.

QBCP-2022 (12-17)   Includes copyrighted material of Insurance Services Office, Inc., with its permission.   Page 10 of 12

a. "We" will pay up to the amount shown in the "schedule of coverages" for the unit-owner relocation costs" "you" incur due to unit-owners who temporarily vacate a portion of a "covered location" as a result of a covered peril that occurs during the policy period that renders the unit-owner's property uninhabitable. "We" will only pay the "unit-owner relocation costs" "you" incur from the date of the direct physical loss or damage by a covered peril to 45 days after the date that the property has been approved for occupancy.

b. For the purposes of this Supplemental Coverage only, "unit-owner relocation costs" means the reasonable and necessary costs incurred by the unit-owner and paid by "you" to:

1) pack, insure, and move or ship personal property, including the costs to move property back into the unit when repairs are completed;

2) terminate and restore utility services, including electric, water, and natural gas; and

3) disassemble and reassemble furniture, fixtures, and equipment.

The unit-owner must be able to produce documentation of such costs.

c. When **Unit Owner Relocation Coverage** applies:

If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

## IV. SUPPLEMENTAL MARINE COVERAGE

The following is added to Supplemental Marine Coverages in the Commercial Output Program Property Coverage Part:

**Spoilage --**

1. "You" may extend the insurance provided by the Commercial Output Program Property Coverage Part to apply to covered property for loss of "perishable stock" due to:

a. breakdown or contamination meaning:

1) change in temperature or humidity resulting from mechanical breakdown or failure of refrigerating, cooling or humidity control apparatus or equipment, only while such equipment or apparatus is at a location(s) described in the "schedule of coverages" or on any vehicle, conveyance, container, or trailer; and

2) contamination from the release of any refrigerant.

b. power outage, meaning change in temperature or humidity resulting from complete or partial interruption of electrical power, either on or off described premises, due to conditions beyond "your" control.

2. "We" will determine the value of "perishable stock" in the event of loss or damage at:

a. the selling price, as if no loss or damage had occurred;

b. less discounts and expenses "you" otherwise would have had.

3. "Perishable Stock" under Definitions is replaced by the following:

21. "Perishable stock" means personal property owned by "you" or by others that is in "your" care, custody or control, preserved and maintained under controlled temperature or humidity conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

4. "We" will not pay for loss or damage resulting from "your" failure to use all reasonable means to protect the "perishable stock" from damage before or following loss.

5. For the purposes of this coverage only, Paragraphs 1.g., 2.g., 2.k., 2.r.2. under Perils Excluded and Paragraph 4. under Additional Property Not Covered Or Subject To Limitations are deleted.

6. "We" will not pay for loss or damage caused by or resulting from:

a. the disconnection of any refrigerating, cooling or humidity control system from the source of power by "you" or "your" employee;

Includes copyrighted material of American Association of Insurance Services
used with its permission.

QBCP-2022 (12-17)     Includes copyrighted material of Insurance Services Office, Inc., with its permission.     Page 11 of 12

    b. the deactivation of electrical power caused by manipulation of any switch or other device used to control the flow of electrical power or current;

    c. the inability of an Electrical Utility Company or other power source to provide sufficient power due to:

       (1) lack of fuel;

       (2) insufficient generating capacity or reduction in supply of power or other utility service of the Electrical Utility Company to meet consumer demand; or

       (3) governmental order;

    d. the inability of a power source at the described premises to provide sufficient power due to lack of generating capacity to meet demand;

    e. breaking of any glass that is a permanent part of any refrigerating, cooling or humidity control unit; or

    f. loss or damage to "perishable stock" located:

       (1) on buildings or structures; or

       (2) in the open.

7. If a refrigerator maintenance or service agreement is in force, "you" must maintain the agreement for this coverage to apply. If this agreement is terminated for any reason, the insurance provided by this Coverage Extension is automatically suspended at the involved location.

8. The most "we" will pay for loss or damage under this coverage is the amount shown in the "schedule of coverages".

9. When **Spoilage** applies:

If more than one coverage under this policy applies to property that has been damaged from one occurrence, "you" may choose only one of these coverages to apply to that loss. The most "we" will pay is the "limit" applicable to the coverage "you" choose.

All other "terms" of the policy apply.

Includes copyrighted material of American Association of Insurance Services used with its permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**QBE.**

# CONDOMINIUM PRO
# SCHEDULE OF COVERAGES
# COMMERCIAL OUTPUT PROGRAM

(The information required to complete this schedule
will be shown below or on the "schedule of coverages".)

| | Limit of Insurance |
|---|---|
| **Catastrophe Limit** — The most "we" pay for any combination of or total of losses arising under one or more coverages in any one occurrence is: | $_____ |

## PROPERTY COVERAGE PART

### LIMITS

-- Building Property Limit -- The most
"we" pay for loss at any one "covered location" is:     $_____

— Business Personal Property Limit -- The most
"we" pay for loss at any one "covered location" is:     $_____

or

— Combined Blanket Limit -- The most "we" pay
for loss at any one "covered location" is:     $_____

[X]  Refer To Scheduled Locations

### COVERAGE - UNITS

[ ]  Single Entity Coverage

[ ]  Inclusive Coverage

### COVERAGE EXTENSIONS

| | |
|---|---|
| -- Business Personal Property Off-Premises | $50,000 |
| — Consequential Loss | **BPP Policy Limit** |
| — Debris Removal, Additional Expense | $50,000 |
| — Emergency Removal | 365 days |
| -- Emergency Removal Expense | $10,000 |

Includes copyrighted material of American Association of Insurance Services
used with its permission.

| | | |
|---|---|---|
| -- | Fraud and Deceit | $5,000 |
| -- | Damage From Theft | $10,000 |
| -- | Off Premises Utility Service Interruption | |
| | - Limit | $50,000 |
| | [ ] Overhead Transmission Lines Excluded | |

**SUPPLEMENTAL COVERAGES**

| | | |
|---|---|---|
| -- | Additional Claim Expense | $10,000 |
| -- | Alternate Key Systems | $25,000 |
| -- | Brands or Labels Expense | $50,000 |
| -- | Crisis Management Expense | $10,000 |
| -- | Emergency Real Estate Consulting Fees | $10,000 |
| -- | Emergency Vacating Expense | $10,000 |
| -- | Expediting Expenses | $50,000 |
| -- | Extra Expense | $250,000 |
| -- | Fire Department Service Charges | $25,000 |
| -- | Identity Theft Expense | $100,000 |
| -- | Inventory and Appraisal Expense | $50,000 |
| -- | Lost Key | $100,000 |
| -- | Ordinance or Law (Undamaged Parts of a Building) | Included in Building Coverage |
| -- | Ordinance or Law (Increased Cost to Repair/ Cost to Demolish and Clear Site) | Up to 20% of Building Limit |
| -- | Personal Effects And Property of Others | $15,000 |
| -- | Pollutant Cleanup And Removal | $50,000 |
| -- | Recharge of Fire Extinguishing Equipment | $50,000 |
| -- | Rewards | $10,000 |
| -- | Sewer Backup and Water Below the Surface | $46,779,100 |
| -- | Trees, Shrubs, and Plants | $50,000 |
| -- | Underground Pipes, Pilings, and Bridges | $250,000 |

Includes copyrighted material of American Association of Insurance Services used with its permission.

QBCP-2023 (12-17)

--    Unit-Owner Relocation Coverage      $10,000

**SUPPLEMENTAL MARINE COVERAGES**

--    Accounts Receivable      $100,000

—    Business Personal Property Off-Premises      $25,000

--    Electrical or Magnetic Disturbance of Computers      $50,000

--    Power Supply Disturbance of Computers      Up to BPP Limit

--    Virus and Hacking Coverage

     -    Limit any one occurrence      $25,000

     -    Limit any 12 month period      $50,000

—    Fine Arts      $100,000

--    Off Premises Computers      $25,000

—    Property On Exhibition      $50,000

—    Property In Transit      $50,000

—    Spoilage      $25,000

—    Software Storage      $50,000

--    Valuable Papers      $100,000

**ADDITIONAL PROPERTY SUBJECT TO LIMITATIONS**

—    Furs (theft)      $10,000

—    Jewelry (theft)      $10,000

--    Stamps, Tickets, Letters of Credit      $5,000

**COVERAGE OPTIONS** (check if applicable)

[ ] Actual Cash Value Applies

[ ] Replacement Cost Applies

[X ] Guaranteed Replacement Cost Applies

[ ] Extended Replacement Cost Applies

[X ] Automatic Increase

     -    Automatic Increase      4%

Includes copyrighted material of American Association of Insurance Services used with its permission.

[X] Scheduled Locations

- Newly Built or Acquired Buildings $1,000,000

- Personal Property - Acquired Locations $250,000

- Locations "You" Elect Not To Describe $250,000

- Coinsurance None

## DEDUCTIBLE

Check One

[ ] Deductible Amount $_____

[X ] Refer to Deductible Endorsements

Includes copyrighted material of American Association of Insurance Services
used with its permission.

## INCOME COVERAGE PART

**COVERAGE** (check one)

[X] Income Coverage Does Not Apply

[ ]  Earnings, Rents, and Extra Expense

[ ]  Earnings and Extra Expense

[ ]  Rents and Extra Expense

[ ]  Extra Expense Only

**LIMIT** (check one)

[ ]  Income Coverage Limit – The most
"we" pay for loss at any one "covered location" is:   $_____

[X]  Refer To Scheduled Locations (check if applicable)

**COVERAGE EXTENSIONS**

--   Interruption By Civil Authority                          30   days

--   Period of Loss Extension                               180 days

**SUPPLEMENTAL COVERAGES**

--   Computer Virus and Hacking

-   Limit any one occurrence                         $25,000

-   Limit any 12 month period                       $50,000

-   Waiting Period                                        12 Hours

--   Dependent Locations                                   $100,000

--   Off Premises Utility
Service Interruption

-   Limit                                                     $50,000

-   Waiting Period                                        12 Hours

[ ]  Overhead Transmission Lines Excluded

Includes copyrighted material of American Association of Insurance Services
used with its permission.

## INCOME COVERAGE PART (cont.)

**SUPPLEMENTAL COVERAGES** (cont.)

— Contract Penalty

- Limit any one occurrence $25,000

- Limit any 12 month period $100,000

— Pollutants Cleanup and Removal $50,000

— Property In Transit, On Exhibition, or Custody of Sales Representatives $10,000

**COVERAGE OPTIONS** (check if applicable)

[X]  Scheduled Locations

- Newly Built or Acquired Locations $250,000

- Coinsurance None

[ ]  Waiting Period _____

[ ]  Monthly Limitation _____

## FLOOD COVERAGE

[ ]  Not Covered

[X ]Scheduled Flood Coverage

- "Catastrophe Limit" $ 1,000,000

- Flood Deductible ($,%) $    50,000

[ ]  Blanket Flood Coverage

- "Occurrence Limit" $_____

- "Aggregate Limit" $_____

- "Catastrophe Limit" $_____

- Flood Deductible ($,%) _____

Includes copyrighted material of American Association of Insurance Services used with its permission.

## EARTHQUAKE COVERAGE

[ ]  Not Covered

[X ]Scheduled Earthquake Coverage

-   "Catastrophe Limit"                      $ 1,000,000

-   Earthquake Deductible ($,%)              $    25,000

[ ]  Blanket Earthquake Coverage

-   "Occurrence Limit"                       $_____

-   "Aggregate Limit"                        $_____

-   "Catastrophe Limit"                      $_____

-   Earthquake Deductible ($,%)               _____

Includes copyrighted material of American Association of Insurance Services
used with its permission.

## OPTIONAL COVERAGES AND ENDORSEMENTS

Includes copyrighted material of American Association of Insurance Services
used with its permission.

QBCP-2023 (12-17)                                                    Page 8 of 8



**QBE**

This endorsement changes
the policy
**-- PLEASE READ THIS CAREFULLY --**

# CONDOMINIUM PRO
# MULTIPLE DEDUCTIBLE
## SCHEDULED PERILS AND LOCATIONS

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

**All Other Covered Perils And Locations --**

Deductible Amount: $ 25,000

## HOW MUCH WE PAY

The deductible provision is deleted and replaced
by the following:

1. **Scheduled Locations --** For covered perils
   and locations described on the Multiple
   Deductible Schedule, "we" pay only that part
   of "your" loss over the deductible amount
   indicated on the schedule in any one
   occurrence.

   When any one occurrence is subject to more
   than one deductible, only the highest
   deductible will be applied. Notwithstanding,
   the determination of the highest deductible
   shall factor in the combination of all
   applicable Per Unit deductibles for any one
   occurrence. If the total of all Per Unit
   deductibles combined is larger than the per
   occurrence deductible for the covered peril
   and scheduled location, the total of all Per
   Unit deductibles combined will be the
   highest deductible and such deductible shall
   apply to the occurrence.

2. **All Other Covered Perils And Locations --**
   For all other covered locations not described
   on the Multiple Deductible Schedule, "we"
   pay only that part of "your" loss over the
   deductible amount indicated on this
   endorsement in any one occurrence.

3. **Percentage Deductible --**

a. **Percentage --** When a 1%, 2%, or 5%
   deductible is indicated on the Multiple
   Deductible Schedule, "we" pay only that
   part of "your" loss over the deductible
   amount in any one occurrence. The
   deductible amount is determined by
   applying the percentage indicated on
   the Multiple Deductible Schedule to the
   applicable "limit" shown on the
   "schedule of coverages" for the covered
   property involved in the loss.

b. **Deductible Applies Separately --** The
   percentage deductible applies
   separately to:

   1) each building or structure, including
      business personal property within
      each building or structure;
   2) business personal property in each
      building or structure that is not
      covered by this policy; and
   3) business personal property in the
      open or in a vehicle.

4. **Per Building Deductible --**

a. When a Per Building deductible is
   indicated on the Multiple Deductible
   Schedule, "we" pay only that part of
   "your" loss over the deductible amount
   per building in any one occurrence.

Includes copyrighted material of American Association of Insurance Services
used with its permission.

b. **Deductible Applies Separately** -- The Per Building deductible applies to separately to each building and includes the business personal property within each building.

5. **Per Unit Deductible --**

When a Per Unit deductible is indicated on the Multiple Deductible Schedule, "we" pay only that part of "your" loss over the deductible amount per unit in any one occurrence.



**This endorsement changes
the policy
-- PLEASE READ THIS CAREFULLY --**

# CONDOMINIUM PRO
## MULTIPLE DEDUCTIBLE SCHEDULE
### SCHEDULED PERILS AND LOCATIONS

(The entries required to complete this endorsement
will be shown below or on the "schedule of coverages".)

Loc.                                    **Described Location**
No.:

01      See Form Co 1052 (04-02) for Scheduled Locations


**Described Peril**: Water Damage

**Deductible Amount For Described Peril**:

    [ ]  Dollar Deductible $

    [ ]  Percentage Deductible    [ ] 1%    [ ] 2%    [ ] 5%

    [ ]  Per Building Deductible       $_____

    [X ] Per Unit Deductible              $ 25,000


**Deductible Amount For All Other Covered Perils**:      $ 25,000

Includes copyrighted material of American Association of Insurance Services
used with its permission.
Page 1 of 1

POLICY NUMBER: MC1800000042800

COMMERCIAL GENERAL LIABILITY
CG DS 01 10 01

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

| COMPANY NAME | PRODUCER NAME |
|---|---|
| QBE Insurance Corporation | McGowan Program Administrators<br>10745 Birmingham Way<br>Woodstock, MD 21163 |

NAMED INSURED Peachtree Place Condominium Association, Inc

MAILING ADDRESS c/o Heritage Property Management Services, Inc
3777 Peachtree Rd NE
Brookhaven, GA 30319

POLICY PERIOD: FROM 05/01/2020 TO 05/01/2021 AT 12:01 A.M. TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $1,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $100,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $5,000 | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | | $2,000,000 |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | | $2,000,000 |

| RETROACTIVE DATE (CG 00 02 ONLY) |
|---|
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW.<br>RETROACTIVE DATE: _____<br>(ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| DESCRIPTION OF BUSINESS |
|---|
| FORM OF BUSINESS: |
| ☐ INDIVIDUAL  ☐ PARTNERSHIP  ☐ JOINT VENTURE  ☐ TRUST |
| ☐ LIMITED LIABILITY COMPANY  ☒ ORGANIZATION, INCLUDING A CORPORATION (BUT NOT IN-CLUDING A PARTNERSHIP, JOINT VENTURE OR LIMITED LIABILITY COMPANY) |
| BUSINESS DESCRIPTION: Residential Condominium Association |

CG DS 01 10 01

© ISO Properties, Inc., 2000
Original

| ALL PREMISES YOU OWN, RENT OR OCCUPY | |
|---|---|
| LOC NO. | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 001-001 | 3777 Peachtree Rd NE<br>DeKalb<br>Atlanta, GA 30319 |

© ISO Properties, inc., 2000<br>Original  CG DS 01 10 01

| LOC NO. | CLASSIFICATION | CODE NO. | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
|---|---|---|---|---|---|---|---|
| | | | | Prem/ Ops | Prod/Comp Ops | Prem/ Ops | Prod/Comp Ops |
| 001-001 | Condominiums-Residential-(Association Risk Only) Products-completed operations are subject to the General Aggregate Limit TERRITORY: 502 | 62003 | 330 Units | 41.601 | Incl. | $13,728 | Incl. |
| | Swimming Pools Products-completed operations are subject to the General Aggregate Limit TERRITORY: 502 | 48925 | 1 Each | 1099.039 | Incl. | $1,099 | Incl. |

**CLASSIFICATION AND PREMIUM**

| CLASSIFICATION AND PREMIUM | | | | | | | |
|---|---|---|---|---|---|---|---|
| LOC NO. | CLASSIFICATION | CODE NO. | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
| | | | | Prem/ Ops | Prod/Comp Ops | Prem/ Ops | Prod/Comp Ops |
| | Terrorism - Certified Acts | | | | | $59 | |
| | Hired & Non-Owned Auto | | | | | $156 | |
| | | | | | | | |

|  | STATE TAX OR OTHER (if applicable) | |
| --- | --- | --- |
|  | TOTAL PREMIUM (SUBJECT TO AUDIT) | $15,042 |
| PREMIUM SHOWN IS PAYABLE: | AT INCEPTION | |
|  | AT EACH ANNIVERSARY | |
|  | (IF POLICY PERIOD IS MORE THAN ONE YEAR AND PREMIUM IS PAID IN ANNUAL INSTALLMENTS) | |
| AUDIT PERIOD (IF APPLICABLE) | ☐ANNUALLY   ☐SEMI-ANNUALLY | ☐QUARTERLY   ☐MONTHLY |

| **ENDORSEMENTS** |
| --- |
| ENDORSEMENTS ATTACHED TO THIS POLICY: |
| See Schedule of Forms and Endorsements |

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned:   05/26/2020 | By: |
| --- | --- |
| (Date) | (Authorized Representative) |

© ISO Properties, Inc., 2000
Original

CG DS 01 10 01

COMMERCIAL GENERAL LIABILITY
CG 00 01 04 13

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

   (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b. This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   (2) The "bodily injury" or "property damage" occurs during the policy period; and

   (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

    **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

    **(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

    **(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

    **(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

    **(a)** Employment by the insured; or

    **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 © Insurance Services Office, Inc., 2012 CG 00 01 04 13

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

© Insurance Services Office, Inc., 2012

**(2)** Any loss, cost or expense arising out of any:

    **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

    **(a)** Less than 26 feet long; and

    **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

    **(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

    **(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III -- Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

### i. Infringement Of Copyright, Patent, Trademark Or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

### j. Insureds In Media And Internet Type Businesses

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

### k. Electronic Chatrooms Or Bulletin Boards

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

### l. Unauthorized Use Of Another's Name Or Product

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

### m. Pollution

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

### n. Pollution-related

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

### o. War

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### p. Recording And Distribution Of Material Or Information In Violation Of Law

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C – MEDICAL PAYMENTS

### 1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

### 2. Exclusions

We will not pay expenses for "bodily injury":

a. Any Insured

To any insured, except "volunteer workers".

b. Hired Person

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. Injury On Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

d. Workers' Compensation And Similar Laws

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. Athletics Activities

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. Products-Completed Operations Hazard

Included within the "products-completed operations hazard".

g. Coverage A Exclusions

Excluded under Coverage A.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments; but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

© Insurance Services Office, Inc., 2012

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C**;

**b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

## 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

### a. Primary Insurance

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

### b. Excess Insurance

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

### c. Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## 5. Premium Audit

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## 6. Representations

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

    © Insurance Services Office, Inc., 2012    CG 00 01 04 13

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

  © Insurance Services Office, Inc., 2012  CG 00 01 04 13

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – CONDOMINIUM UNIT OWNERS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

WHO IS AN INSURED (Section II) is amended to include as an insured each individual unit owner of the insured condominium, but only with respect to liability arising out of the ownership, maintenance or repair of that portion of the premises which is not reserved for that unit owner's exclusive use or occupancy.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

However, unless Paragraph **(1)** above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

    © Insurance Services Office, Inc., 2013

POLICY NUMBER: MC1800000042800

COMMERCIAL GENERAL LIABILITY
CG 21 44 04 17

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| |
|---|
| **Premises:** <br> All scheduled locations. |
| **Project Or Operation:** <br><br> |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 01**, the provisions under this Paragraph **A.** apply:

  **1.** Paragraph **1.b.** under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

  **b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

   **(1)** The "bodily injury" or "property damage":

    **(a)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

    **(b)** Arises out of the project or operation shown in the Schedule; or

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

  **2.** Paragraph **1.b.** under **Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

  **b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

   **(1)** The offense arises out of your business:

    **(a)** Performed on the premises shown in the Schedule; or

(b) In connection with the project or operation shown in the Schedule; and

(2) The offense was committed during the policy period.

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

(1) False arrest, detention or imprisonment; or

(2) The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

3. Paragraph 1.a. under **Section I – Coverage C – Medical Payments** is replaced by the following:

a. We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

(1) Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

(2) Arises out of the project or operation shown in the Schedule;

provided that:

(a) The accident takes place during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

B. If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 02**, the provisions under this Paragraph **B.** apply:

1. Paragraph 1.b. under **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

b. This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

(1) The "bodily injury" or "property damage":

(a) Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

(b) Arises out of the project or operation shown in the Schedule;

(2) The "bodily injury" or "property damage" did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

(3) A claim for damages because of the "bodily injury" or "property damage" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V** – Extended Reporting Periods.

2. Paragraph 1.b. under **Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

b. This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

(1) The offense arises out of your business:

(a) Performed on the premises shown in the Schedule; or

(b) In connection with the project or operation shown in the Schedule;

(2) The offense was not committed before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

 © Insurance Services Office, Inc., 2016 CG 21 44 04 17

(3) A claim for damages because of the "personal and advertising injury" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V – Extended Reporting Periods.**

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

(1) False arrest, detention or imprisonment; or

(2) The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

3. Paragraph **1.a.** under **Section I – Coverage C – Medical Payments** is replaced by the following:

a. We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

(1) Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

(2) Arises out of the project or operation shown in the Schedule;

provided that:

(a) The accident takes place during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

 © Insurance Services Office, Inc., 2016

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section I – **Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section I – **Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

CG 21 47 12 07        © ISO Properties, Inc., 2006        Page 1 of 1   ☐

COMMERCIAL GENERAL LIABILITY
CG 21 60 09 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" (or "personal and advertising injury" if defined as such in your policy) arising directly or indirectly out of:

**a.** Any actual or alleged failure, malfunction or inadequacy of:

(1) Any of the following, whether belonging to any insured or to others:

    **(a)** Computer hardware, including microprocessors;

    **(b)** Computer application software;

    **(c)** Computer operating systems and related software;

    **(d)** Computer networks;

    **(e)** Microprocessors (computer chips) not part of any computer system; or

    **(f)** Any other computerized or electronic equipment or components; or

(2) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph 2.a.(1) of this endorsement

due to the inability to correctly recognize, process, interpret or accept the year 2000 and beyond.

**b.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **2.a.** of this endorsement.

Copyright, Insurance Services Office, Inc., 1998

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

(a) "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

(b) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(i) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(ii) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 © ISO Properties, Inc., 2003  ☐

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of Section I – Coverage A – Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of Section I – Coverage B – Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

© ISO Properties, Inc., 2003

COMMERCIAL GENERAL LIABILITY
CG 21 71 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

    **a.** Physical injury that involves a substantial risk of death; or

    **b.** Protracted and obvious physical disfigurement; or

    **c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

© Insurance Services Office, Inc., 2015

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

   b. The act resulted in damage:

      (1) Within the United States (including its territories and possessions and Puerto Rico); or

      (2) Outside of the United States in the case of:

         (a) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

         (b) The premises of any United States mission; and

   c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by. an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

   Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

D. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

     © Insurance Services Office, Inc., 2015     **CG 21 71 01 15**

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms); silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

© ISO Properties, Inc., 2004

COMMERCIAL GENERAL LIABILITY
CG 24 26 04 13

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the **Definitions** section is replaced by the following:

"Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

© Insurance Services Office, Inc., 2012

COMMERCIAL GENERAL LIABILITY
CG 26 57 04 00

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES – ADDITIONAL INSURED – CONDOMINIUM ASSOCIATIONS

This endorsement modifies insurance provided under the following:

   COMMERCIAL GENERAL LIABILITY COVERAGE PART

**Section II – Who Is An Insured** is amended to include the following as an insured:

   1.  All agents of the association; and

   2.  All unit owners and other persons entitled to occupy any unit or other portion of the condominium

but only with respect to liability arising out of, or in connection with, the use, ownership, maintenance or repair of the common elements or other portion of the condominium which the association has the responsibility to maintain.

Copyright, Insurance Services Office, Inc., 1999                     □



**POLICY NUMBER:** MC1800000042800

COMMERCIAL GENERAL LIABILITY
QBCG-0100 (08-09)



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# EXCLUSION - ASBESTOS LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

**A.** The following exclusion is added to the Commercial General Liability Coverage Form under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability**

The following exclusion is added to the Products/Completed Operations Liability Coverage Form and the Owners and Contractors Protective Liability Coverage Form under Paragraph **2., Exclusions** of **Section I – Bodily Injury And Property Damage Liability**

The following exclusion is added to the Railroad Protective Liability Coverage Form under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Physical Damage to Property**

**2. Exclusions**

This insurance does not apply to:

**Asbestos Liability**

**a.** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, asbestos fibers or dust.

**b.** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, asbestos in any form.

**c.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, asbestos in any form, by any insured or by any other person or entity.

**B.** The following exclusion is added to the Commercial General Liability Coverage Form under Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Asbestos Liability**

**a.** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, asbestos fibers or dust.

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, asbestos in any form, by any insured or by any other person or entity.

All other terms and conditions of this policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**POLICY NUMBER:** MC1800000042800

**COMMERCIAL GENERAL LIABILITY**
**QBCG-0101 (08-09)**



**QBE**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - LEAD LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

**A.** The following exclusion is added to the Commercial General Liability Coverage Form under Paragraph **2., Exclusions** of Section I – Coverage A – Bodily Injury and Property Damage Liability and Paragraph 2., **Exclusions** of Section I – Coverage B – Personal And Advertising Injury Liability and Paragraph 2., **Exclusions** of Section I – Coverage C – Medical Payments.

The following exclusion is added to the Products/Completed Operations Liability Coverage Form and the Owners and Contractors Protective Liability Coverage Form under Paragraph **2., Exclusions of Section I – Bodily Injury and Property Damage Liability.**

The following exclusion is added to the Railroad Protective Liability Coverage Form under Paragraph **2. Exclusions** of Section I – Coverage A – Bodily Injury and Property Damage Liability and Paragraph 2., **Exclusions of Section I – Coverage B – Physical Damage to Property.**

**2. Exclusions**

This insurance does not apply to:

**Lead Liability**

"Bodily Injury", "property damage", "personal and advertising injury" or any other loss, cost or expense:

**(1)** Arising out of the presence, ingestion, inhalation, absorption, manufacture of, use of, sale of, installation of, removal of, distribution of or exposure to lead in any form or any product containing lead; or

**(2)** In which the insured is obligated to pay to any party because of damages arising out of the presence, ingestion, inhalation, absorption, manufacture of, use of, sale of, installation of, removal of, distribution of or exposure to lead in any form or any product containing lead.

All other terms and conditions of this policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc., with its permission

**POLICY NUMBER:** MC1800000042800

COMMERCIAL GENERAL LIABILITY
QBCG-0151 (08-09)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# HIRED AUTO AND NON-OWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Additional Premium |
|---|---|
| Non-Ownership Liability | Included |
| Hired Auto Liability | Included |

**"HIRED AUTO" LIABILITY**

The insurance provided under **Section I - Coverage A** applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your employees in the course of your business.

With respect to the insurance provided by this endorsement:

It is hereby agreed that under **Section I – Coverage A Bodily Injury And Property Damage Liability Exclusions c., e., g., h., j., k., l., m., n.** are deleted in their entirety and the following exclusions are added:

This insurance does not apply to:

1. **"Bodily Injury"**:

    a. To an employee of the insured arising out of and in the course of employment by the insured; or

    b. To the spouse, child, parent, brother or sister of that employee as a consequence of **a.** above.

    This exclusion applies:

    a. Whether the insured may be liable as an employer or in any other capacity; and

    b. To any obligation to share damages with or repay someone else who must pay damages because of injury.

    This exclusion does not apply to:

    a. Liability assumed by the insured under an "insured contract"; or

    b. "bodily injury" arising out of and in the course of domestic employment by the insured unless benefits for such injury are in whole or in part either payable or required to be provided under any workers compensation law.

2. **"Property Damage"** to:

    a. Property owned or being transported by, or rented or loaned to the insured; or

    b. Property in the care, custody or control of the insured.

**NON-OWNED AUTO LIABILITY**

The insurance provided under **Section I - Coverage A Bodily Injury And Property Damage Liability** applies to "bodily injury" or "property damage" arising out of the use of any "Non-owned auto" in your business by any person other than you.

**SECTION II - WHO IS AN INSURED** is replaced by the following:

Each of the following is an insured under this insurance to the extent set forth below:

    a. You;

    b. Any other person using a "hired auto" with your permission;

    c. With respect to a "non-owned auto", any partner or executive officer of yours, but only while such "non-owned auto" is being used in your business;

Includes copyrighted material of Insurance Services Office, Inc., with its permission

**d.** Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under **a., b.,** or **c.** above.

None of the following is an insured:

**a.** Any person engaged in the business of his or her employer with respect to "bodily injury" to any co-employee of such person injured in the course of employment;

**b.** Any partner or executive officer with respect to any "auto" owned by such partner or officer or a member of his or her household;

**c.** Any person while employed in or otherwise engaged in duties in connection with an "auto business", other than an "auto business" you operate;

**d.** The owner or lessee (of whom you are a sub lessee) of a "hired auto" or the owner of a "Non-owned auto" or any agent or employee of any such owner or lessee;

**e.** Any person or organization with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF

The general aggregate limit (other than Products/Completed Operations stated in the Commercial General Liability Declarations) does not apply to the insurance provided by this endorsement. There is no other change in the application of **SECTION III - LIMITS OF INSURANCE.**

## SECTION V - DEFINITIONS

The following additional definitions apply:

"Auto Business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

"Hired Auto" means only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your employees or partners or members of their households.

"Non-Owned Auto" means only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your employees or partners or members of their households but only while used in your business or your personal affairs.

"Insured Contract" is changed by the addition of the following:

**9.** "Insured Contract" means:

    **g.** That part of any contract or agreement entered into as part of your business, by you or any of your employees pertaining to the rental or lease of any "auto";

Paragraph **g.** does not include that part of any contract or agreement:

    **(1)** That pertains to the loan, lease or rental of an "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

    **(2)** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

All other terms and conditions of this policy remain unchanged.

**POLICY NUMBER:** MC1800000042800



INTERLINE
QBIL-0124 (08-09)



### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# POLLUTANTS DEFINITION AMENDMENT

All Coverage Parts or Coverage Forms included in this policy are subject to the following:

The definition of "pollutants" is replaced in its entirety by the following:

"Pollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, radiation or radioactive contamination, pathogenic or poisonous biological or chemical materials and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

All other terms and conditions of this policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

# EXHIBIT B



P.O. Box 975, Sun Prairie, WI 53590
Phone: 608.837.4440 • Toll Free: 800.362.5448
qbe.com/us

March 31, 2022

**Via Email-** remington@lawhuggins.com
Peachtree Place Condominium Association, Inc.
C/O: Remington Huggins, Esq
110 Norcross St
Roswell, GA 30075

RE:   Claim No:          808629N
      Named Insured:     Peachtree Place Condominium Association, Inc.
      Insuring Co:       QBE Insurance Corporation
      Policy No.:        MC1800000042800

Dear Mr. Huggins:

I am the claims professional writing on behalf of QBE Insurance Corporation ("we", "us", "our"), a member company of QBE North America, which issued Policy No. MC1800000042800 to Peachtree Place Condominium Association, Inc. for the period 05/01/2020-05/01/2021 (the "Policy"). Please direct all future correspondence to my attention. If you are not the appropriate individual to whom this letter should be addressed, please let me know the appropriate individual and I will send this letter to that person instead.

The purpose of this letter is to advise you of our position regarding coverage under the Policy (the "Claim"). We value our customers and appreciate your business. For the reasons explained below, however, we regret to inform you that the Policy does not provide coverage for this Claim.

In considering the request for coverage, we have reviewed the Policy and the information available to us. **The Policy's relevant terms are quoted herein for convenient review.** Kindly refer to the Policy for its complete terms and conditions. To the extent that any of the quoted policy terms or provisions herein differ from the language contained in the Policy, the Policy controls. No other insurance policies were considered. If you assert a right to coverage under another policy issued by us or any other QBE North America company, please submit notice pursuant to the notice provisions contained in that policy.

We expect that you may have questions regarding our position after reading this letter. Please feel free to contact me with any questions you may have.

### RELEVANT FACTUAL BACKGROUND

The following provides a summary of the information provided to us to date.

The insured has reported that, on October 29, 2020, a tropical storm damaged multiple roofs on the insured condominiums. QBE's investigation into the cause of loss and resulting damage discovered that a wind damage loss was previously submitted to the insured's prior insurance carrier, Nationwide, for wind losses that occurred prior to October 29, 2020. In this prior claim, the insured reported to Nationwide that all 16 roofs on the loss site were deemed a total loss and damaged during Nationwide's policy term. The insured also retained an engineer, Probe Forensic Engineering, LLC, who drafted an inspection report dated January 11, 2021. In that report, Probe engineers opined that the subject roofs were damaged by straight line winds on April 13, 2020. Probe further opined that the roofing repairs proposed by Envista Engineering on behalf of Nationwide were not feasible, did not meet code requirements and that the complete replacement of roof coverings at the subject property was warranted.

As the roofs at the subject property have been documented by the insured's engineer and claimed by the insured to be damaged beyond repair, from a loss date of April 13, 2020, QBE rejects the claim and Proof of Loss submitted on March 2, 2022 as the damage predates the inception date of the Policy.  QBE further asserts that the damage claim tendered under QBE's Policy is duplicative to claims previously tendered to Nationwide.

**COVERAGE POSITION**

# COMMERCIAL OUTPUT PROGRAM PROPERTY COVERAGE PART

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described herein subject to all the "terms" of the Commercial Output Program. This coverage is also subject to the "schedule of coverages" and additional policy conditions relating to assignment or transfer of rights or duties, cancellation, changes or modifications, inspections, and examination of books and records.

## PERILS EXCLUDED

2. "We" do not pay for loss or damage that is caused by or results from one or more of the following excluded causes or events:

f. **Defects, Errors, and Omissions** -- "We" do not pay for loss which results from one or more of the following:
1) an act, error, or omission (negligent or not) relating to:
. . .
b) the design, specification, construction, workmanship, installation, or maintenance of property;
. . . or
d) maintenance of property (such as land, structures, or improvements); whether on or off a "covered location"

o. **Settling, Cracking, Shrinking, Bulging, or Expanding** -- "We" do not pay for loss caused by settling, cracking, shrinking, bulging, or expanding of pavements, footings, foundations, walls, ceilings, or roofs. But if settling, cracking, shrinking, bulging, or expanding results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

s. **Wear and Tear** -- "We" do not pay for loss caused by wear and tear, marring, or scratching. But if wear and tear, marring, or scratching results in a "specified peril" or the breakage of building glass, "we" cover the loss or damage caused by that "specified peril" or the breakage of building glass.

t. **Weather** -- "We" do not pay for loss caused by weather conditions if the weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss or damage. But if weather conditions result in a covered peril, "we" cover the loss or damage caused by that covered peril.

## WHAT MUST BE DONE
## IN CASE OF LOSS

1. **Notice** -- In case of a loss, "you" must: a. give "us" or "our" agent prompt notice including a description of the property involved ("we" may request written notice);

## OTHER CONDITIONS

7. **Misrepresentation, Concealment, or Fraud—**

 These Commercial Output Program coverages are void as to "you" and any other insured if, before or after a loss:

a. "you" or any other insured have willfully concealed or misrepresented:

1) a material fact or circumstance that relates to this insurance or the subject thereof; or

2) "your" interest herein; or

b. there has been fraud or false swearing by "you" or any other insured with regard to a matter that relates to this insurance or the subject thereof.

**8. Policy Period –**
"We" pay for a covered loss that occurs during the policy period.

<u>CONCLUSION</u>

For the reasons discussed above, the Policy does not provide coverage for the Claim. We therefore deny coverage for this Claim under the Policy.

Our coverage position is based on the information presently available to us. Neither this letter nor our investigation is or should be construed as a waiver of any terms, conditions, exclusions or other provisions of the Policy or any other policies of insurance issued by us or any other QBE North America company. We expressly reserve all of our rights under the Policy, at law, and in equity, including, but not limited to, the right to assert additional defenses to any claims for coverage and to modify its coverage position if subsequent information indicates that such action is warranted.

Should you have any additional information that you feel would cause us to review our position, we ask that you advise us as soon as possible. If you have any other insurance policies that may respond to this claim, you should notify that carrier immediately.

In closing, we encourage you to contact us if you have any questions or concerns regarding the contents of this letter. You can reach me at (608)825-5779 or Adam.Jacobs@us.qbe.com. Thank you for your cooperation in this matter.

Very truly yours,

Adam Jacobs
Senior Claim Specialist, Property Claims

cc:    ***McGowan Program Administrators***

# EXHIBIT C

**BERRONG**    **Berrong Construction**

Insured:    Peachtree Place Condominiums
Property:   3777 Peachtree Rd NE
              Brookhaven, GA 30319

Estimator:   Cannon Berrong                               Business:   (770) 400-9709
Company:   Berrong Construction                    E-mail:   Cannon@Berrong.com
Business:   935 Highway 124, Suite 209
               Braselton, GA 30517

**Claim Number:**                      **Policy Number:**                     **Type of Loss:** Storm Damage

Date of Loss:                          Date Received:
Date Inspected:                     Date Entered:

Price List:   GAAT8X_FEB22
              Restoration/Service/Remodel
Estimate:   PEACHTREE-PLACE-DEP

**BERRONG**   **Berrong Construction**

*\*\*Please be advised, To whom it may concern:  We reserve all of our rights as a privately owned General Contracting Company.  Any attempt to interfere with our contract, or our business relationship with our customer will be considered as "tortious interference", also known as "intentional interference with contractual relations", and will be followed up with the appropriate civil action against the tortfeasor and the company they are acting as an agent of, in the jurisdiction where our contract originated.*

**Please also be aware that our business model as a General Construction firm is to subcontract all specialty, licensed, and/or hazardous trades to specialized tradesmen.  Therefore, we do not use the default demolition general labor (DMO) in the "unit price" of the Xactimate removal line items on any specialty, licensed, or hazardous trades.  All removal lines "unit price" are attributed to their appropriate specialty, licensed, and/or hazardous trade.  This is required to appropriately represent our cost of job-personnel overhead that is built into Xactimate's line item price.**

**According to OSHA:**
"Two major classes of hazardous work involved in construction are roofing and carpentry.  Among these workers, falls from heights comprise significant portions of injuries and costs.  This analysis looks at workers' compensation data for injuries resulting from falls from elevations, and from falls from ladders and scaffolds.  Data came from statistics collected from insured employers in 36 states, which comprises approximately 1/3 of total workers' compensation benefits."

**As a General Contractor, we are required to abide by all state regulated building codes and schedule/supervise all specialty trade sub-contractors, as well as, handle all permit processes, OSHA regulation compliance, general liability insurance for this project, and worker's compensation for our employees/sub-contractors that we supervise or that otherwise enter the job site while work is in progress.  Therefore, General Contractors overhead and profit is charged on all projects, as well as the job related overhead general conditions.**

**According to Xactware (Xactimate):**
"The building cost data published by Xactware is not designed to be inclusive of sales tax, General O&P, or Job-Related O&P within the unit prices."

"**General Overhead** are expenses incurred by a General Contractor, that cannot be attributed to individual projects, and include any and all expenses necessary for the General Contractor to operate their business. Examples (including but not limited to): General and Administrative (G&A) expenses, office rent, utilities, office supplies, salaries for office personnel, depreciation on office equipment, licenses, and advertising. Including General Overhead expenses in an Xactimate estimate–General Overhead expenses are not included in Xactware's unit pricing, but are typically added to the estimate as a percentage of the total bid along with the appropriate profit margin.
**Job-Related Overhead** are expenses that can be attributed to a project, but cannot be attributed to a specific task and include any and all necessary expenses to complete the project other than direct materials and labor. Examples (including but not limited to): Project managers, onsite portable offices and restroom facilities, temporary power and fencing, security if needed, etc. Including Job-Related Overhead expenses in an Xactimate estimate–Job Related Overhead expenses should be added as separate line items to the Xactimate estimate. This is done within the Line Item Entry window of an Xactimate estimate by selecting the proper price list items, or creating your own miscellaneous items."

**According to the Federal Trade Commission:**
Price fixing is an agreement (written, verbal, or inferred from conduct) among competitors that raises, lowers, or stabilizes prices or competitive terms. Generally, the antitrust laws require that each company establish prices and other terms on its own, without agreeing with a competitor. When consumers make choices about what products and services to buy, they expect that the price has been determined freely on the basis of supply and demand, not by an agreement among competitors. When competitors agree to restrict competition, the result is often higher prices. Accordingly, price fixing is a major concern of government antitrust enforcement. Illegal price fixing occurs whenever two or more competitors agree to take actions that have the effect of raising, lowering or stabilizing the price of any product or service without any legitimate justification.

**BERRONG**   **Berrong Construction**

## PEACHTREE-PLACE

**PEACHTREE-PLACE**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *The price list has been updated to February 2022, to reflect current labor and material pricing for when the work will most likely be performed.* | | | | | | | |
| *The City of Brookhaven, GA has adopted and enforces the 20 International Building Code, as mandated by the State of Georgia.* | | | | | | | |
| *IBC 102.1 states where there is a conflict between a general requirement and a specific requirement, the specific requirement shall be applicable. Where, in any specific case, different sections of this code specify different materials, methods of construction or other requirements, the most restrictive shall govern.* | | | | | | | |
| **Total: PEACHTREE-PLACE** | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

### BUILDINGS
### Building 2

**Building 2**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 2 measurements are based on EagleView Report: 35150104.* | | | | | | | |
| **Total: Building 2** | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

### Roof

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 1. Remove Tile roofing - Concrete - "S" or flat tile | 56.41 SQ | 438.87 | 0.00 | 4,951.33 | 29,707.99 | (0.00) | 29,707.99 |
| *Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.* | | | | | | | |
| 2. Tile roofing - Concrete - "S" or flat tile - w/out felt | 70.51 SQ | 552.08 | 1,097.30 | 8,004.89 | 48,029.36 | (3,429.08) | 44,600.28 |
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.* | | | | | | | |
| *Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."* | | | | | | | |
| 3. Roofing felt - 30 lb. | 64.87 SQ | 35.35 | 57.55 | 470.14 | 2,820.84 | (179.85) | 2,640.99 |

**BERRONG**   **Berrong Construction**

### CONTINUED - Roof

| DESCRIPTION | QUANTITY UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2). "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 4.  Hip/Ridge flashing* | 308.00 LF | 6.97 | 68.99 | 443.15 | 2,658.90 | (215.60) | 2,443.30 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 5.  Ridge / Hip / Rake cap - tile roofing | 395.00 LF | 12.13 | 225.31 | 1,003.33 | 6,019.99 | (704.09) | 5,315.90 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 6.  R&R Drip edge | 440.00 LF | 3.54 | 40.48 | 319.62 | 1,917.70 | (126.50) | 1,791.20 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing. metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 7.  R&R Valley metal - (W) profile | 131.00 LF | 8.11 | 33.01 | 219.08 | 1,314.51 | (103.16) | 1,211.34 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 8.  R&R Counterflashing - Apron flashing | 110.00 LF | 10.88 | 12.76 | 241.91 | 1,451.47 | (39.88) | 1,411.59 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

**BERRONG** | **Berrong Construction**

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 9.  R&R Aluminum sidewall/endwall flashing - color finish | 110.00 LF | 9.80 | 43.82 | 224.36 | 1,346.19 | (136.95) | 1,209.24 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new.  The removal action of this line is not included with the removal of the field material in Xactimate.  Flashing is required by IBC 1503.2.  Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated.  The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 10.  Bird stop - Eave closure strip for tile roofing - metal | 353.00 LF | 3.46 | 44.34 | 253.14 | 1,518.86 | (138.55) | 1,380.31 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 11.  Remove Additional charge for steep roof - 7/12 to 9/12 slope | 0.33 SQ | 37.11 | 0.00 | 2.45 | 14.70 | (0.00) | 14.70 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a steep roof*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 12.  Additional charge for steep roof - 7/12 to 9/12 slope | 0.33 SQ | 42.73 | 0.00 | 2.82 | 16.92 | (0.00) | 16.92 |

*Additional labor charge for lost productivity on a steep roof, due to accessibility, and extra safety precautions due to increased danger.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 13.  Remove Additional charge for high roof (2 stories or greater) | 56.41 SQ | 14.02 | 0.00 | 158.17 | 949.04 | (0.00) | 949.04 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 14.  Additional charge for high roof (2 stories or greater) | 56.41 SQ | 18.87 | 0.00 | 212.89 | 1,277.35 | (0.00) | 1,277.35 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 15.  Flashing - pipe jack | 12.00 EA | 43.58 | 12.54 | 107.10 | 642.60 | (39.18) | 603.42 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 16.  Roof mount power attic vent | 3.00 EA | 527.66 | 37.04 | 324.00 | 1,944.02 | (115.74) | 1,828.28 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 2208 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

| | | | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **Total: Roof** | | | 1,673.14 | 16,938.41 | 101,630.44 | 5,228.58 | 96,401.86 |

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

**BERRONG** Berrong Construction

## CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| 17. Re-nailing of roof sheathing - complete re-nail | 5,641.00 SF | 0.23 | 4.51 | 260.39 | 1,562.33 | (14.10) | 1,548.23 |

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 18. Add charge for re-nailing sheathing steep roof - 7/12 - 9/12 slope* | 33.00 SF | 0.32 | 0.42 | 2.20 | 13.18 | (1.32) | 11.86 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a steep roof.*

| 19. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 56.41 SQ | 18.87 | 0.00 | 212.89 | 1,277.35 | (0.00) | 1,277.35 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 20. Hip/ridge/rake/eave nailer board - 2x2 | 395.00 LF | 1.99 | 18.33 | 160.88 | 965.25 | (57.28) | 907.97 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| Totals: Carpentry | | | 23.26 | 636.35 | 3,818.12 | 72.70 | 3,745.42 |

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 21. Electrician - per hour | 6.00 HR | 95.06 | 0.00 | 114.07 | 684.43 | (0.00) | 684.43 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| Totals: Electrical | | | 0.00 | 114.07 | 684.43 | 0.00 | 684.43 |

| Total: Roof | | | 1,696.41 | 17,688.83 | 106,132.99 | 5,301.28 | 100,831.71 |

## Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

PEACHTREE-PLACE-DEP · 2/24/2022 Page: 6

**BERRONG**  Berrong Construction

### CONTINUED - Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 22.  R&R Gutter / downspout - aluminum - up to 5" | 433.00 LF | 10.30 | 155.53 | 923.09 | 5,538.52 | (486.04) | 5,052.48 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| **Totals:  Guttering** | | | 155.53 | 923.09 | 5,538.52 | 486.04 | 5,052.48 |

### Stucco

**Stucco**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 23.  Stucco repair around installed flashings^ | 110.00 LF | 23.47 | 16.02 | 519.54 | 3,117.26 | (50.05) | 3,067.21 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| **Total:  Stucco** | | | 16.02 | 519.54 | 3,117.26 | 50.05 | 3,067.21 |

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 24.  Clean stucco | 110.00 SF | 1.01 | 0.09 | 22.24 | 133.43 | (0.28) | 133.15 |
| *Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.* | | | | | | | |
| 25.  Seal & paint stucco | 110.00 SF | 1.45 | 2.55 | 32.41 | 194.46 | (7.98) | 186.48 |
| *Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.* | | | | | | | |
| **Totals:  Painting** | | | 2.64 | 54.65 | 327.89 | 8.26 | 319.63 |
| **Total:  Stucco** | | | 18.66 | 574.19 | 3,445.15 | 58.31 | 3,386.84 |
| **Total:  Exterior** | | | 174.19 | 1,497.28 | 8,983.67 | 544.35 | 8,439.32 |
| **Total:  Building 2** | | | 1,870.60 | 19,186.11 | 115,116.66 | 5,845.63 | 109,271.03 |

### Building 3

**Building 3**

**BERRONG**   Berrong Construction

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 3 measurements are based on EagleView Report: 35150103.* | | | | | | | |
| **Total:  Building 3** | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

### Roof

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |

**26.  Remove Tile roofing - Concrete – "S" or flat tile**   210.98 SQ   438.87   0.00   18,518.56   111,111.35   (0.00)   111,111.35

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

**27.  Tile roofing - Concrete – "S" or flat tile - w/out felt**   263.73 SQ   552.08   4,104.27   29,940.87   179,645.20   (12,825.85)   166,819.35

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

**28.  Roofing felt - 30 lb.**   242.63 SQ   35.35   215.26   1,758.45   10,550.68   (672.69)   9,877.99

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

**29.  Hip/Ridge flashing***   1,103.00 LF   6.97   247.07   1,587.00   9,521.98   (772.10)   8,749.88

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1.  Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings.  IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled when rusted, damaged or deteriorated.  The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

**30.  Ridge / Hip / Rake cap - tile roofing**   1,395.00 LF   12.13   795.71   3,543.41   21,260.47   (2,486.59)   18,773.88

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

**31.  R&R Drip edge**   1,419.00 LF   3.54   130.55   1,030.76   6,184.57   (407.96)   5,776.61

**BERRONG** | **Berrong Construction**

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **32. R&R Valley metal - (W) profile** | 480.00 LF | 8.11 | 120.96 | 802.75 | 4,816.51 | (378.00) | 4,438.51 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **33. R&R Counterflashing - Apron flashing** | 368.00 LF | 10.88 | 42.69 | 809.31 | 4,855.83 | (133.40) | 4,722.44 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **34. R&R Aluminum sidewall/endwall flashing - color finish** | 368.00 LF | 9.80 | 146.61 | 750.60 | 4,503.61 | (458.16) | 4,045.46 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **35. R&R Cupola flashing - average (32" x 36")*** | 2.00 EA | 427.66 | 12.79 | 173.62 | 1,041.73 | (39.96) | 1,001.77 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing cupola flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **36. R&R Chimney flashing - average (32" x 36")** | 1.00 EA | 404.03 | 6.43 | 82.09 | 492.55 | (20.10) | 472.46 |

**BERRONG**  **Berrong Construction**

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a roofing subcontractor to remove the existing chimney flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field shingles in Xactimate. Chimney flashing is required by Building Code R703.4(2). Code states that flashings shall be installed at the intersections of chimneys. Code R905.2.8.4 states that chimney flashing, specifically, shall be applied in accordance with the shingle manufacturers printed instructions. Building code R908.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 37. R&R Saddle or cricket - up to 25 SF | 3.00 EA | 309.43 | 17.27 | 189.11 | 1,134.67 | (53.97) | 1,080.70 |

*Labor and material for a roofing subcontractor to remove the existing chimney and cupola crickets, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field shingles in Xactimate. BC 1511.5 prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 38. Bird stop - Eave closure strip for tile roofing - metal | 1,127.00 LF | 3.46 | 141.55 | 808.19 | 4,849.17 | (442.35) | 4,406.82 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 39. Remove Additional charge for steep roof - 7/12 to 9/12 slope | 20.47 SQ | 37.11 | 0.00 | 151.93 | 911.57 | (0.00) | 911.57 |

*Labor for a commercial roofing subcontractor specializing in tile tile roofing systems to remove the tile roofing, furring strips, and felt on a steep roof*

| 40. Additional charge for steep roof - 7/12 to 9/12 slope | 20.47 SQ | 42.73 | 0.00 | 174.94 | 1,049.62 | (0.00) | 1,049.62 |

*Additional labor charge for lost productivity on a steep roof, due to accessibility, and extra safety precautions due to increased danger.*

| 41. Remove Additional charge for steep roof - 10/12 - 12/12 slope | 28.45 SQ | 58.31 | 0.00 | 331.78 | 1,990.70 | (0.00) | 1,990.70 |

*Labor for a commercial roofing subcontractor specializing in tile tile roofing systems to remove the tile roofing, furring strips, and felt on a double steep roof*

| 42. Additional charge for steep roof - 10/12 - 12/12 slope | 28.45 SQ | 67.16 | 0.00 | 382.14 | 2,292.84 | (0.00) | 2,292.84 |

*Additional labor charge for lost productivity on a steep roof, due to accessibility, and extra safety precautions due to increased danger.*

| 43. Remove Additional charge for high roof (2 stories or greater) | 210.98 SQ | 14.02 | 0.00 | 591.59 | 3,549.53 | (0.00) | 3,549.53 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 44. Additional charge for high roof (2 stories or greater) | 210.98 SQ | 18.87 | 0.00 | 796.24 | 4,777.43 | (0.00) | 4,777.43 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 45. Flashing - pipe jack | 18.00 EA | 43.58 | 18.81 | 160.65 | 963.90 | (58.77) | 905.13 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 46. Roof mount power attic vent | 10.00 EA | 527.66 | 123.46 | 1,080.01 | 6,480.07 | (385.80) | 6,094.27 |

**BERR⊃NG** **Berrong Construction**

### CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 9600 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design. the logical way to achieve the code required ventilation is install power attic vents.*

| Total: Roof | | | 6,123.42 | 63,663.99 | 381,983.97 | 19,135.70 | 362,848.27 |
|---|---|---|---|---|---|---|---|

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| 47. Re-nailing of roof sheathing - complete re-nail | 21,098.SF 00 | 0.23 | 16.88 | 973.88 | 5,843.30 | (52.75) | 5,790.55 |
|---|---|---|---|---|---|---|---|

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 48. Add charge for re-nailing sheathing steep roof - 7/12 - 9/12 slope* | 2,047.00 SF | 0.32 | 26.20 | 136.25 | 817.49 | (81.88) | 735.61 |
|---|---|---|---|---|---|---|---|

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a steep roof.*

| 49. Add charge for re-nailing sheathing steep roof - 10/12 - 12/12 slope* | 2,845.10 SF | 0.41 | 36.42 | 240.58 | 1,443.49 | (113.80) | 1,329.69 |
|---|---|---|---|---|---|---|---|

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a double steep roof.*

| 50. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 210.98 SQ | 18.87 | 0.00 | 796.24 | 4,777.43 | (0.00) | 4,777.43 |
|---|---|---|---|---|---|---|---|

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 51. Hip/ridge/rake/eave nailer board - 2x2 | 1,395.00 LF | 1.99 | 64.73 | 568.16 | 3,408.93 | (202.28) | 3,206.65 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| Totals: Carpentry | | | 144.23 | 2,715.11 | 16,290.64 | 450.71 | 15,839.93 |
|---|---|---|---|---|---|---|---|

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

**BERRONG**  **Berrong Construction**

### CONTINUED - Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 52.  Electrician - per hour | 20.00 HR | 95.06 | 0.00 | 380.24 | 2,281.44 | (0.00) | 2,281.44 |
| *Additional labor required for an electrician to install the wiring to the code mandated power attic vent.* | | | | | | | |
| Totals:  Electrical | | | 0.00 | 380.24 | 2,281.44 | 0.00 | 2,281.44 |
| Total:  Roof | | | 6,267.65 | 66,759.34 | 400,556.05 | 19,586.41 | 380,969.64 |

### Exterior

#### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 53.  R&R Gutter / downspout - aluminum - up to 5" | 1,327.00 LF | 10.30 | 476.66 | 2,828.95 | 16,973.71 | (1,489.56) | 15,484.15 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| Totals:  Guttering | | | 476.66 | 2,828.95 | 16,973.71 | 1,489.56 | 15,484.15 |

#### Stucco

Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 54.  Stucco repair around installed flashings* | 368.00 LF | 23.47 | 53.58 | 1,738.11 | 10,428.65 | (167.44) | 10,261.21 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total:  Stucco | | | 53.58 | 1,738.11 | 10,428.65 | 167.44 | 10,261.21 |

#### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 55.  Clean stucco | 368.00 SF | 1.01 | 0.29 | 74.39 | 446.37 | (0.92) | 445.45 |
| *Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.* | | | | | | | |
| 56.  Seal & paint stucco | 368.00 SF | 1.45 | 8.54 | 108.43 | 650.57 | (26.68) | 623.89 |

PEACHTREE-PLACE-DEP

2/24/2022          Page: 12

**BERRONG**   **Berrong Construction**

## CONTINUED - Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.* | | | | | | | |
| Totals: Painting | | | 8.83 | 182.82 | 1,096.93 | 27.60 | 1,069.33 |
| Total: Stucco | | | 62.41 | 1,920.93 | 11,525.58 | 195.04 | 11,330.54 |
| Total: Exterior | | | 539.07 | 4,749.88 | 28,499.29 | 1,684.60 | 26,814.70 |
| Total: Building 3 | | | 6,806.72 | 71,509.22 | 429,055.34 | 21,271.01 | 407,784.33 |

### Building 4

**Building 4**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 4 measurements are based on EagleView Report: 35150106.* | | | | | | | |
| Total: Building 4 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

### Roof

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 57. Remove Tile roofing - Concrete - "S" or flat tile | 139.74 SQ | 438.87 | 0.00 | 12,265.54 | 73,593.23 | (0.00) | 73,593.23 |
| *Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.* | | | | | | | |
| 58. Tile roofing - Conercte - "S" or flat tile - w/out felt | 174.68 SQ | 552.08 | 2,718.44 | 19,831.15 | 118,986.92 | (8,495.13) | 110,491.79 |
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.* | | | | | | | |
| *Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."* | | | | | | | |
| 59. Roofing felt - 30 lb. | 160.70 SQ | 35.35 | 142.57 | 1,164.66 | 6,987.99 | (445.54) | 6,542.45 |

**BERRONG**  **Berrong Construction**

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 60.  Hip/Ridge flashing* | 881.00 LF | 6.97 | 197.34 | 1,267.58 | 7,605.50 | (616.70) | 6,988.80 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 61.  Ridge / Hip / Rake cap - tile roofing | 949.00 LF | 12.13 | 541.31 | 2,410.54 | 14,463.22 | (1,691.59) | 12,771.63 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 62.  R&R Drip edge | 996.00 LF | 3.54 | 91.63 | 723.49 | 4,340.97 | (286.35) | 4,054.61 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 63.  R&R Valley metal - (W) profile | 343.00 LF | 8.11 | 86.44 | 573.63 | 3,441.80 | (270.11) | 3,171.69 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 64.  R&R Counterflashing - Apron flashing | 348.00 LF | 10.88 | 40.37 | 765.32 | 4,591.93 | (126.15) | 4,465.78 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

**BERRONG** **Berrong Construction**

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 65. R&R Aluminum sidewall/endwall flashing - color finish | 348.00 LF | 9.80 | 138.64 | 709.81 | 4,258.85 | (433.26) | 3,825.60 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cop flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 66. R&R Cupola flashing - average (32" x 36")* | 8.00 EA | 427.66 | 51.15 | 694.49 | 4,166.91 | (159.84) | 4,007.08 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing cupola flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 67. R&R Saddle or cricket - up to 25 SF | 8.00 EA | 309.43 | 46.05 | 504.30 | 3,025.79 | (143.92) | 2,881.87 |

*Labor and material for a roofing subcontractor to remove the existing cupola cricket, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field shingles in Xactimate. IBC 1511.5 prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 68. Bird stop - Eave closure strip for tile roofing - metal | 928.00 LF | 3.46 | 116.56 | 665.49 | 3,992.92 | (364.24) | 3,628.68 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 69. Remove Additional charge for high roof (2 stories or greater) | 139.74 SQ | 14.02 | 0.00 | 391.83 | 2,350.98 | (0.00) | 2,350.98 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 70. Additional charge for high roof (2 stories or greater) | 139.74 SQ | 18.87 | 0.00 | 527.38 | 3,164.27 | (0.00) | 3,164.27 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 71. Flashing - pipe jack | 10.00 EA | 43.58 | 10.45 | 89.25 | 535.50 | (32.65) | 502.85 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 72. Roof mount power attic vent | 8.00 EA | 527.66 | 98.76 | 864.01 | 5,184.05 | (308.64) | 4,875.41 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 6192 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

**BERRONG**  **Berrong Construction**

### CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Total: Roof | | | 4,279.72 | 43,448.47 | 260,690.83 | 13,374.12 | 247,316.71 |

#### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| 73. Re-nailing of roof sheathing - complete re-nail | 13,974. SF 00 | 0.23 | 11.18 | 645.04 | 3,870.24 | (34.94) | 3,835.30 |
|---|---|---|---|---|---|---|---|

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 74. Additional charge for re-nailing sheathing high roof (2 stories or greater) | 139.74 SQ | 18.87 | 0.00 | 527.38 | 3,164.27 | (0.00) | 3,164.27 |
|---|---|---|---|---|---|---|---|
| 75. Hip/ridge/rake/eave nailer board - 2x2 | 949.00 LF | 1.99 | 44.03 | 386.51 | 2,319.05 | (137.61) | 2,181.44 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| Totals: Carpentry | | | 55.21 | 1,558.93 | 9,353.56 | 172.55 | 9,181.01 |
|---|---|---|---|---|---|---|---|

#### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 76. Electrician - per hour | 16.00 HR | 95.06 | 0.00 | 304.19 | 1,825.15 | (0.00) | 1,825.15 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| Totals: Electrical | | | 0.00 | 304.19 | 1,825.15 | 0.00 | 1,825.15 |
|---|---|---|---|---|---|---|---|

| Total: Roof | | | 4,334.93 | 45,311.59 | 271,869.54 | 13,546.67 | 258,322.87 |
|---|---|---|---|---|---|---|---|

### Exterior

**BERRONG** | Berrong Construction

## Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 77.  R&R Gutter / downspout - aluminum - up to 5" | 1,088.00 LF | 10.30 | 390.81 | 2,319.44 | 13,916.65 | (1,221.28) | 12,695.37 |

*Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.*

| Totals:  Guttering | | | 390.81 | 2,319.44 | 13,916.65 | 1,221.28 | 12,695.37 |

## Stucco

### Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 78.  Stucco repair around installed flashings* | 348.00 LF | 23.47 | 50.67 | 1,643.65 | 9,861.87 | (158.34) | 9,703.53 |

*Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.*

| Total:  Stucco | | | 50.67 | 1,643.65 | 9,861.87 | 158.34 | 9,703.53 |

## Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 79.  Clean stucco | 348.00 SF | 1.01 | 0.28 | 70.35 | 422.11 | (0.87) | 421.24 |

*Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied*

| 80.  Seal & paint stucco | 348.00 SF | 1.45 | 8.07 | 102.53 | 615.21 | (25.23) | 589.98 |

*Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.*

| Totals:  Painting | | | 8.35 | 172.89 | 1,037.32 | 26.10 | 1,011.22 |
| Total:  Stucco | | | 59.02 | 1,816.53 | 10,899.19 | 184.44 | 10,714.75 |
| Total:  Exterior | | | 449.83 | 4,135.97 | 24,815.84 | 1,405.72 | 23,410.12 |
| Total:  Building 4 | | | 4,784.76 | 49,447.56 | 296,685.39 | 14,952.39 | 281,732.99 |

## Building 5

### Building 5

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 5 measurements are based on EagleView Report: 35150107.* | | | | | | | |

**BERRONG** **Berrong Construction**

## CONTINUED - Building 5

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Total: Building 5 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## Roof

Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.*

| 81. Remove Tile roofing - Concrete - "S" or flat tile | 85.40 SQ | 438.87 | 0.00 | 7,495.90 | 44,975.40 | (0.00) | 44,975.40 |
|---|---|---|---|---|---|---|---|

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 82. Tile roofing - Concrete - "S" or flat tile - w/out felt | 106.75 SQ | 552.08 | 1,661.29 | 12,119.17 | 72,714.99 | (5,191.52) | 67,523.47 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 83. Roofing felt - 30 lb. | 98.21 SQ | 35.35 | 87.13 | 711.77 | 4,270.62 | (272.29) | 3,998.33 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 84. Hip/Ridge flashing* | 537.00 LF | 6.97 | 120.29 | 772.64 | 4,635.81 | (375.90) | 4,259.91 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 85. Ridge / Hip / Rake cap - tile roofing | 561.00 LF | 12.13 | 319.99 | 1,424.98 | 8,549.91 | (999.98) | 7,549.93 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

**BERRONG** Berrong Construction

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 86.  R&R Drip edge | 574.00 LF | 3.54 | 52.81 | 416.95 | 2,501.72 | (165.03) | 2,336.70 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 87.  R&R Valley metal - (W) profile | 187.00 LF | 8.11 | 47.12 | 312.74 | 1,876.43 | (147.26) | 1,729.17 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 88.  R&R Counterflashing - Apron flashing | 131.00 LF | 10.88 | 15.20 | 288.10 | 1,728.57 | (47.49) | 1,681.08 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 89.  R&R Aluminum sidewall/endwall flashing - color finish | 131.00 LF | 9.80 | 52.19 | 267.20 | 1,603.19 | (163.10) | 1,440.09 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 90.  R&R Cupola flashing - average (32" x 36")* | 4.00 EA | 427.66 | 25.57 | 347.24 | 2,083.46 | (79.92) | 2,003.53 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing cupola flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 91.  R&R Saddle or cricket - up to 25 SF | 4.00 EA | 309.43 | 23.03 | 252.15 | 1,512.90 | (71.96) | 1,440.94 |

**BERR⊃NG**   **Berrong Construction**

---

### CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a roofing subcontractor to remove the existing cupola cricket, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field shingles in Xactimate. IBC 1511.5 prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 92. Bird stop - Eave closure strip for tile roofing - metal | 550.00 LF | 3.46 | 69.08 | 394.42 | 2,366.50 | (215.88) | 2,150.62 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 93. Remove Additional charge for high roof (2 stories or greater) | 85.40 SQ | 14.02 | 0.00 | 239.46 | 1,436.77 | (0.00) | 1,436.77 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 94. Additional charge for high roof (2 stories or greater) | 85.40 SQ | 18.87 | 0.00 | 322.30 | 1,933.80 | (0.00) | 1,933.80 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 95. Flashing - pipe jack | 8.00 EA | 43.58 | 8.36 | 71.40 | 428.40 | (26.12) | 402.28 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 96. Roof mount power attic vent | 5.00 EA | 527.66 | 61.73 | 540.01 | 3,240.03 | (192.90) | 3,047.13 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 3600 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roof's material and design, the logical way to achieve the code required ventilation is install power attic vents.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Total: Roof** | | | 2,543.79 | 25,976.42 | 155,858.50 | 7,949.35 | 147,909.16 |

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 97. Re-nailing of roof sheathing - complete re-nail | 8,540.00 SF | 0.23 | 6.83 | 394.21 | 2,365.24 | (21.35) | 2,343.89 |

**BERRONG** Berrong Construction

## CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.* | | | | | | | |
| 98.  Additional charge for re-nailing sheathing high roof (2 stories or greater) | 85.40 SQ | 18.87 | 0.00 | 322.30 | 1,933.80 | (0.00) | 1,933.80 |
| *Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.* | | | | | | | |
| 99.  Hip/ridge/rake/eave nailer board - 2x2 | 561.00 LF | 1.99 | 26.03 | 228.48 | 1,370.90 | (81.35) | 1,289.55 |
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.* | | | | | | | |
| **Totals: Carpentry** | | | 32.86 | 944.99 | 5,669.94 | 102.70 | 5,567.24 |

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 100.  Electrician - per hour | 10.00 HR | 95.06 | 0.00 | 190.12 | 1,140.72 | (0.00) | 1,140.72 |
| *Additional labor required for an electrician to install the wiring to the code mandated power attic vent.* | | | | | | | |
| **Totals: Electrical** | | | 0.00 | 190.12 | 1,140.72 | 0.00 | 1,140.72 |
| **Total: Roof** | | | 2,576.65 | 27,111.53 | 162,669.17 | 8,052.05 | 154,617.12 |

### Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 101.  R&R Gutter / downspout - aluminum - up to 5" | 630.00 LF | 10.30 | 226.30 | 1,343.06 | 8,058.36 | (707.18) | 7,351.18 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| **Totals: Guttering** | | | 226.30 | 1,343.06 | 8,058.36 | 707.18 | 7,351.18 |

### Stucco

**BERRONG** | Berrong Construction

## Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 102. Stucco repair around installed flashings* | 131.00 LF | 23.47 | 19.07 | 618.73 | 3,712.37 | (59.61) | 3,652.76 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total: Stucco | | | 19.07 | 618.73 | 3,712.37 | 59.61 | 3,652.76 |

## Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 103. Clean stucco | 131.00 SF | 1.01 | 0.10 | 26.48 | 158.90 | (0.33) | 158.57 |
| *Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.* | | | | | | | |
| 104. Seal & paint stucco | 131.00 SF | 1.45 | 3.04 | 38.60 | 231.59 | (9.50) | 222.09 |
| *Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.* | | | | | | | |
| Totals: Painting | | | 3.14 | 65.08 | 390.48 | 9.83 | 380.65 |
| Total: Stucco | | | 22.22 | 683.81 | 4,102.86 | 69.44 | 4,033.41 |
| Total: Exterior | | | 248.51 | 2,026.87 | 12,161.21 | 776.62 | 11,384.59 |
| Total: Building 5 | | | 2,825.16 | 29,138.40 | 174,830.38 | 8,828.67 | 166,001.71 |

## Building 6

### Building 6

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 6 measurements are based on EagleView Report: 35150108.* | | | | | | | |
| Total: Building 6 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## Roof

### Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 105. Remove Tile roofing - Concrete - "S" or flat tile | 51.17 SQ | 438.87 | 0.00 | 4,491.40 | 26,948.38 | (0.00) | 26,948.38 |

PEACHTREE-PLACE-DEP

**BERRONG** Berrong Construction

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 106. Tile roofing - Concrete - "S" or flat tile - w/out felt | 63.96 SQ | 552.08 | 995.37 | 7,261.28 | 43,567.69 | (3,110.53) | 40,457.16 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 107. Roofing felt - 30 lb. | 58.85 SQ | 35.35 | 52.21 | 426.51 | 2,559.07 | (163.16) | 2,395.91 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 108. Hip/Ridge flashing* | 357.00 LF | 6.97 | 99.97 | 513.65 | 3,081.97 | (249.90) | 2,832.01 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 109. Ridge / Hip / Rake cap - tile roofing | 382.00 LF | 12.13 | 217.89 | 970.31 | 5,821.86 | (680.92) | 5,140.94 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 110. R&R Drip edge | 417.00 LF | 3.54 | 38.36 | 302.91 | 1,817.45 | (119.89) | 1,697.56 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 111. R&R Valley metal - (W) profile | 131.00 LF | 8.11 | 33.01 | 219.08 | 1,314.51 | (103.16) | 1,211.34 |

**BERRONG** Berrong Construction

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 112. R&R Counterflashing - Apron flashing | 60.00 LF | 10.88 | 6.96 | 131.95 | 791.71 | (21.75) | 769.96 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 113. R&R Aluminum sidewall/endwall flashing - color finish | 60.00 LF | 9.80 | 23.90 | 122.38 | 734.28 | (74.70) | 659.58 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 114. Bird stop - Eave closure strip for tile roofing - metal | 392.00 LF | 3.46 | 49.24 | 281.11 | 1,686.67 | (153.86) | 1,532.81 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 115. Remove Additional charge for high roof (2 stories or greater) | 51.17 SQ | 14.02 | 0.00 | 143.48 | 860.88 | (0.00) | 860.88 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 116. Additional charge for high roof (2 stories or greater) | 51.17 SQ | 18.87 | 0.00 | 193.12 | 1,158.70 | (0.00) | 1,158.70 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 117. Flashing - pipe jack | 6.00 EA | 43.58 | 6.27 | 53.55 | 321.30 | (19.59) | 301.71 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 118. Roof mount power attic vent | 3.00 EA | 527.66 | 37.04 | 324.00 | 1,944.02 | (115.74) | 1,828.28 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 1968 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

**BERRONG**  **Berrong Construction**

### CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Total: Roof | | | 1,540.22 | 15,434.74 | 92,608.43 | 4,813.20 | 87,795.24 |

#### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| 119. Re-nailing of roof sheathing - complete re-nail | 5,117.00 SF | 0.23 | 4.09 | 236.20 | 1,417.20 | (12.79) | 1,404.41 |
|---|---|---|---|---|---|---|---|

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 120. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 51.17 SQ | 18.87 | 0.00 | 193.12 | 1,158.70 | (0.00) | 1,158.70 |
|---|---|---|---|---|---|---|---|

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 121. Hip/ridge/rake/eave nailer board - 2x2 | 382.00 LF | 1.99 | 17.72 | 155.58 | 933.49 | (55.39) | 878.10 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| Totals: Carpentry | | | 21.82 | 584.90 | 3,509.39 | 68.18 | 3,441.21 |
|---|---|---|---|---|---|---|---|

#### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 122. Electrician - per hour | 6.00 HR | 95.06 | 0.00 | 114.07 | 684.43 | (0.00) | 684.43 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| Totals: Electrical | | | 0.00 | 114.07 | 684.43 | 0.00 | 684.43 |
|---|---|---|---|---|---|---|---|

| Total: Roof | | | 1,562.04 | 16,133.71 | 96,802.25 | 4,881.38 | 91,920.88 |
|---|---|---|---|---|---|---|---|

**BERRONG**  **Berrong Construction**

## Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 123. R&R Gutter / downspout - aluminum - up to 5" | 472.00 LF | 10.30 | 169.54 | 1,006.23 | 6,037.37 | (529.82) | 5,507.55 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| Totals: Guttering | | | 169.54 | 1,006.23 | 6,037.37 | 529.82 | 5,507.55 |

### Stucco

**Stucco**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 124. Stucco repair around installed flashings* | 60.00 LF | 23.47 | 8.74 | 283.39 | 1,700.32 | (27.30) | 1,673.02 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total: Stucco | | | 8.74 | 283.39 | 1,700.32 | 27.30 | 1,673.02 |

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 125. Clean stucco | 60.00 SF | 1.01 | 0.05 | 12.13 | 72.78 | (0.15) | 72.63 |
| *Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.* | | | | | | | |
| 126. Seal & paint stucco | 60.00 SF | 1.45 | 1.39 | 17.68 | 106.07 | (4.35) | 101.72 |
| *Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.* | | | | | | | |
| Totals: Painting | | | 1.44 | 29.81 | 178.85 | 4.50 | 174.35 |
| Total: Stucco | | | 10.18 | 313.20 | 1,879.17 | 31.80 | 1,847.37 |
| Total: Exterior | | | 179.72 | 1,319.42 | 7,916.54 | 561.62 | 7,354.92 |
| Total: Building 6 | | | 1,741.76 | 17,453.13 | 104,718.79 | 5,443.00 | 99,275.79 |

## Building 7

**Building 7**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

**BERRONG**   **Berrong Construction**

CONTINUED - Building 7

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 7 measurements are based on EagleView Report: 35150109.* | | | | | | | |
| Total: Building 7 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Roof**

Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 127. Remove Tile roofing - Concrete - "S" or flat tile | 138.06 SQ | 438.87 | 0.00 | 12,118.08 | 72,708.47 | (0.00) | 72,708.47 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 128. Tile roofing - Concrete - "S" or flat tile - w/out felt | 172.58 SQ | 552.08 | 2,685.76 | 19,592.75 | 117,556.48 | (8,393.00) | 109,163.48 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 129. Roofing felt - 30 lb. | 158.77 SQ | 35.35 | 140.86 | 1,150.68 | 6,904.06 | (440.19) | 6,463.87 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 130. Hip/Ridge flashing* | 893.00 LF | 6.97 | 200.03 | 1,284.85 | 7,709.09 | (625.10) | 7,083.99 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 131. Ridge / Hip / Rake cap - tile roofing | 922.00 LF | 12.13 | 525.91 | 2,341.95 | 14,051.72 | (1,643.47) | 12,408.25 |

**BERRONG** Berrong Construction

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| **132. R&R Drip edge** | 936.00 LF | 3.54 | 86.11 | 679.91 | 4,079.46 | (269.10) | 3,810.36 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **133. R&R Valley metal - (W) profile** | 350.00 LF | 8.11 | 88.20 | 585.34 | 3,512.04 | (275.63) | 3,236.41 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **134. R&R Counterflashing - Apron flashing** | 297.00 LF | 10.88 | 34.45 | 653.16 | 3,918.97 | (107.66) | 3,811.31 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **135. R&R Aluminum sidewall/endwall flashing - color finish** | 297.00 LF | 9.80 | 118.32 | 605.78 | 3,634.71 | (369.77) | 3,264.94 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **136. R&R Cupola flashing - average (32" x 36")\*** | 8.00 EA | 427.66 | 51.15 | 694.49 | 4,166.91 | (159.84) | 4,007.08 |
|---|---|---|---|---|---|---|---|

**BERRONG** Berrong Construction

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing cupola flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 137. R&R Saddle or cricket - up to 25 SF | 8.00 EA | 309.43 | 46.05 | 504.30 | 3,025.79 | (143.92) | 2,881.87 |

*Labor and material for a roofing subcontractor to remove the existing cupola cricket, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field shingles in Xactimate. IBC 1511.5 prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 138. Bird stop - Eave closure strip for tile roofing - metal | 907.00 LF | 3.46 | 113.92 | 650.43 | 3,902.57 | (356.00) | 3,546.57 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 139. Remove Additional charge for high roof (2 stories or greater) | 138.06 SQ | 14.02 | 0.00 | 387.12 | 2,322.72 | (0.00) | 2,322.72 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 140. Additional charge for high roof (2 stories or greater) | 138.06 SQ | 18.87 | 0.00 | 521.04 | 3,126.23 | (0.00) | 3,126.23 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 141. Flashing - pipe jack | 12.00 EA | 43.58 | 12.54 | 107.10 | 642.60 | (39.18) | 603.42 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 142. Roof mount power attic vent | 7.00 EA | 527.66 | 86.42 | 756.01 | 4,536.05 | (270.06) | 4,265.99 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 6147 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

| Total: Roof | | | 4,189.73 | 42,632.98 | 255,797.87 | 13,092.92 | 242,704.95 |

## Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

**BERRONG**   Berrong Construction

CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| 143. Re-nailing of roof sheathing - complete re-nail | 13,806. SF 00 | 0.23 | 11.04 | 637.28 | 3,823.71 | (34.52) | 3,789.19 |
|---|---|---|---|---|---|---|---|

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 144. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 138.06 SQ | 18.87 | 0.00 | 521.04 | 3,126.23 | (0.00) | 3,126.23 |
|---|---|---|---|---|---|---|---|

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 145. Hip/ridge/rake/eave nailer board - 2x2 | 922.00 LF | 1.99 | 42.78 | 375.51 | 2,253.07 | (133.69) | 2,119.38 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| Totals: Carpentry | | | 53.83 | 1,533.84 | 9,203.01 | 168.21 | 9,034.80 |
|---|---|---|---|---|---|---|---|

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 146. Electrician - per hour | 14.00 HR | 95.06 | 0.00 | 266.17 | 1,597.01 | (0.00) | 1,597.01 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| Totals: Electrical | | | 0.00 | 266.17 | 1,597.01 | 0.00 | 1,597.01 |
|---|---|---|---|---|---|---|---|

| Total: Roof | | | 4,243.55 | 44,432.98 | 266,597.89 | 13,261.13 | 253,336.76 |
|---|---|---|---|---|---|---|---|

### Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 147. R&R Gutter / downspout - aluminum - up to 5" | 1,027.00 LF | 10.30 | 368.90 | 2,189.40 | 13,136.40 | (1,152.81) | 11,983.59 |

**BERRONG**   **Berrong Construction**

### CONTINUED - Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| Totals: Guttering | | | 368.90 | 2,189.40 | 13,136.40 | 1,152.81 | 11,983.59 |

### Stucco

**Stucco**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 148. Stucco repair around installed flashings* | 297.00 LF | 23.47 | 43.24 | 1,402.77 | 8,416.60 | (135.14) | 8,281.46 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total: Stucco | | | 43.24 | 1,402.77 | 8,416.60 | 135.14 | 8,281.46 |

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 149. Clean stucco | 297.00 SF | 1.01 | 0.24 | 60.04 | 360.25 | (0.74) | 359.51 |
| *Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.* | | | | | | | |
| 150. Seal & paint stucco | 297.00 SF | 1.45 | 6.89 | 87.51 | 525.05 | (21.53) | 503.52 |
| *Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.* | | | | | | | |
| Totals: Painting | | | 7.13 | 147.55 | 885.30 | 22.27 | 863.03 |
| Total: Stucco | | | 50.37 | 1,550.32 | 9,301.90 | 157.41 | 9,144.49 |
| Total: Exterior | | | 419.27 | 3,739.72 | 22,438.30 | 1,310.22 | 21,128.08 |
| Total: Building 7 | | | 4,662.82 | 48,172.70 | 289,036.18 | 14,571.35 | 274,464.83 |

### Building 8

**Building 8**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

**BERRONG**   **Berrong Construction**

CONTINUED - Building 8

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 8 measurements are based on EagleView Report: 35150110.* | | | | | | | |
| Total: Building 8 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## Roof

Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 151. Remove Tile roofing - Concrete - "S" or flat tile | 57.49 SQ | 438.87 | 0.00 | 5,046.13 | 30,276.77 | (0.00) | 30,276.77 |
| *Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.* | | | | | | | |
| 152. Tile roofing - Concrete - "S" or flat tile - w/out felt | 71.86 SQ | 552.08 | 1,118.31 | 8,158.16 | 48,948.94 | (3,494.73) | 45,454.21 |
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.* | | | | | | | |
| *Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."* | | | | | | | |
| 153. Roofing felt - 30 lb. | 66.11 SQ | 35.35 | 58.65 | 479.13 | 2,874.77 | (183.29) | 2,691.48 |
| *Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.* | | | | | | | |
| 154. Hip/Ridge flashing* | 319.00 LF | 6.97 | 71.46 | 458.98 | 2,753.86 | (223.30) | 2,530.56 |
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.* | | | | | | | |
| 155. Ridge / Hip / Rake cap - tile roofing | 401.00 LF | 12.13 | 228.73 | 1,018.57 | 6,111.43 | (714.78) | 5,396.65 |

**BERRONG**  **Berrong Construction**

### CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| **156.  R&R Drip edge** | 459.00 LF | 3.54 | 42.23 | 333.42 | 2,000.51 | (131.96) | 1,868.55 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **157.  R&R Valley metal - (W) profile** | 134.00 LF | 8.11 | 33.77 | 224.10 | 1,344.61 | (105.53) | 1,239.08 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **158.  R&R Counterflashing - Apron flashing** | 113.00 LF | 10.88 | 13.11 | 248.51 | 1,491.06 | (40.96) | 1,450.10 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **159.  R&R Aluminum sidewall/endwall flashing - color finish** | 113.00 LF | 9.80 | 45.02 | 230.48 | 1,382.90 | (140.69) | 1,242.22 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| **160.  Bird stop - Eave closure strip for tile roofing - metal** | 377.00 LF | 3.46 | 47.35 | 270.35 | 1,622.13 | (147.97) | 1,474.16 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| **161.  Remove Additional charge for steep roof - 7/12 to 9/12 slope** | 0.59 SQ | 37.11 | 0.00 | 4.38 | 26.27 | (0.00) | 26.27 |

*Labor for a commercial roofing subcontractor specializing in tile tile roofing systems to remove the tile roofing, furring strips, and felt on a steep roof*

**BERRONG**    **Berrong Construction**

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 162. Additional charge for steep roof - 7/12 to 9/12 slope | 0.59 SQ | 42.73 | 0.00 | 5.04 | 30.25 | (0.00) | 30.25 |
| *Additional labor charge for lost productivity on a steep roof, due to accessibility, and extra safety precautions due to increased danger.* | | | | | | | |
| 163. Remove Additional charge for steep roof - 10/12 - 12/12 slope | 0.11 SQ | 58.31 | 0.00 | 1.28 | 7.69 | (0.00) | 7.69 |
| *Labor for a commercial roofing subcontractor specializing in tile tile roofing systems to remove the tile roofing, furring strips, and felt on a double steep roof* | | | | | | | |
| 164. Additional charge for steep roof - 10/12 - 12/12 slope | 0.11 SQ | 67.16 | 0.00 | 1.48 | 8.87 | (0.00) | 8.87 |
| *Additional labor charge for lost productivity on a steep roof, due to accessibility, and extra safety precautions due to increased danger.* | | | | | | | |
| 165. Remove Additional charge for high roof (2 stories or greater) | 57.49 SQ | 14.02 | 0.00 | 161.20 | 967.21 | (0.00) | 967.21 |
| *Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof* | | | | | | | |
| 166. Additional charge for high roof (2 stories or greater) | 57.49 SQ | 18.87 | 0.00 | 216.97 | 1,301.81 | (0.00) | 1,301.81 |
| *Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.* | | | | | | | |
| 167. Flashing - pipe jack | 10.00 EA | 43.58 | 10.45 | 89.25 | 535.50 | (32.65) | 502.85 |
| *Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.* | | | | | | | |
| 168. Roof mount power attic vent | 3.00 EA | 527.66 | 37.04 | 324.00 | 1,944.02 | (115.74) | 1,828.28 |
| *Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 2256 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.* | | | | | | | |

| Total: Roof | | | 1,706.11 | 17,271.43 | 103,628.60 | 5,331.60 | 98,297.00 |

Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.* | | | | | | | |
| 169. Re-nailing of roof sheathing - complete re-nail | 5,749.00 SF | 0.23 | 4.60 | 265.37 | 1,592.24 | (14.37) | 1,577.87 |

**BERRONG**  **Berrong Construction**

## CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instilation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 170. Add charge for re-nailing sheathing steep roof - 7/12 - 9/12 slope* | 59.10 SF | 0.32 | 0.76 | 3.93 | 23.60 | (2.36) | 21.24 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a steep roof.*

| 171. Add charge for re-nailing sheathing steep roof - 10/12 - 12/12 slope* | 11.20 SF | 0.41 | 0.14 | 0.95 | 5.68 | (0.45) | 5.23 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a double steep roof.*

| 172. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 57.49 SQ | 18.87 | 0.00 | 216.97 | 1,301.81 | (0.00) | 1,301.81 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 173. Hip/ridge/rake/eave nailer board - 2x2 | 401.00 LF | 1.99 | 18.61 | 163.32 | 979.92 | (58.15) | 921.77 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| **Totals: Carpentry** | | | 24.11 | 650.54 | 3,903.25 | 75.33 | 3,827.92 |

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 174. Electrician - per hour | 6.00 HR | 95.06 | 0.00 | 114.07 | 684.43 | (0.00) | 684.43 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| **Totals: Electrical** | | | 0.00 | 114.07 | 684.43 | 0.00 | 684.43 |

| **Total: Roof** | | | 1,730.22 | 18,036.05 | 108,216.27 | 5,406.93 | 102,809.35 |

## Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 175. R&R Gutter / downspout - aluminum - up to 5" | 457.00 LF | 10.30 | 164.15 | 974.25 | 5,845.51 | (512.98) | 5,332.53 |

*Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.*

**BERRONG** **Berrong Construction**

### CONTINUED - Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Totals: Guttering | | | 164.15 | 974.25 | 5,845.51 | 512.98 | 5,332.53 |

### Stucco

**Stucco**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 176.  Stucco repair around installed flashings* | 113.00 LF | 23.47 | 16.45 | 533.71 | 3,202.28 | (51.42) | 3,150.86 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total: Stucco | | | 16.45 | 533.71 | 3,202.28 | 51.42 | 3,150.86 |

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 177.  Clean stucco | 113.00 SF | 1.01 | 0.09 | 22.84 | 137.06 | (0.28) | 136.78 |
| *Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.* | | | | | | | |
| 178.  Seal & paint stucco | 113.00 SF | 1.45 | 2.62 | 33.29 | 199.77 | (8.19) | 191.58 |
| *Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.* | | | | | | | |
| Totals: Painting | | | 2.71 | 56.14 | 336.83 | 8.47 | 328.36 |
| Total: Stucco | | | 19.16 | 589.85 | 3,539.11 | 59.89 | 3,479.22 |
| Total: Exterior | | | 183.32 | 1,564.10 | 9,384.61 | 572.87 | 8,811.74 |
| Total:  Building 8 | | | 1,913.54 | 19,600.15 | 117,600.89 | 5,979.80 | 111,621.08 |

### Building 9

**Building 9**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 9 measurements are based on EagleView Report: 35150111.* | | | | | | | |

**BERRONG** Berrong Construction

CONTINUED - Building 9

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Total: Building 9 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## Roof

Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.*

| 179. Remove Tile roofing - Concrete - "S" or flat tile | 56.92 SQ | 438.87 | 0.00 | 4,996.10 | 29,976.58 | (0.00) | 29,976.58 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 180. Tile roofing - Concrete - "S" or flat tile - w/out felt | 71.15 SQ | 552.08 | 1,107.26 | 8,077.55 | 48,465.31 | (3,460.20) | 45,005.11 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 181. Roofing felt - 30 lb. | 65.46 SQ | 35.35 | 58.08 | 474.42 | 2,846.50 | (181.49) | 2,665.01 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 182. Hip/Ridge flashing* | 312.00 LF | 6.97 | 69.89 | 448.91 | 2,693.43 | (218.40) | 2,475.03 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 183. Ridge / Hip / Rake cap - tile roofing | 380.00 LF | 12.13 | 216.75 | 965.23 | 5,791.38 | (677.35) | 5,114.03 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

**BERRONG** Berrong Construction

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 184.  R&R Drip edge | 424.00 LF | 3.54 | 39.01 | 307.99 | 1,847.96 | (121.90) | 1,726.07 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 185.  R&R Valley metal - (W) profile | 125.00 LF | 8.11 | 31.50 | 209.05 | 1,254.30 | (98.44) | 1,155.86 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 186.  R&R Counterflashing - Apron flashing | 83.00 LF | 10.88 | 9.63 | 182.53 | 1,095.20 | (30.09) | 1,065.12 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 187.  R&R Aluminum sidewall/endwall flashing - color finish | 83.00 LF | 9.80 | 33.07 | 169.29 | 1,015.76 | (103.34) | 912.42 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 188.  Bird stop - Eave closure strip for tile roofing - metal | 356.00 LF | 3.46 | 44.71 | 255.29 | 1,531.77 | (139.73) | 1,392.04 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 189.  Remove Additional charge for high roof (2 stories or greater) | 56.92 SQ | 14.02 | 0.00 | 159.60 | 957.62 | (0.00) | 957.62 |
|---|---|---|---|---|---|---|---|

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 190.  Additional charge for high roof (2 stories or greater) | 56.92 SQ | 18.87 | 0.00 | 214.82 | 1,288.90 | (0.00) | 1,288.90 |
|---|---|---|---|---|---|---|---|

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 191.  Flashing - pipe jack | 8.00 EA | 43.58 | 8.36 | 71.40 | 428.40 | (26.12) | 402.28 |
|---|---|---|---|---|---|---|---|

**BERRONG**   **Berrong Construction**

### CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 192. Roof mount power attic vent | 3.00 EA | 527.66 | 37.04 | 324.00 | 1,944.02 | (115.74) | 1,828.28 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 2208 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total: Roof | | | 1,655.29 | 16,856.19 | 101,137.13 | 5,172.80 | 95,964.33 |

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 193. Re-nailing of roof sheathing - complete re-nail | 5,692.00 SF | 0.23 | 4.55 | 262.74 | 1,576.46 | (14.23) | 1,562.23 |

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 194. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 56.92 SQ | 18.87 | 0.00 | 214.82 | 1,288.90 | (0.00) | 1,288.90 |
|---|---|---|---|---|---|---|---|

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 195. Hip/ridge/rake/eave nailer board - 2x2 | 380.00 LF | 1.99 | 17.63 | 154.77 | 928.60 | (55.10) | 873.50 |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Totals: Carpentry | | | 22.19 | 632.33 | 3,793.95 | 69.33 | 3,724.62 |

### Electrical

**BERRONG**  RESTORATION · ROOFING · CONSTRUCTION    **Berrong Construction**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 196. Electrician - per hour | 6.00 HR | 95.06 | 0.00 | 114.07 | 684.43 | (0.00) | 684.43 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Totals: Electrical | | | 0.00 | 114.07 | 684.43 | 0.00 | 684.43 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total: Roof | | | 1,677.48 | 17,602.59 | 105,615.51 | 5,242.13 | 100,373.38 |

### Exterior

#### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 197. R&R Gutter / downspout - aluminum - up to 5" | 436.00 LF | 10.30 | 156.61 | 929.48 | 5,576.89 | (489.41) | 5,087.48 |

*Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Totals: Guttering | | | 156.61 | 929.48 | 5,576.89 | 489.41 | 5,087.48 |

#### Stucco

Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 198. Stucco repair around installed flashings* | 83.00 LF | 23.47 | 12.08 | 392.02 | 2,352.11 | (37.77) | 2,314.34 |

*Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total: Stucco | | | 12.08 | 392.02 | 2,352.11 | 37.77 | 2,314.34 |

#### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 199. Clean stucco | 83.00 SF | 1.01 | 0.07 | 16.78 | 100.68 | (0.21) | 100.47 |

*Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 200. Seal & paint stucco | 83.00 SF | 1.45 | 1.93 | 24.46 | 146.73 | (6.02) | 140.71 |

*Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Totals: Painting | | | 1.99 | 41.23 | 247.41 | 6.23 | 241.18 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total: Stucco | | | 14.08 | 433.25 | 2,599.52 | 44.00 | 2,555.52 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total: Exterior | | | 170.69 | 1,362.74 | 8,176.41 | 533.41 | 7,643.00 |

**BERRONG**  **Berrong Construction**

| Total: Building 9 | | 1,848.17 | 18,965.32 | 113,791.93 | 5,775.54 | 108,016.39 |
|---|---|---|---|---|---|---|

### Building 11

**Building 11**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 11 measurements are based on EagleView Report: 35150113.* | | | | | | | |
| Total: Building 11 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

### Roof

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 201. Remove Tile roofing - Concrete - "S" or flat tile | 114.97 SQ | 438.87 | 0.00 | 10,091.38 | 60,548.26 | (0.00) | 60,548.26 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 202. Tile roofing - Concrete - "S" or flat tile - w/out felt | 143.71 SQ | 552.08 | 2,236.47 | 16,315.18 | 97,891.07 | (6,988.98) | 90,902.09 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 203. Roofing felt - 30 lb. | 132.22 SQ | 35.35 | 117.31 | 958.26 | 5,749.54 | (366.58) | 5,382.96 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 204. Hip/Ridge flashing* | 554.00 LF | 6.97 | 124.10 | 797.10 | 4,782.57 | (387.80) | 4,394.77 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

**BERRONG** Berrong Construction

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 205. Ridge / Hip / Rake cap - tile roofing | 628.00 LF | 12.13 | 358.21 | 1,595.17 | 9,571.02 | (1,119.41) | 8,451.61 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 206. R&R Drip edge | 610.00 LF | 3.54 | 56.12 | 443.10 | 2,658.62 | (175.38) | 2,483.24 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 207. R&R Valley metal - (W) profile | 234.00 LF | 8.11 | 58.97 | 391.34 | 2,348.05 | (184.28) | 2,163.77 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 208. R&R Counterflashing - Apron flashing | 53.00 LF | 10.88 | 6.15 | 116.56 | 699.35 | (19.21) | 680.14 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 209. R&R Aluminum sidewall/endwall flashing - color finish | 53.00 LF | 9.80 | 21.12 | 108.10 | 648.62 | (65.99) | 582.63 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 210. Bird stop - Eave closure strip for tile roofing - metal | 536.00 LF | 3.46 | 67.32 | 384.38 | 2,306.26 | (210.38) | 2,095.88 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 211. Remove Additional charge for high roof (2 stories or greater) | 114.97 SQ | 14.02 | 0.00 | 322.38 | 1,934.26 | (0.00) | 1,934.26 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

**BERRONG** Berrong Construction

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 212. Additional charge for high roof (2 stories or greater) | 114.97 SQ | 18.87 | 0.00 | 433.90 | 2,603.38 | (0.00) | 2,603.38 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 213. Flashing - pipe jack | 10.00 EA | 43.58 | 10.45 | 89.25 | 535.50 | (32.65) | 502.85 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 214. Roof mount power attic vent | 6.00 EA | 527.66 | 74.07 | 648.01 | 3,888.04 | (231.48) | 3,656.56 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 4800 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

| Total: Roof | | | 3,130.28 | 32,694.09 | 196,164.53 | 9,782.14 | 186,382.39 |

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| 215. Re-nailing of roof sheathing - complete re-nail | 11,497. SF 00 | 0.23 | 9.20 | 530.70 | 3,184.21 | (28.74) | 3,155.47 |

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 216. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 114.97 SQ | 18.87 | 0.00 | 433.90 | 2,603.38 | (0.00) | 2,603.38 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 217. Hip/ridge/rake/eave nailer board - 2x2 | 628.00 LF | 1.99 | 29.14 | 255.77 | 1,534.63 | (91.06) | 1,443.57 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| Totals: Carpentry | | | 38.34 | 1,220.37 | 7,322.22 | 119.80 | 7,202.42 |

**BERRONG** Berrong Construction

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 218. Electrician - per hour | 12.00 HR | 95.06 | 0.00 | 228.14 | 1,368.86 | (0.00) | 1,368.86 |
| *Additional labor required for an electrician to install the wiring to the code mandated power attic vent.* | | | | | | | |
| Totals: Electrical | | | 0.00 | 228.14 | 1,368.86 | 0.00 | 1,368.86 |
| Total: Roof | | | 3,168.62 | 34,142.60 | 204,855.61 | 9,901.94 | 194,953.67 |

## Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 219. R&R Gutter / downspout - aluminum - up to 5" | 676.00 LF | 10.30 | 242.82 | 1,441.12 | 8,646.74 | (758.81) | 7,887.93 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| Totals: Guttering | | | 242.82 | 1,441.12 | 8,646.74 | 758.81 | 7,887.93 |

### Stucco

Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 220. Stucco repair around installed flashings* | 53.00 LF | 23.47 | 7.72 | 250.33 | 1,501.95 | (24.12) | 1,477.83 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total: Stucco | | | 7.72 | 250.33 | 1,501.95 | 24.12 | 1,477.83 |

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 221. Clean stucco | 53.00 SF | 1.01 | 0.04 | 10.71 | 64.29 | (0.13) | 64.16 |
| *Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.* | | | | | | | |
| 222. Seal & paint stucco | 53.00 SF | 1.45 | 1.23 | 15.62 | 93.70 | (3.84) | 89.86 |
| *Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.* | | | | | | | |
| Totals: Painting | | | 1.27 | 26.33 | 157.98 | 3.97 | 154.01 |

**BERRONG** — **Berrong Construction**

| | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Total: Stucco | 8.99 | 276.66 | | 1,659.93 | | 28.09 | 1,631.84 |
| Total: Exterior | 251.81 | 1,717.78 | | 10,306.68 | | 786.90 | 9,519.77 |
| Total: Building 11 | 3,420.42 | 35,860.38 | | 215,162.29 | | 10,688.84 | 204,473.45 |

## Building 12

**Building 12**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 12 measurements are based on EagleView Report: 35150114.* | | | | | | | |
| Total: Building 12 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## Roof

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 223. Remove Tile roofing - Concrete - "S" or flat tile | 103.97 SQ | 438.87 | 0.00 | 9,125.86 | 54,755.17 | (0.00) | 54,755.17 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 224. Tile roofing - Concrete - "S" or flat tile - w/out felt | 129.96 SQ | 552.08 | 2,022.49 | 14,754.16 | 88,524.97 | (6,320.28) | 82,204.69 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 225. Roofing felt - 30 lb. | 119.57 SQ | 35.35 | 106.08 | 866.58 | 5,199.46 | (331.51) | 4,867.95 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 226. Hip/Ridge flashing* | 476.00 LF | 6.97 | 106.62 | 684.87 | 4,109.21 | (333.20) | 3,776.01 |

**BERRONG**  **Berrong Construction**

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 227. Ridge / Hip / Rake cap - tile roofing | 550.00 LF | 12.13 | 313.72 | 1,397.04 | 8,382.26 | (980.38) | 7,401.88 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 228. R&R Drip edge | 529.00 LF | 3.54 | 48.67 | 384.27 | 2,305.59 | (152.09) | 2,153.51 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 229. R&R Valley metal - (W) profile | 201.00 LF | 8.11 | 50.65 | 336.15 | 2,016.91 | (158.29) | 1,858.62 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 230. R&R Counterflashing - Apron flashing | 62.00 LF | 10.88 | 7.19 | 136.35 | 818.10 | (22.48) | 795.62 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 231. R&R Aluminum sidewall/endwall flashing - color finish | 62.00 LF | 9.80 | 24.70 | 126.46 | 758.76 | (77.19) | 681.57 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 232. Bird stop - Eave closure strip for tile roofing - metal | 455.00 LF | 3.46 | 57.15 | 326.29 | 1,957.74 | (178.59) | 1,779.15 |

PEACHTREE-PLACE-DEP                                                                    2/24/2022        Page: 46

**BERRONG** Berrong Construction

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.* | | | | | | | |
| 233. Remove Additional charge for high roof (2 stories or greater) | 103.97 SQ | 14.02 | 0.00 | 291.53 | 1,749.19 | (0.00) | 1,749.19 |
| *Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof* | | | | | | | |
| 234. Additional charge for high roof (2 stories or greater) | 103.97 SQ | 18.87 | 0.00 | 392.38 | 2,354.29 | (0.00) | 2,354.29 |
| *Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.* | | | | | | | |
| 235. Flashing - pipe jack | 10.00 EA | 43.58 | 10.45 | 89.25 | 535.50 | (32.65) | 502.85 |
| *Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.* | | | | | | | |
| 236. Roof mount power attic vent | 6.00 EA | 527.66 | 74.07 | 648.01 | 3,888.04 | (231.48) | 3,656.56 |
| *Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 4320 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roof's material and design, the logical way to achieve the code required ventilation is install power attic vents.* | | | | | | | |
| **Total: Roof** | | | 2,821.80 | 29,559.20 | 177,355.21 | 8,818.14 | 168,537.07 |

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.** | | | | | | | |
| 237. Re-nailing of roof sheathing - complete re-nail | 10,397.00 SF | 0.23 | 8.32 | 479.93 | 2,879.55 | (25.99) | 2,853.56 |
| *Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during installation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.* | | | | | | | |
| 238. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 103.97 SQ | 18.87 | 0.00 | 392.38 | 2,354.29 | (0.00) | 2,354.29 |
| *Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.* | | | | | | | |
| 239. Hip/ridge/rake/eave nailer board - 2x2 | 550.00 LF | 1.99 | 25.52 | 224.00 | 1,344.02 | (79.75) | 1,264.27 |

**BERRONG** Berrong Construction

## CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.* | | | | | | | |
| Totals: Carpentry | | | 33.84 | 1,096.31 | 6,577.87 | 105.74 | 6,472.13 |

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 240. Electrician - per hour | 12.00 HR | 95.06 | 0.00 | 228.14 | 1,368.86 | (0.00) | 1,368.86 |
| *Additional labor required for an electrician to install the wiring to the code mandated power attic vent.* | | | | | | | |
| Totals: Electrical | | | 0.00 | 228.14 | 1,368.86 | 0.00 | 1,368.86 |
| Total: Roof | | | 2,855.64 | 30,883.66 | 185,301.94 | 8,923.88 | 176,378.06 |

### Exterior

#### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 241. R&R Gutter / downspout - aluminum - up to 5" | 575.00 LF | 10.30 | 206.54 | 1,225.81 | 7,354.85 | (645.44) | 6,709.41 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| Totals: Guttering | | | 206.54 | 1,225.81 | 7,354.85 | 645.44 | 6,709.41 |

### Stucco

Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 242. Stucco repair around installed flashings* | 62.00 LF | 23.47 | 9.03 | 292.83 | 1,757.00 | (28.21) | 1,728.79 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total: Stucco | | | 9.03 | 292.83 | 1,757.00 | 28.21 | 1,728.79 |

**BERRONG** **Berrong Construction**

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 243.  Clean stucco | 62.00 SF | 1.01 | 0.05 | 12.53 | 75.20 | (0.16) | 75.04 |

*Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 244.  Seal & paint stucco | 62.00 SF | 1.45 | 1.44 | 18.27 | 109.61 | (4.50) | 105.11 |

*Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.*

| | | | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Totals:  Painting | | | 1.49 | 30.80 | 184.81 | 4.66 | 180.15 |
| Total:  Stucco | | | 10.52 | 323.64 | 1,941.81 | 32.87 | 1,908.94 |
| Total:  Exterior | | | 217.06 | 1,549.44 | 9,296.66 | 678.31 | 8,618.35 |
| Total:  Building 12 | | | 3,072.69 | 32,433.10 | 194,598.60 | 9,602.19 | 184,996.41 |

### Building 13

**Building 13**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 13 measurements are based on EagleView Report: 35150116.* | | | | | | | |
| Total:  Building 13 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

### Roof

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 245.  Remove Tile roofing - Concrete - "S" or flat tile | 137.68 SQ | 438.87 | 0.00 | 12,084.72 | 72,508.34 | (0.00) | 72,508.34 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 246.  Tile roofing - Concrete - "S" or flat tile - w/out felt | 172.10 SQ | 552.08 | 2,678.29 | 19,538.25 | 117,229.51 | (8,369.65) | 108,859.86 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

PEACHTREE-PLACE-DEP                                                                2/24/2022          Page: 49

**BERRONG** Berrong Construction

### CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| **247. Roofing felt - 30 lb.** | 158.33 SQ | 35.35 | 140.47 | 1,147.49 | 6,884.93 | (438.97) | 6,445.96 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **248. Hip/Ridge flashing\*** | 598.00 LF | 6.97 | 133.95 | 860.40 | 5,162.41 | (418.60) | 4,743.81 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **249. Ridge / Hip / Rake cap - tile roofing** | 899.00 LF | 12.13 | 512.79 | 2,283.53 | 13,701.19 | (1,602.47) | 12,098.72 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **250. R&R Drip edge** | 919.00 LF | 3.54 | 84.55 | 667.56 | 4,005.37 | (264.21) | 3,741.16 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **251. R&R Valley metal - (W) profile** | 297.00 LF | 8.11 | 74.84 | 496.70 | 2,980.22 | (233.89) | 2,746.32 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **252. R&R Counterflashing - Apron flashing** | 203.00 LF | 10.88 | 23.55 | 446.44 | 2,678.63 | (73.59) | 2,605.04 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

**BERRONG** Berrong Construction

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 253. R&R Aluminum sidewall/endwall flashing - color finish | 198.00 LF | 9.80 | 78.88 | 403.86 | 2,423.14 | (246.51) | 2,176.63 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 254. Bird stop - Eave closure strip for tile roofing - metal | 618.00 LF | 3.46 | 77.62 | 443.18 | 2,659.08 | (242.57) | 2,416.51 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 255. Remove Additional charge for steep roof greater than 12/12 slope | 0.40 SQ | 72.40 | 0.00 | 5.79 | 34.75 | (0.00) | 34.75 |

*Labor for a commercial roofing subcontractor specializing in tile tile roofing systems to remove the tile roofing, furring strips, and felt on a triple steep roof*

| 256. Additional charge for steep roof greater than 12/12 slope | 0.40 SQ | 84.91 | 0.00 | 6.79 | 40.75 | (0.00) | 40.75 |

*Additional labor charge for lost productivity on a triple steep roof, due to accessibility, and extra safety precautions due to increased danger.*

| 257. Remove Additional charge for high roof (2 stories or greater) | 137.68 SQ | 14.02 | 0.00 | 386.05 | 2,316.32 | (0.00) | 2,316.32 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 258. Additional charge for high roof (2 stories or greater) | 137.68 SQ | 18.87 | 0.00 | 519.60 | 3,117.62 | (0.00) | 3,117.62 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 259. Flashing - pipe jack | 10.00 EA | 43.58 | 10.45 | 89.25 | 535.50 | (32.65) | 502.85 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 260. Roof mount power attic vent | 7.00 EA | 527.66 | 86.42 | 756.01 | 4,536.05 | (270.06) | 4,265.99 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 4800 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

| Total: Roof | | | 3,901.81 | 40,135.64 | 240,813.82 | 12,193.17 | 228,620.65 |

Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

**BERRONG** Berrong Construction

## CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 261. Re-nailing of roof sheathing - complete re-nail | 13,830.00 SF | 0.23 | 11.06 | 638.39 | 3,830.36 | (34.58) | 3,795.78 |

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 262. Add charge for re-nailing sheathing steep roof - over 12/12 slope* | 40.00 SF | 0.47 | 0.51 | 3.86 | 23.17 | (1.60) | 21.57 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a triple steep roof.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 263. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 138.30 SQ | 18.87 | 0.00 | 521.94 | 3,131.66 | (0.00) | 3,131.66 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 264. Hip/ridge/rake/eave nailer board - 2x2 | 899.00 LF | 1.99 | 41.71 | 366.14 | 2,196.87 | (130.36) | 2,066.51 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| Totals: Carpentry | | | 53.29 | 1,530.34 | 9,182.06 | 166.54 | 9,015.52 |
|---|---|---|---|---|---|---|---|

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 265. Electrician - per hour | 14.00 HR | 95.06 | 0.00 | 266.17 | 1,597.01 | (0.00) | 1,597.01 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| Totals: Electrical | | | 0.00 | 266.17 | 1,597.01 | 0.00 | 1,597.01 |
|---|---|---|---|---|---|---|---|

| Total: Roof | | | 3,955.10 | 41,932.15 | 251,592.89 | 12,359.71 | 239,233.18 |
|---|---|---|---|---|---|---|---|

### Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| PEACHTREE-PLACE-DEP | | | | | | 2/24/2022 | Page: 52 |

**BERRONG** Berrong Construction

## CONTINUED - Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 266.  R&R Gutter / downspout - aluminum - up to 5" | 838.00 LF | 10.30 | 301.01 | 1,786.48 | 10,718.89 | (940.66) | 9,778.23 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| Totals:  Guttering | | | 301.01 | 1,786.48 | 10,718.89 | 940.66 | 9,778.23 |

### Stucco

Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 267.  Stucco repair around installed flashings* | 203.00 LF | 23.47 | 29.56 | 958.79 | 5,752.76 | (92.37) | 5,660.39 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total:  Stucco | | | 29.56 | 958.79 | 5,752.76 | 92.37 | 5,660.39 |

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 268.  Clean stucco | 203.00 SF | 1.01 | 0.16 | 41.04 | 246.23 | (0.51) | 245.72 |
| *Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.* | | | | | | | |
| 269.  Seal & paint stucco | 203.00 SF | 1.45 | 4.71 | 59.81 | 358.87 | (14.72) | 344.15 |
| *Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.* | | | | | | | |
| Totals:  Painting | | | 4.87 | 100.85 | 605.10 | 15.23 | 589.87 |
| Total:  Stucco | | | 34.43 | 1,059.64 | 6,357.86 | 107.60 | 6,250.26 |
| Total:  Exterior | | | 335.44 | 2,846.13 | 17,076.75 | 1,048.26 | 16,028.49 |
| Total:  Building 13 | | | 4,290.54 | 44,778.27 | 268,669.64 | 13,407.97 | 255,261.67 |

## Building 14

Building 14

**BERRONG**  **Berrong Construction**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 14 measurements are based on EagleView Report: 35150117.* | | | | | | | |
| **Total:  Building 14** | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## Roof

Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 270.  Remove Tile roofing - Concrete - "S" or flat tile | 133.89 SQ | 438.87 | 0.00 | 11,752.06 | 70,512.36 | (0.00) | 70,512.36 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 271.  Tile roofing - Concrete - "S" or flat tile - w/out felt | 167.36 SQ | 552.08 | 2,604.52 | 19,000.13 | 114,000.76 | (8,139.14) | 105,861.62 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

   *Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 272.  Roofing felt - 30 lb. | 38.97 SQ | 35.35 | 34.57 | 282.43 | 1,694.60 | (108.04) | 1,586.56 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 273.  Hip/Ridge flashing* | 603.00 LF | 6.97 | 135.07 | 867.60 | 5,205.58 | (422.10) | 4,783.48 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 274.  Ridge / Hip / Rake cap - tile roofing | 895.00 LF | 12.13 | 510.51 | 2,273.37 | 13,640.23 | (1,595.34) | 12,044.89 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 275.  R&R Drip edge | 889.00 LF | 3.54 | 81.79 | 645.77 | 3,874.62 | (255.59) | 3,619.03 |

**BERRONG**  **Berrong Construction**

**CONTINUED - Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 276. R&R Valley metal - (W) profile | 299.00 LF | 8.11 | 75.35 | 500.05 | 3,000.29 | (235.46) | 2,764.83 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 277. R&R Counterflashing - Apron flashing | 172.00 LF | 10.88 | 19.95 | 378.26 | 2,269.57 | (62.35) | 2,207.22 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 278. R&R Aluminum sidewall/endwall flashing - color finish | 172.00 LF | 9.80 | 68.52 | 350.82 | 2,104.95 | (214.14) | 1,890.81 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 279. Bird stop - Eave closure strip for tile roofing - metal | 597.00 LF | 3.46 | 74.98 | 428.12 | 2,568.72 | (234.32) | 2,334.40 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 280. Remove Additional charge for steep roof - 7/12 to 9/12 slope | 0.36 SQ | 37.11 | 0.00 | 2.67 | 16.03 | (0.00) | 16.03 |

*Labor for a commercial roofing subcontractor specializing in tile tile roofing systems to remove the tile roofing, furring strips, and felt on a steep roof*

| 281. Additional charge for steep roof - 7/12 to 9/12 slope | 0.36 SQ | 42.73 | 0.00 | 3.08 | 18.46 | (0.00) | 18.46 |

*Additional labor charge for lost productivity on a steep roof, due to accessibility, and extra safety precautions due to increased danger.*

| 282. Remove Additional charge for high roof (2 stories or greater) | 133.89 SQ | 14.02 | 0.00 | 375.43 | 2,252.57 | (0.00) | 2,252.57 |

**BERRONG** **Berrong Construction**

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof* | | | | | | | |
| 283. Additional charge for high roof (2 stories or greater) | 133.89 SQ | 18.87 | 0.00 | 505.30 | 3,031.80 | (0.00) | 3,031.80 |
| *Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.* | | | | | | | |
| 284. Flashing - pipe jack | 10.00 EA | 43.58 | 10.45 | 89.25 | 535.50 | (32.65) | 502.85 |
| *Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.* | | | | | | | |
| 285. Roof mount power attic vent | 7.00 EA | 527.66 | 86.42 | 756.01 | 4,536.05 | (270.06) | 4,265.99 |
| *Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 5760 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.* | | | | | | | |

| Total: Roof | | | 3,702.14 | 38,210.35 | 229,262.08 | 11,569.19 | 217,692.88 |
|---|---|---|---|---|---|---|---|

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.* | | | | | | | |
| 286. Re-nailing of roof sheathing - complete re-nail | 13,389. SF 00 | 0.23 | 10.71 | 618.04 | 3,708.22 | (33.47) | 3,674.75 |
| *Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.* | | | | | | | |
| 287. Add charge for re-nailing sheathing steep roof - 7/12 - 9/12 slope* | 36.00 SF | 0.32 | 0.46 | 2.40 | 14.38 | (1.44) | 12.94 |
| *Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a steep roof.* | | | | | | | |
| 288. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 133.89 SQ | 18.87 | 0.00 | 505.30 | 3,031.80 | (0.00) | 3,031.80 |
| *Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.* | | | | | | | |
| 289. Hip/ridge/rake/eave nailer board - 2x2 | 895.00 LF | 1.99 | 41.53 | 364.52 | 2,187.09 | (129.78) | 2,057.31 |

**BERRONG** | **Berrong Construction**

### CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.* | | | | | | | |
| Totals: Carpentry | | | 52.70 | 1,490.25 | 8,941.49 | 164.69 | 8,776.80 |

#### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 290. Electrician - per hour | 14.00 HR | 95.06 | 0.00 | 266.17 | 1,597.01 | (0.00) | 1,597.01 |
| *Additional labor required for an electrician to install the wiring to the code mandated power attic vent.* | | | | | | | |
| Totals: Electrical | | | 0.00 | 266.17 | 1,597.01 | 0.00 | 1,597.01 |
| Total: Roof | | | 3,754.84 | 39,966.76 | 239,800.57 | 11,733.88 | 228,066.69 |

### Exterior

#### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 291. R&R Gutter / downspout - aluminum - up to 5" | 797.00 LF | 10.30 | 286.28 | 1,699.08 | 10,194.46 | (894.63) | 9,299.83 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| Totals: Guttering | | | 286.28 | 1,699.08 | 10,194.46 | 894.63 | 9,299.83 |

### Stucco

Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 292. Stucco repair around installed flashings* | 172.00 LF | 23.47 | 25.04 | 812.38 | 4,874.26 | (78.26) | 4,796.00 |
| *Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.* | | | | | | | |
| Total: Stucco | | | 25.04 | 812.38 | 4,874.26 | 78.26 | 4,796.00 |

**BERRONG**  **Berrong Construction**

**Painting**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 293.  Clean stucco | 172.00 SF | 1.01 | 0.14 | 34.77 | 208.63 | (0.43) | 208.20 |

*Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 294.  Seal & paint stucco | 172.00 SF | 1.45 | 3.99 | 50.68 | 304.07 | (12.47) | 291.60 |

*Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Totals:  Painting | | | 4.13 | 85.45 | 512.70 | 12.90 | 499.80 |
| Total:  Stucco | | | 29.17 | 897.83 | 5,386.96 | 91.16 | 5,295.80 |
| Total:  Exterior | | | 315.45 | 2,596.90 | 15,581.42 | 985.79 | 14,595.63 |
| Total:  Building 14 | | | 4,070.29 | 42,563.66 | 255,381.99 | 12,719.67 | 242,662.32 |

**Building 15**

**Building 15**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 15 measurements are based on EagleView Report: 35150116.* | | | | | | | |
| Total:  Building 15 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Roof**

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 295.  Remove Tile roofing - Concrete - "S" or flat tile | 147.13 SQ | 438.87 | 0.00 | 12,914.19 | 77,485.13 | (0.00) | 77,485.13 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 296.  Tile roofing - Concrete - "S" or flat tile - w/out felt | 183.91 SQ | 552.08 | 2,862.08 | 20,879.02 | 125,274.13 | (8,944.00) | 116,330.13 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

**BERRONG** Berrong Construction

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 297. Roofing felt - 30 lb. | 169.20 SQ | 35.35 | 150.11 | 1,226.27 | 7,357.60 | (469.11) | 6,888.49 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507 2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 298. Hip/Ridge flashing* | 720.00 LF | 6.97 | 161.28 | 1,035.94 | 6,215.62 | (504.00) | 5,711.62 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 299. Ridge / Hip / Rake cap - tile roofing | 853.00 LF | 12.13 | 486.55 | 2,166.49 | 13,000.13 | (1,520.47) | 11,479.66 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 300. R&R Drip edge | 773.00 LF | 3.54 | 71.12 | 561.51 | 3,369.04 | (222.24) | 3,146.80 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 301. R&R Valley metal - (W) profile | 351.00 LF | 8.11 | 88.45 | 587.01 | 3,522.07 | (276.41) | 3,245.66 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 302. R&R Counterflashing - Apron flashing | 75.00 LF | 10.88 | 8.70 | 164.94 | 989.64 | (27.19) | 962.45 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

**BERRONG**  **Berrong Construction**

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 303.  R&R Aluminum sidewall/endwall flashing - color finish | 75.00 LF | 9.80 | 29.88 | 152.98 | 917.86 | (93.38) | 824.48 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new.  The removal action of this line is not included with the removal of the field material in Xactimate.  Flashing is required by IBC 1503.2.  Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated.  The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 304.  Bird stop - Eave closure strip for tile roofing - metal | 640.00 LF | 3.46 | 80.38 | 458.96 | 2,753.74 | (251.20) | 2,502.54 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 305.  Remove Additional charge for high roof (2 stories or greater) | 147.13 SQ | 14.02 | 0.00 | 412.55 | 2,475.31 | (0.00) | 2,475.31 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 306.  Additional charge for high roof (2 stories or greater) | 147.13 SQ | 18.87 | 0.00 | 555.27 | 3,331.61 | (0.00) | 3,331.61 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 307.  Flashing - pipe jack | 10.00 EA | 43.58 | 10.45 | 89.25 | 535.50 | (32.65) | 502.85 |

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 308.  Roof mount power attic vent | 8.00 EA | 527.66 | 98.76 | 864.01 | 5,184.05 | (308.64) | 4,875.41 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 7056 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

| Total:  Roof | | | 4,047.77 | 42,068.57 | 252,411.43 | 12,649.29 | 239,762.14 |

Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| 309.  Re-nailing of roof sheathing - complete re-nail | 14,713. SF 00 | 0.23 | 11.77 | 679.15 | 4,074.91 | (36.78) | 4,038.13 |

**BERRONG**  **Berrong Construction**

## CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 310. Additional charge for re-nailing sheathing high roof (2 stories or greater) | 147.13 SQ | 18.87 | 0.00 | 555.27 | 3,331.61 | (0.00) | 3,331.61 |

*

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 311. Hip/ridge/rake/eave nailer board - 2x2 | 853.00 LF | 1.99 | 39.58 | 347.41 | 2,084.46 | (123.69) | 1,960.77 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| Totals:  Carpentry | | | 51.35 | 1,581.83 | 9,490.98 | 160.47 | 9,330.51 |

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 312. Electrician - per hour | 16.00 HR | 95.06 | 0.00 | 304.19 | 1,825.15 | (0.00) | 1,825.15 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| Totals:  Electrical | | | 0.00 | 304.19 | 1,825.15 | 0.00 | 1,825.15 |

| Total:  Roof | | | 4,099.12 | 43,954.59 | 263,727.56 | 12,809.76 | 250,917.80 |

## Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 313. R&R Gutter / downspout - aluminum - up to 5" | 820.00 LF | 10.30 | 294.54 | 1,748.11 | 10,488.65 | (920.45) | 9,568.20 |

*Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.*

| Totals:  Guttering | | | 294.54 | 1,748.11 | 10,488.65 | 920.45 | 9,568.20 |

### Stucco

**BERRONG** Berrong Construction

## Stucco

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 314. Stucco repair around installed flashings* | 75.00 LF | 23.47 | 10.92 | 354.23 | 2,125.40 | (34.13) | 2,091.27 |

*Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.*

| Total: Stucco | | | 10.92 | 354.23 | 2,125.40 | 34.13 | 2,091.27 |
|---|---|---|---|---|---|---|---|

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 315. Clean stucco | 75.00 SF | 1.01 | 0.06 | 15.16 | 90.97 | (0.19) | 90.78 |

*Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.*

| 316. Seal & paint stucco | 75.00 SF | 1.45 | 1.74 | 22.10 | 132.59 | (5.44) | 127.15 |
|---|---|---|---|---|---|---|---|

*Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.*

| Totals: Painting | | | 1.80 | 37.26 | 223.56 | 5.63 | 217.93 |
|---|---|---|---|---|---|---|---|
| Total: Stucco | | | 12.72 | 391.49 | 2,348.96 | 39.76 | 2,309.20 |
| Total: Exterior | | | 307.26 | 2,139.60 | 12,837.62 | 960.21 | 11,877.41 |
| Total: Building 15 | | | 4,406.38 | 46,094.20 | 276,565.18 | 13,769.97 | 262,795.21 |

### Building 16

**Building 16**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 16 measurements are based on EagleView Report: 35150119.* | | | | | | | |
| Total: Building 16 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

### Roof

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 317. Remove Tile roofing - Concrete - "S" or flat tile | 100.54 SQ | 438.87 | 0.00 | 8,824.80 | 52,948.79 | (0.00) | 52,948.79 |

**BERRƏNG**   **Berrong Construction**

**CONTINUED - Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 318. Tile roofing - Concrete - "S" or flat tile - w/out felt | 125.68 SQ | 552.08 | 1,955.88 | 14,268.26 | 85,609.55 | (6,112.13) | 79,497.42 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 319. Roofing felt - 30 lb. | 115.62 SQ | 35.35 | 102.58 | 837.95 | 5,027.70 | (320.56) | 4,707.14 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 320. Hip/Ridge flashing* | 490.00 LF | 6.97 | 109.76 | 705.01 | 4,230.07 | (343.00) | 3,887.07 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 321. Ridge / Hip / Rake cap - tile roofing | 588.00 LF | 12.13 | 335.40 | 1,493.57 | 8,961.40 | (1,048.11) | 7,913.29 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 322. R&R Drip edge | 621.00 LF | 3.54 | 57.13 | 451.09 | 2,706.57 | (178.54) | 2,528.02 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 323. R&R Valley metal - (W) profile | 161.00 LF | 8.11 | 40.57 | 269.26 | 1,615.54 | (126.79) | 1,488.75 |

**BERRONG** **Berrong Construction**

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 324. R&R Counterflashing - Apron flashing | 57.00 LF | 10.88 | 6.61 | 125.35 | 752.13 | (20.66) | 731.46 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 325. R&R Aluminum sidewall/endwall flashing - color finish | 57.00 LF | 9.80 | 22.71 | 116.26 | 697.57 | (70.97) | 626.60 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 326. Bird stop - Eave closure strip for tile roofing - metal | 523.00 LF | 3.46 | 65.69 | 375.05 | 2,250.32 | (205.28) | 2,045.04 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.*

| 327. Remove Additional charge for steep roof greater than 12/12 slope | 0.37 SQ | 72.40 | 0.00 | 5.36 | 32.15 | (0.00) | 32.15 |

*Labor for a commercial roofing subcontractor specializing in tile tile roofing systems to remove the tile roofing, furring strips, and felt on a triple steep roof*

| 328. Additional charge for steep roof greater than 12/12 slope | 0.37 SQ | 84.91 | 0.00 | 6.28 | 37.70 | (0.00) | 37.70 |

*Additional labor charge for lost productivity on a triple steep roof, due to accessibility, and extra safety precautions due to increased danger.*

| 329. Remove Additional charge for high roof (2 stories or greater) | 100.54 SQ | 14.02 | 0.00 | 281.91 | 1,691.48 | (0.00) | 1,691.48 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof*

| 330. Additional charge for high roof (2 stories or greater) | 100.54 SQ | 18.87 | 0.00 | 379.44 | 2,276.63 | (0.00) | 2,276.63 |

*Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.*

| 331. Flashing - pipe jack | 8.00 EA | 43.58 | 8.36 | 71.40 | 428.40 | (26.12) | 402.28 |

**BERRONG** | Berrong Construction

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.*

| 332. Roof mount power attic vent | 6.00 EA | 527.66 | 74.07 | 648.01 | 3,888.04 | (231.48) | 3,656.56 |

*Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 4320 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.*

| **Total: Roof** | | | **2,778.76** | **28,859.01** | **173,154.04** | **8,683.64** | **164,470.39** |

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.*

| 333. Re-nailing of roof sheathing - complete re-nail | 10,054. SF 00 | 0.23 | 8.04 | 464.09 | 2,784.56 | (25.14) | 2,759.42 |

*Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during instillation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.*

| 334. Add charge for re-nailing sheathing steep roof - over 12/12 slope* | 36.70 SF | 0.47 | 0.47 | 3.54 | 21.26 | (1.47) | 19.79 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a triple steep roof.*

| 335. Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 100.54 SQ | 18.87 | 0.00 | 379.44 | 2,276.63 | (0.00) | 2,276.63 |

*Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.*

| 336. Hip/ridge/rake/eave nailer board - 2x2 | 588.00 LF | 1.99 | 27.28 | 239.48 | 1,436.88 | (85.26) | 1,351.62 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.*

| **Totals: Carpentry** | | | **35.80** | **1,086.56** | **6,519.33** | **111.87** | **6,407.46** |

**BERRONG**   Berrong Construction

### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 337. Electrician - per hour | 12.00 HR | 95.06 | 0.00 | 228.14 | 1,368.86 | (0.00) | 1,368.86 |

*Additional labor required for an electrician to install the wiring to the code mandated power attic vent.*

| Totals: Electrical | | | 0.00 | 228.14 | 1,368.86 | 0.00 | 1,368.86 |
|---|---|---|---|---|---|---|---|

| Total: Roof | | | 2,814.56 | 30,173.71 | 181,042.23 | 8,795.51 | 172,246.72 |
|---|---|---|---|---|---|---|---|

## Exterior

### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 338. R&R Gutter / downspout - aluminum - up to 5" | 643.00 LF | 10.30 | 230.97 | 1,370.77 | 8,224.64 | (721.77) | 7,502.87 |

*Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.*

| Totals: Guttering | | | 230.97 | 1,370.77 | 8,224.64 | 721.77 | 7,502.87 |
|---|---|---|---|---|---|---|---|

### Stucco

**Stucco**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 339. Stucco repair around installed flashings* | 57.00 LF | 23.47 | 8.30 | 269.22 | 1,615.31 | (25.94) | 1,589.37 |

*Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.*

| Total: Stucco | | | 8.30 | 269.22 | 1,615.31 | 25.94 | 1,589.37 |
|---|---|---|---|---|---|---|---|

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 340. Clean stucco | 57.00 SF | 1.01 | 0.05 | 11.52 | 69.14 | (0.14) | 69.00 |

*Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied.*

| 341. Seal & paint stucco | 57.00 SF | 1.45 | 1.32 | 16.79 | 100.77 | (4.13) | 96.64 |
|---|---|---|---|---|---|---|---|

*Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.*

| Totals: Painting | | | 1.37 | 28.32 | 169.91 | 4.27 | 165.64 |
|---|---|---|---|---|---|---|---|

**BERRONG** **Berrong Construction**

| | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Total: Stucco | | 9.67 | 297.54 | 1,785.21 | 30.21 | 1,755.01 |
| Total: Exterior | | 240.63 | 1,668.31 | 10,009.85 | 751.98 | 9,257.87 |
| Total: Building 16 | | 3,055.19 | 31,842.01 | 191,052.08 | 9,547.49 | 181,504.60 |

## Building 17

**Building 17**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *All building 17 measurements are based on EagleView Report: 35150115.* | | | | | | | |
| Total: Building 17 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## Roof

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck.* | | | | | | | |
| 342. Remove Tile roofing - Concrete - "S" or flat tile | 72.58 SQ | 438.87 | 0.00 | 6,370.64 | 38,223.82 | (0.00) | 38,223.82 |

*Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove, haul and dispose of the tile roofing, furring strips, and felt.*

| 343. Tile roofing - Concrete - "S" or flat tile - w/out felt | 90.73 SQ | 552.08 | 1,411.98 | 10,300.44 | 61,802.64 | (4,412.43) | 57,390.21 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing to replace the tile roofing and furring strips. Includes a 25% cutting, shipping and bundling loss factor for a hip roof. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required. This line item DOES NOT include HIP/RIDGE SHINGLES. It is clear in Xactimate's item description pane for this line item, that it is designed for field tile only. This line item does include a sufficient waste factor to account for the cutting loss that would be expected for a roof of this complexity.*

*Xactimate defines waste as "Material that must be purchased but cannot be used. WASTE can result from trimming, rejection because of defect or other efforts to maintain acceptable quality of the structural part containing that material", and then goes on to say "a percent of WASTE should be included in virtually all material calculations."*

| 344. Roofing felt - 30 lb. | 83.47 SQ | 35.35 | 74.05 | 604.94 | 3,629.66 | (231.42) | 3,398.24 |

*Labor and material for a commercial roofing subcontractor to replace the underlayment to code. OSHA/access issue https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_id=10757&p_table=STANDARDS 1926.501(a)(2): "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." Additionally, IBC 1507.1 states that roof coverings shall be applied in accordance to the manufactures instructions. Instructions state that for slopes 4/12 or greater, successive sheets will be overlapped by 2 inches and end laps and offset end laps a minimum of 6 inches. A double layer is to be applied at all valleys, hips and ridges. In addition IBC 1507.2.8 states for roof slopes of four units vertical in 12 units horizontal (33-percent slope) or greater, underlayment shall be one layer applied in the following manner. Underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches (51 mm), fastened sufficiently to hold in place. This line item does include a sufficient waste factor (15%) to account for the cutting loss and required overlapping that would be expected for a roof of this complexity.*

| 345. Hip/Ridge flashing* | 304.00 LF | 6.97 | 68.10 | 437.40 | 2,624.37 | (212.80) | 2,411.57 |

**BERRONG**   **Berrong Construction**

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the code mandated hip/ridge flashing. Hip/ridge flashing is required by IBC 1503.2.1. Code requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 346.  Ridge / Hip / Rake cap - tile roofing | 367.00 LF | 12.13 | 209.34 | 932.21 | 5,593.26 | (654.18) | 4,939.08 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to replace the ridge/hip/rake cap. IBC 1506.3 states that roof covering materials shall be delivered in packages bearing the manufacturer's identifying marks and approved testing agency labels required.*

| 347.  R&R Drip edge | 451.00 LF | 3.54 | 41.49 | 327.61 | 1,965.64 | (129.66) | 1,835.97 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing drip edge, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Edge flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 348.  R&R Valley metal - (W) profile | 34.00 LF | 8.11 | 8.57 | 56.86 | 341.17 | (26.78) | 314.39 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing valley, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Valley metal is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 349.  R&R Counterflashing - Apron flashing | 20.00 LF | 10.88 | 2.32 | 43.98 | 263.90 | (7.25) | 256.65 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing counter flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 350.  R&R Aluminum sidewall/endwall flashing - color finish | 20.00 LF | 9.80 | 7.97 | 40.79 | 244.76 | (24.90) | 219.86 |

*Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to remove the existing endwall flashing at the base of the cap flashing, discard in a job-site waste receptacle and replace with new. The removal action of this line is not included with the removal of the field material in Xactimate. Flashing is required by IBC 1503.2. Code requires that flashing be installed in such a manner so as to prevent moisture entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane. In addition, IBC 1503.2.1 requires that flashing be installed at wall and roof intersections, at gutters, wherever there is a change in roof slope or direction and around roof openings. IBC 1511.5 also states that existing vent flashing, metal edgings, drain outlets, collars and metal flashings shall not be reinstalled where rusted, damaged or deteriorated. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation.*

| 351.  Bird stop - Eave closure strip for tile roofing - metal | 388.00 LF | 3.46 | 48.73 | 278.24 | 1,669.46 | (152.29) | 1,517.17 |

**BERRONG**  **Berrong Construction**

## CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing systems to install the required bird stop.* | | | | | | | |
| 352.  Remove Additional charge for steep roof - 7/12 to 9/12 slope | 0.49 SQ | 37.11 | 0.00 | 3.64 | 21.82 | (0.00) | 21.82 |
| *Labor for a commercial roofing subcontractor specializing in tile tile roofing systems to remove the tile roofing, furring strips, and felt on a steep roof.* | | | | | | | |
| 353.  Additional charge for steep roof - 7/12 to 9/12 slope | 0.49 SQ | 42.73 | 0.00 | 4.19 | 25.13 | (0.00) | 25.13 |
| *Additional labor charge for lost productivity on a triple steep roof, due to accessibility, and extra safety precautions due to increased danger.* | | | | | | | |
| 354.  Remove Additional charge for high roof (2 stories or greater) | 72.58 SQ | 14.02 | 0.00 | 203.51 | 1,221.08 | (0.00) | 1,221.08 |
| *Labor for a commercial roofing subcontractor specializing in tile roofing systems to remove the tile roofing, furring strips, and felt on a high roof* | | | | | | | |
| 355.  Additional charge for high roof (2 stories or greater) | 72.58 SQ | 18.87 | 0.00 | 273.92 | 1,643.50 | (0.00) | 1,643.50 |
| *Additional labor charge for lost productivity on a high roof, due to accessibility, and extra safety precautions due to increased danger.* | | | | | | | |
| 356.  Flashing - pipe jack | 8.00 EA | 43.58 | 8.36 | 71.40 | 428.40 | (26.12) | 402.28 |
| *Labor and material for a commercial roofing subcontractor to replace the existing pipe jack flashing. Pipe jack flashings are required by IBC 1503.2. Code states that flashings shall be installed around penetrations through the roof plane. IBC 1511.5 also prohibits the reinstallation of these flashings when rusted, damaged or deteriorated. The dictionary's definition of damage is: physical harm caused to something in such a way as to impair its value, usefulness, or normal function. The function of flashing is to prevent water from entering through penetrations in the roof plane. The very act of installing the flashing damages it, and therefore, is not allowable for reinstallation. For example, flashings previously installed will have nail holes in them compromising their functionality.* | | | | | | | |
| 357.  Roof mount power attic vent | 4.00 EA | 527.66 | 49.38 | 432.00 | 2,592.03 | (154.32) | 2,437.71 |
| *Labor and material for a commercial roofing subcontractor to install the code mandated ventilation. This roof requires at least 2976 square inches of exhaust NFVA. The ventilation calculation is based on the 1/150 rule. IBC Section 1203 requires that the attic space be properly ventilated. Based on the roofs material and design, the logical way to achieve the code required ventilation is install power attic vents.* | | | | | | | |
| **Total: Roof** | | | 1,930.29 | 20,381.77 | 122,290.61 | 6,032.15 | 116,258.47 |

### Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *The current condition of the existing roof deck has not been determined at this time, and must be inspected prior to the roofing system being replaced. IBC 1511.2 states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during the installation of the roof covering system. If replacement or repair is required additional supplements will be submitted.* | | | | | | | |
| 358.  Re-nailing of roof sheathing - complete re-nail | 7,258.00 SF | 0.23 | 5.81 | 335.03 | 2,010.18 | (18.15) | 1,992.03 |
| *Additional nails and labor for a commercial roofing subcontractor to re-nail the existing roof sheathing. IBC 1511.3 states that roof replacement shall include the removal of existing layers of roof coverings down to the deck. IBC 1511.2 also states that the structural roof components shall be capable of supporting the roof covering system and the material and equipment loads that will be encountered during installation of the roof covering system. The sheathing is considered part of the "Total Roof System". The excessive winds sustained along with the actual removal of the shingles will cause the decking system to be lifted and the fasteners to be loosened, therefore, requiring all of the sheathing to be re-nailed.* | | | | | | | |

**BERRONG** INSULATION · ROOFING · CONSTRUCTION  **Berrong Construction**

### CONTINUED - Carpentry

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 359.  Add charge for re-nailing sheathing steep roof - 7/12 - 9/12 slope* | 49.00 SF | 0.32 | 0.63 | 3.26 | 19.57 | (1.96) | 17.61 |
| *Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a steep roof.* | | | | | | | |
| 360.  Additional charge for re-nailing sheathing high roof (2 stories or greater) * | 72.58 SQ | 18.87 | 0.00 | 273.92 | 1,643.50 | (0.00) | 1,643.50 |
| *Additional labor for a commercial roofing subcontractor to re-nail the sheathing on a high roof.* | | | | | | | |
| 361.  Hip/ridge/rake/eave nailer board - 2x2 | 367.00 LF | 1.99 | 17.03 | 149.47 | 896.83 | (53.22) | 843.61 |
| *Labor and material for a commercial roofing subcontractor specializing in tile roofing to install the required nailer board.* | | | | | | | |
| Totals:  Carpentry | | | 23.46 | 761.68 | 4,570.07 | 73.33 | 4,496.74 |

#### Electrical

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 362.  Electrician - per hour | 8.00 HR | 95.06 | 0.00 | 152.10 | 912.58 | (0.00) | 912.58 |
| *Additional labor required for an electrician to install the wiring to the code mandated power attic vent.* | | | | | | | |
| Totals: Electrical | | | 0.00 | 152.10 | 912.58 | 0.00 | 912.58 |
| Total:  Roof | | | 1,953.75 | 21,295.54 | 127,773.26 | 6,105.48 | 121,667.79 |

### Exterior

#### Guttering

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 363.  R&R Gutter / downspout - aluminum - up to 5" | 468.00 LF | 10.30 | 168.11 | 997.70 | 5,986.21 | (525.33) | 5,460.87 |
| *Labor and material for a commercial guttering subcontractor to remove the existing guttering, discard in a job-site waste receptacle and replace with new.* | | | | | | | |
| Totals: Guttering | | | 168.11 | 997.70 | 5,986.21 | 525.33 | 5,460.87 |

### Stucco

Stucco

**BERRONG**   **Berrong Construction**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 364. Stucco repair around installed flashings* | 20.00 LF | 23.47 | 2.91 | 94.46 | 566.77 | (9.10) | 557.67 |

*Labor and material for a commercial subcontractor specializing stucco repair to repair the stucco around the installed code mandated flashings.*

| Total: Stucco | | | 2.91 | 94.46 | 566.77 | 9.10 | 557.67 |
|---|---|---|---|---|---|---|---|

### Painting

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 365. Clean stucco | 20.00 SF | 1.01 | 0.02 | 4.04 | 24.26 | (0.05) | 24.21 |

*Labor and material for a painting subcontractor to clean the damaged stucco after the installation of the code mandated flashing and leak barrier, dirt and dust must be removed before fresh paint is applied*

| 366. Seal & paint stucco | 20.00 SF | 1.45 | 0.46 | 5.89 | 35.36 | (1.45) | 33.91 |
|---|---|---|---|---|---|---|---|

*Labor and material for a painting subcontractor to repaint the damaged stucco after the installation of the code mandated flashing and leak barrier.*

| Totals: Painting | | | 0.48 | 9.94 | 59.62 | 1.50 | 58.12 |
|---|---|---|---|---|---|---|---|
| Total: Stucco | | | 3.39 | 104.40 | 626.39 | 10.60 | 615.79 |
| Total: Exterior | | | 171.50 | 1,102.10 | 6,612.60 | 535.93 | 6,076.67 |
| Total: Building 17 | | | 2,125.25 | 22,397.64 | 134,385.86 | 6,641.41 | 127,744.45 |
| Total: BUILDINGS | | | 50,894.30 | 529,441.87 | 3,176,651.20 | 159,044.93 | 3,017,606.27 |

## GENERAL

### GENERAL

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *OSHA Safety Compliance is required on ALL construction projects as mandated by Federal Law.* | | | | | | | |

| Total: GENERAL | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|---|---|---|---|---|---|---|---|

### Temporary Equipment

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 367. Caution tape | 3,000.00 LF | 0.08 | 2.40 | 48.48 | 290.88 | (0.00) | 290.88 |
| *Additional equipment required to barrier off the outside perimeter.* | | | | | | | |
| 368. R&R Temporary fencing | 400.00 LF | 6.97 | 0.00 | 557.60 | 3,345.60 | (0.00) | 3,345.60 |
| *Temporary fencing to protect equipment and material against theft and vandalism during the construction process.* | | | | | | | |
| 369. Dumpster load - Approx. 40 yards, 7-8 tons of debris | 225.00 EA | 730.00 | 0.00 | 32,850.00 | 197,100.00 | (0.00) | 197,100.00 |

**BERRONG** Berrong Construction

## CONTINUED - Temporary Equipment

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Required for all specified construction debris. The calculation is based on volume as well as weight.* | | | | | | | |
| 370. Telehandler/forklift and operator | 540.00 HR | 113.57 | 0.00 | 12,265.56 | 73,593.36 | (0.00) | 73,593.36 |
| *Additional equipment and licensed operator required to safely move material around the job-site. OSHA 1926.1053(b)(22) states an employee shall not carry any object or load that could cause the employee to lose balance and fall. Must be present throughout the duration of the project.* | | | | | | | |
| 371. Telehandler - pick up/del. (each way)* | 2.00 EA | 175.00 | 0.00 | 70.00 | 420.00 | (0.00) | 420.00 |
| 372. Forklift and operator* | 540.00 HR | 113.57 | 0.00 | 12,265.56 | 73,593.36 | (0.00) | 73,593.36 |
| *Additional equipment and licensed operator required to safely move material to and from the roof line. OSHA 1926.1053(b)(22) states an employee shall not carry any object or load that could cause the employee to lose balance and fall. Must be present throughout the duration of the project.* | | | | | | | |
| 373. Forklift - pick up/del. (each way)* | 2.00 EA | 175.00 | 0.00 | 70.00 | 420.00 | (0.00) | 420.00 |
| 374. Crane and operator - 14 ton capacity - 65' extension boom | 360.00 HR | 137.00 | 0.00 | 9,864.00 | 59,184.00 | (0.00) | 59,184.00 |
| *Additional equipment and licensed operator required to move the forklift and dumpsters to the parking garage roof.* | | | | | | | |
| 375. Crane - pick up/del. (each way)* | 2.00 EA | 169.25 | 0.00 | 67.70 | 406.20 | (0.00) | 406.20 |
| 376. Temporary toilet (per month) | 4.00 MO | 106.15 | 0.00 | 84.92 | 509.52 | (0.00) | 509.52 |
| *Job-site toilets are required by OSHA under regulation: Title 29 CFR 1926.51(c)(1). "Toilets shall be provided for employees according Table D-1": Table D-1 states there must be 1 toilet for 20 or less employees.* | | | | | | | |
| 377. Roofer - per hour | 180.00 HR | 120.30 | 0.00 | 4,330.80 | 25,984.80 | (0.00) | 25,984.80 |
| *Additional labor hours required due to lack of access to each building.* | | | | | | | |
| 378. Temporary Walk Ways* | 0.00 EA | 0.00 | 0.00 | 0.00 | 0.00 | (0.00) | 0.00 |
| *Open bid item for temporary walk ways. Invoice will be submitted upon receipt.* | | | | | | | |
| **Totals: Temporary Equipment** | | | 2.40 | 72,474.62 | 434,847.72 | 0.00 | 434,847.72 |

### Permits and Supervision

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 379. Commercial Building Permit and Plan Review* | 1.00 EA | 0.00 | 0.00 | 0.00 | 0.00 | (0.00) | 0.00 |
| *To be determined by the City of Brookhaven, GA.* | | | | | | | |
| 380. Commercial Supervision / Project Management - per hour | 816.00 HR | 75.37 | 0.00 | 12,300.38 | 73,802.30 | (0.00) | 73,802.30 |

**BERRONG**   **Berrong Construction**

**CONTINUED - Permits and Supervision**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

*Project Manager orders materials; schedules material deliveries, confirms that all materials were delivered, schedules sub-contractors, and manages/oversees project with property owners/managers and all tradesmen. The Project Manager also coordinates and oversees OSHA mandated safety compliance and therefore must be present throughout the duration of the job.*
*OSHA regulation Title 29 CFR §1926.502(h)- Safety Monitoring Systems -*
*www.osha.gov/Publications/Const_Res_Man/1926m_interps.html*
*1926.502(h) "Safety monitoring systems." Safety monitoring systems [See 1926.501(b)(10) and 1926.502(k)] and their use shall comply with the following provisions:*
*1926.502(h)(1) The employer shall designate a competent person to monitor the safety of other employees and the employer shall ensure that the safety monitor complies with the following requirements:*
*1926.502(h)(1)(i) The safety monitor shall be competent to recognize fall hazards;*
*1926.502(h)(1)(ii) The safety monitor shall warn the employee when it appears that the employee is unaware of a fall hazard or is acting in an unsafe manner;*
*1926.502(h)(1)(iii) The safety monitor shall be on the same walking/working surface and within visual sighting distance of the employee being monitored;*
*1926.502(h)(1)(iv) The safety monitor shall be close enough to communicate orally with the employee; and*
*1926.502(h)(1)(v) The safety monitor shall not have other responsibilities which could take the monitor's attention from the monitoring function*

| | | | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Totals:  Permits and Supervision | | | 0.00 | 12,300.38 | 73,802.30 | 0.00 | 73,802.30 |

**Job Safety**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 381. General clean - up | 90.00 HR | 40.26 | 0.07 | 724.69 | 4,348.17 | (0.00) | 4,348.17 |

*Labor hours for general construction debris clean-up, the site must be maintained for the general safety and protection of customers, employees and subcontractors in the area. OSHA 1926.25(a): "During the course of construction, alteration, or repairs, form and scrap lumber with protruding nails, and all other debris, shall be kept cleared from work areas, passageways, and stairs, in and around buildings or other structures."*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 382. Osha Fall Protection | 450.00 HR | 27.50 | 405.72 | 2,556.14 | 15,336.86 | (0.00) | 15,336.86 |

*Additional labor charge for lost productivity due to extra safety precautions to comply with OSHA regulations:*
*Here is a link to the OSHA website: http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=STANDARDS&p_id=10757*
*Here is the link to the listing OSHA fines that have been levied against various contractors for not being in compliance: http://ogesdw.dol.gov/*
*1926.501(a)(2) The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely . Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity.*
*1926.502(a) "General."*
*1926.502(a)(1) Fall protection systems required by this part shall comply with the applicable provisions of this section.*
*1926.502(a)(2)  shall provide and install all fall protection systems required by this subpart for an employee, and shall comply with all other pertinent requirements of this subpart before that employee begins the work that necessitates the fall protection.*

| | | | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| Totals:  Job Safety | | | 405.79 | 3,280.84 | 19,685.03 | 0.00 | 19,685.03 |
| Total:  GENERAL | | | 408.19 | 88,055.84 | 528,335.05 | 0.00 | 528,335.05 |
| Line Item Totals:  PEACHTREE-PLACE | | | 51,302.50 | 617,497.71 | 3,704,986.25 | 159,044.93 | 3,545,941.32 |

**BERRONG** Berrong Construction

## Summary for Building

| | |
|---|---:|
| Line Item Total | 3,036,186.05 |
| Material Sales Tax | 51,302.50 |
| Subtotal | 3,087,488.55 |
| Overhead | 308,748.85 |
| Profit | 308,748.85 |
| **Replacement Cost Value** | **$3,704,986.25** |
| Less Depreciation | (159,044.93) |
| **Actual Cash Value** | **$3,545,941.32** |
| **Net Claim** | **$3,545,941.32** |
| Total Recoverable Depreciation | 159,044.93 |
| **Net Claim if Depreciation is Recovered** | **$3,704,986.25** |

Cannon Berrong

# EXHIBIT D



**J. Remington Huggins, Esq.**
110 Norcross Street
Roswell, GA 30075
Remington@lawhuggins.com
(770) 913-6229

March 31, 2022

Mr. Adam Jacobs                                    Sent Via Email:
QBE Insurance Corporation                          adam.jacobs@us.qbe.com
P.O. Box 975
Sun Prairie, WI 53590

Re:   Named Insured(s): Peachtree Place Condominium Association, Inc
      Property Address: 3777 Peachtree Rd NE, Brookhaven, GA 30319
      Date of Loss: 10/29/2020
      Policy No.: MC1800000042800
      Claim No.: 808629N

Mr. Jacobs:

     As you know I have been retained by Peachtree Place Condominium Association, Inc.
("Peachtree Place"), to represent it regarding the above referenced property insurance claim. The
purpose of this correspondence is to highlight elements of this claim. Please see listed below
evidence of Peachtree Place's claim:

**I.      DATE OF LOSS.**

     As you know, the date of loss associated with Peachtree Place's claim is one of the
strongest wind events Atlanta has experienced in many years. Tropical Storm Zeta devastated the
city of Atlanta and the surrounding cities on October 29, 2020. Tropical Storm Zeta caused death,
unprecedented tree falls, and unprecedented power outages. This evidence was provided to QBE
Insurance Corporation ("QBE") as a result of its document requests. It is undeniable that Tropical
Storm Zeta impacted Peachtree Place and caused significant damage. This fact can be further
established by QBE's own agent and representative, as described below.

**II.     CAUSATION.**

     Following Peachtree Place's filing of its Tropical Storm Zeta claim, QBE inspected the
property for the first time on or around June 9th, 2021. During the first inspection QBE assigned
its agent and representative, Mr. Austin Hagwood of Sedgwick, to inspect all the roof surfaces at
Peachtree Place. Mr. Hagwood inspected every individual roof surface that was subject to the
claim. After each individual roof inspection Mr. Hagwood expressed to all individuals who were
present for the inspection that each roof had sustained significant wind damage and needed to be
replaced. After the inspection of all subject roof surfaces concluded, Mr. Hagwood stated
unequivocally all the roofs subject to the Tropical Storm Zeta claim needed to be replaced. Mr:

To: Adam Jones, QBE Insurance Corporation
Client: Peachtree Place Condominium Association, Inc.
March 31, 2022
Page **2** of **3**

Hagwood continued by stating all the roofs were totaled and needed to be replaced, and therefore asked for the "ESX" files so he could start drafting an estimate for the roof replacements. Mr. Hagwood also said, "this is probably a three (3) million plus job for the storm damaged roofs". Mr. Hagwood further stated the claim would probably be transferred to another desk adjuster because he would be drafting an estimate for over three (3) million dollars. Further, after the inspection and on 6/14/2021 Mr. Hagwood continued to ask for the "ESX" files by email so he could draft an estimate. Please see "Attachment A" to this correspondence an email from Mr. Hagwood requesting the "ESX" files.

Additionally, Peachtree Place hired its own engineer, Mark T. Kilgore, Ph.D., P.E., to inspect the roof surfaces and draft a report regarding his findings. Based on his inspection of the roof surfaces, Dr. Kilgore concluded Peachtree Place's roofs had widespread damage that was caused by storm damage. Further, after Dr. Kilgore researched weather data relating to Tropical Storm Zeta he concluded the roof systems were damaged by result of Tropical Storm Zeta which occurred on October 29, 2020. ***Dr. Kilgore's inspection occurred after Tropical Storm Zeta.***

Lastly, Peachtree Place hired an experienced contractor to inspect the roof systems at Peachtree Place. The contractor agreed the roof surfaces were significantly damaged from Tropical Storm Zeta and needed to be fully replaced.

## III.   REPAIRABILITY.

In addition to the fact that Peachtree Place's roofs sustained widespread wind damage as a result of Tropical Storm Zeta, these damages are not repairable. Dr. Kilgore concluded that based on his observations of Peachtree Place's roofs, coupled with his knowledge of the International Building Code, the roofs cannot be repaired and must be replaced.  In addition, as you know, Peachtree Place's roofs are covered in Boral Barcelona 900 concrete tiles. These tiles are no longer manufactured and are therefore discontinued. Stated differently, Peachtree Place's roof tiles are unavailable, and no compatible tiles exist to perfect a proper and code-compliant repair of the damages.  This fact is further confirmed by Peachtree Place's contractor, who, after inspecting Peachtree Place's roof systems, determined the roofs could not be properly repaired & brought up to proper building code standards.

## IV.   CONCLUSION.

In conclusion, based on 1) QBE's agent and representative's, Mr. Hagwood's, observations; 2) Dr. Kilgore's observations; and 3) Peachtree Place's contractor's observations, Peachtree Place's roofs sustained widespread damage from Tropical Storm Zeta, cannot be repaired, and must be replaced. No contractor can complete a proper repair of the damages to the roof systems due to the amount of damage to the roofs, and the unavailability of replacement concrete tiles.

My client does not understand why it took QBE roughly over ***nine months*** after the claim was filed to make a coverage decision. My client therefore asks QBE to look at all of the facts,

To: Adam Jones, QBE Insurance Corporation
Client: Peachtree Place Condominium Association, Inc.
March 31, 2022
Page 3 of 3

evidence, and opinions with an eye towards *coverage*, and not with an eye towards *denial*. The evidence is clear; the date of loss is undeniable; the extent of damage is not in dispute; and the need to replace Peachtree Place's roofs is obvious. QBE must extend full coverage for Peachtree Place's loss and agree to replace all roofs at Peachtree Place.

Further, in response to your correspondence dated March 31, 2022, my client hereby makes a formal bad faith demand pursuant to O.C.G.A. § 33-4-6 that QBE settle the above claim for the sum of **$3,704,986.25, less the applicable deductible.** Please see the enclosed estimate of damages totaling $3,704,986.25.

This lack of good faith has forced Peachtree Place to retain my continued legal services in order to fairly settle its claim. Accordingly, it is our contention that QBE's conduct constitutes an unfair claim settlement pursuant to O.C.G.A. § 33-6-34, and is a breach of the insurance policy. Bad faith claims handling violation of O.C.G.A. § 33-6-34 triggers additional liability on QBE's part under O.C.G.A. § 33-4-6 that includes the amount of the claim, plus a penalty of an additional fifty percent (50%) of the value of the claim and reasonable attorneys' fees and costs.

This correspondence will also serve as notification that QBE may also be required to pay reasonable attorneys' fees due to QBE's failure to perform as per the terms of the insurance contract entered into with Peachtree Place. Such payment is necessitated as a result of Peachtree Place having to retain this firm for legal services to pursue its claim for damages and should be paid in addition to the amount of any valid claim for contractual benefits and costs. The purpose of this letter is to encourage QBE to resolve Peachtree Place's claim in a fair and equitable manner without the need for further legal action. In the event that QBE fails to respond to this letter with an offer of settlement that is acceptable to Peachtree Place, we will have no alternative but to recommend to it that a lawsuit be filed against QBE.

Please feel free to contact me should QBE have any questions pertaining to this correspondence. Thank you.

Sincerely,

J. Remington Huggins, Esq.
Attorney at Law

JRH/
Encl.

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| PEACHTREE PLACE CONDOMINIUM ASSOCIATION, INC., **Plaintiff,** | ) ) ) ) | |
| v. | ) ) | **CIVIL ACTION FILE NO.:** **22-A-09170-6** |
| QBE INSURANCE CORPORATION, | ) ) | |
| **Defendant.** | ) ) ) ) | |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS DIRECTED TO DEFENDANT

COMES NOW, Plaintiff, **Peachtree Place Condominium Association, Inc.**, by and through the undersigned counsel, and hereby propounds the following First Set of Interrogatories and Request for Production of Documents to the Defendant, **QBE Insurance Corporation**, to be answered separately and fully, in writing, under oath, and in accordance with the Georgia Civil Practice Act, O.C.G.A. §§ 9-11-33 and 9-11-34.

## GENERAL INSTRUCTIONS

1. You are required to answer and verify the following interrogatories and requests for production of documents within forty-five (45) days of the date of service.

2. Each paragraph below shall operate and be construed independently; and, unless otherwise indicated, no paragraph limits the scope of any other paragraph.

3. In answering these discovery requests, you are required to furnish all information available to You (not merely such information as you know of your own personal knowledge); including information in the possession of your attorneys and accountants, other persons directly or indirectly employed by or connected with you or your attorneys or accountants, or anyone else acting on your behalf or otherwise subject to your control.

4.  Your obligation to answer these discovery requests is intended to be continuing in nature; therefore, you are required by O.C.G.A. § 9-11-26 and instructed by the Plaintiff to reasonably & promptly amend or supplement your response if you learn that any prior response is in some material respect incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to Plaintiff during the discovery process or in writing.

5.  You are instructed that a failure by you to make, amend, or supplement a response in a timely manner or to otherwise comply with O.C.G.A. § 9-11-26 may result in sanctions against You.

6.  The singular includes the plural number, and vice versa. The masculine includes the feminine and neutral genders. The past tense includes the present tense where the clear meaning is distorted by a change of tense.

7.  Each document request shall be deemed to call for the production of the original document or documents. If the original is not available, then a copy shall be produced if it differs in any respect from the original or from other copies (e.g., by reason of handwritten, typed, or printed notes or comments having been added to the copy that do not appear on the original).

8.  If a request seeks a document that, to your knowledge, does not exist, please state that the document does not exist.

9.  Without interfering with the readability of a document, please identify by Bates number or other means the request(s) to which the document is responsive.

10. For each document responsive to any request that is withheld under a claim of privilege, you are required by Uniform Superior Court Rule 5.5 to provide a privilege log containing the following information:

    a.   The date the document was prepared or created;

    b.   The name and title of the author or authors of the document;

    a.   A summary of the subject matter of the document;

    b.   The identity of each person or persons (other than those giving solely stenographic or clerical assistance) who assisted the author or authors in creating the document;

    c.   The identity of each person to whom the document or the contents of the document have been communicated (either intentionally or inadvertently), the date(s) of such communication, the title of each such person, and the date of such communication;

    d.   A statement of the basis on which privilege is claimed; and

    e.   The identity and title, if any, of the person or persons providing the information requested in subsections (a) through (f) above.

## DEFINITIONS

As used in these interrogatories, the terms listed below are defined as follows:

1. "Document(s)" or "documentation" means any writing of any kind, including originals and all non-identical copies (whether different from the originals by reason of any notation made on such copies or otherwise), including without limitation correspondence, memoranda, notes, desk calendars, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, checks, invoices, statements, receipts, returns, warranties, guaranties, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversation, telephone calls, meetings or other

communications, bulletins, magazines, publications, printed matter, photographs, computer printouts, teletypes, faxes, invoices, worksheets and all drafts, alterations, modifications, changes and amendments of any of the foregoing, tapes, tape recordings, transcripts, graphic or aural records or representations of any kind, memorialized depictions of the Property or of Communications relating to the Claim, and electronic, mechanical or electric records or representations of any kind which You have knowledge or which are now or were formally in your actual or constructive possession, custody or control.

2.  "Claim" or "Policyholder's Claim" shall refer to Claim No. 808629N, which was drafted by the Insurance Company and issued to the Policyholder for direct physical loss or direct physical damage to the Property.

3.  "Communication" shall mean and include any oral or written utterance, notation, or statement of any nature whatsoever, including but not limited to correspondence, personal conversation, telephone calls, dialogues, discussions, interviews, consultations, telegrams, telexes, cables, memoranda, agreements, notes, and oral, written, or other understandings or agreements. This shall include all written, recorded, or signed statements of any party, including the Policyholder, any adjuster, subcontractor, witnesses, investigators, or agents, representative, or employee of the parties concerning the subject matter of this action.

4.  "Identify" shall mean:

    a.  when used to refer to a document, means to state the following:

        1.The subject of the document;

        2.The title of the document;

        3.The type of document (e.g., letter, memorandum, telegram, chart);

4.The date of the document, or if the specific date thereof is unknown, the month and year or other best approximation of such date with reference to other events;

5.The identity of the person or persons who wrote, contributed to, prepared or originated such document; and

6.The present or last known location and custodian of the document.

b. when used in reference to a *person*, "identify" means to state to the fullest extent possible the person's name, present or last known address, present or last known telephone number(s), and, if a natural person, the person's employer and position of employment at the time(s) in question.

c. when used in reference to a *conversation* or *communication*, "identify" means to state the date and length of the communication, the identity of all parties to the communication, the identity of all other witnesses to the communication, the place where the communication took place (if the communication did not take place in person, set forth the location of each party to and each witness to the communication), and the general subject matter(s) of the communication.

d. when used in reference to a *claim*, "identify" means to state the date and location the claim arose, the location the claim was defended, the names of the parties involved, the case style, the amount in controversy, and the general nature of the claim.

e. "Relating to" any given subject means any document, communication, or statement that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with,

touches upon, or is in any manner whatsoever pertinent to that subject and supports, evidences, describes, mentions, refers to, contradicts or comprises the subject.

5. "Including" shall mean "including, but not limited to."

6. "And" and "or" shall be construed conjunctively or disjunctively as required by the context within the scope of a discovery request so as not to exclude any information that might be deemed outside the scope of the request or by any other construction.

7. "Person(s)" shall mean and include a natural person, firm, association, organization, partnership, business trust, corporation (public or private), or government entity.

8. "Parties" includes all named parties in this litigation and their agents, employees, servants, officers, and directors.

9. "Plaintiff" and "Policyholder" mean the above-captioned Plaintiff or the Policyholder listed on MC1800000042800 and his/her/its employees, representative, agents, employees, servants, officers, and directors.

10. "Property" or "Insured Property" means the property located at 3777 Peachtree Rd. NE, Brookhaven, GA 30319.

11. "You," "Your," "Defendant," and "Insurance Company" means Defendant Insurance Company and its employees, representatives, agents, employees, servants, officers, directors, adjusters, branch claims representatives, regional or home office claims auditors or claims examiners, all claims managers and claims supervisors at any level, executive officers of the company, and all members of any review or claims committee, and each person presently or formerly acting or authorized to act on Defendant's behalf.

12. "Policy" means Policy No. MC1800000042800 issued by QBE Insurance Corporation.

13. "Broker" means an insurance broker, excess/surplus lines broker, licensed insurance agent, managing general agent, or other insurance intermediary involved in the purchase, sale, negotiation, or placement of the Policy.

14. "Coverage Letter(s)" means the correspondence from You to Policyholder dated anytime, regarding Your position as to coverage for the Loss.

15. "Loss" means the event on or around October 29, 2020, in which Policyholder suffered property damage and has consequently incurred extra expenses such as additional living expenses, business income losses, and other losses afforded coverage for under the Policy.

16. "Possession, custody or control" includes the joint or several possession, custody, or control not only by the person to whom these interrogatories are addressed, but also the joint or several possession, custody, or control by each or any other person acting, or purporting to act on behalf of, the Person, whether as an employee, attorney, accountant, agent, sponsor, spokesman, or otherwise.

## INTERROGATORIES

1.

Identify any and all Persons involved in any way whatsoever in the investigation, adjustment, and handling of Plaintiff's claim for insurance benefits arising from the Loss on or about October 29, 2020, and for each, please include his/her name, place of employment, address, and telephone number; his/her title, license(s), and certification(s); the date his/her involvement in this claim commenced; the date his/her involvement in this claim concluded; and a description his/her involvement in this claim.

This interrogatory seeks information about every individual involved in the Claim including, but not limited to, Persons employed by the Defendant or retained by Defendant through

a third-party entity. For Defendant's employees specifically, this Interrogatory seeks the name of every employee of Defendant who had anything to do with the Claim.

2.

If any Person identified in Your answer to Interrogatory No. 1 is or was Your employee, agent, or representative, please state whether said Person has been promoted, demoted, terminated, or transferred from October 29, 2020 to present; describe in detail the change in employment status of each such Person, including the circumstances of the Person's employment before and after the change in status; and provide the last-known residence address and telephone number or place of current employment of each such former employee.

3.

Describe each and every investigative step conducted by You, or by anyone on Your behalf, regarding Plaintiff's Claim, beginning with the date and method You received notice of the subject Claim, and identify any and all documents and correspondence (paper or electronic) generated, obtained, or otherwise placed in Your possession, in the course of Your investigation.

4.

Identify each and every person that You expect to call as an expert witness at trial, and for each, please state: the subject matter on which the expert is expected to testify; the substance of the facts and opinions to which the expert is expected to testify; a summary of the grounds for each opinion; the data or other information considered by the expert in forming their opinions; whether a written report has been prepared; and identify the data or other information considered by the expert in forming their opinions & all documents You furnished to the expert.

5.

If You have retained or employed an expert in conjunction with the Claim who is not expected to be called as a witness at trial, please identify said expert(s), and for each, please state their address and contact information.

6.

Please state the date and manner in which You received notice of the Claim; the date and manner in which You acknowledged receipt of the Claim; the date and manner in which You commenced investigation of the Claim; the date and manner in which You requested from the Plaintiff all items, statements, and forms that You reasonably believed, at the time, would be required from the Plaintiff; the date and manner in which You notified the Plaintiff in writing of the acceptance or rejection of the claim; and the date, amount, and reason for any insurance proceed payments You have made to the Plaintiff.

7.

Have You extended coverage for any part of Plaintiff's Claim for insurance benefits, or have You denied or rejected Plaintiff's Claim? If You extended coverage for any part of Plaintiff's Loss, please state with specificity the provisions, endorsements, or any other part of the Policy governing Plaintiff's Loss that supports Your extension of coverage; please state with specificity Your reasons for denying or rejecting any part of Plaintiff's Claim; and include all facts and policy provisions that supported Your decision to deny or reject Plaintiff's Claim. This Interrogatory seeks the above information even if coverage was extended for the Loss but fell below the Plaintiff's deductible.

8.

Do You contend the damage to the Property can be repaired? If so, please state with specificity the method of repair Defendant contends should be used to repair the Property. This request seeks any and all building codes (state, county, city, or municipal), industry standards, and industry practices employed in the investigation, evaluation, and determination of methods used to repair damages caused by the Loss that Defendant states could be used to repair the Property. If such information exists, please state: the name(s), address(es), and telephone number(s) of all Persons who have personal knowledge of any of these industry standards or practices; and identify all documents that support or explain any of these building codes, engineering industry standards, and practices.

If You do not have an answer to this Interrogatory, please affirmatively state none of the above was relied upon in determining if the damage sustained to the Property by the Loss is or was repairable.

9.

Does the Policy owe for anything less than a proper repair of the damaged Property caused by a covered loss? If the Policy does not owe for a proper repair, please state with specificity the provision of the Policy which does not provide for a proper repair.

10.

Please identify any and all written policies, procedures, guidelines, or other documents (including document(s) maintained in physical or electronic form) You maintained for Your internal or third party adjusters to use in the state of Georgia in connection with adjusting Wind/Hail losses that were in effect on October 29, 2020 through present.

11.

Please state with specificity the approximate date and event which caused You to anticipate litigation with respect to Plaintiff's cause of action and identify all documents that support or explain any of these facts.

12.

Identify any and all documents (including those maintained electronically) relating to the investigation, claim handling, and adjustment of Wind/Hail claims in the state of Georgia that are routinely generated throughout the handling and investigation of such claims (including, but not limited to, Investigation Reports; reserve sheets; electronic claims diaries or similar record logs; claims review reports; and/or any team report relative to this claim) for the two years preceding October 29, 2020 to the present, and state whether any such documents were generated during the investigation and handling of the Claim.

13.

Have any documents (including those maintained electronically) relating to the Claim been destroyed, lost, or disposed of? If so, please identify what, when and why the document was destroyed, and describe Your document retention policy.

14.

Do You contend the Property was damaged by any excluded peril? If so, state the specific provision in the Policy supporting the exclusion and how the exclusion impacted Your claim decision, state in detail Your factual basis for this contention, and identify any documents supporting Your contention.

15.

Do You contend the Plaintiff failed to satisfy any condition, covenant, or duty of the Policy or otherwise breached the Policy? If so, identify each specific condition, covenant, or duty of the Policy You contend the Plaintiff failed to satisfy or breach, and identify all the documents relating to Your assertion and all Persons with knowledge of such facts.

16.

Identify the underwriting documents created or acquired in the formation of the Policy for the Property including any risk reports for the Property that have been generated or obtained at any time, and state if any Notice(s) of Cancellation or Notice(s) of Non-Renewal of the Policy have been issued.

17.

Identify any and all photographs, audio recordings, video recordings, written statements taken, or other memorializing documentation obtained during the course of Your investigation of the Claim. In Your response, please describe in detail what each document depicts or memorializes and state the date when each such document or memorialization was obtained or generated.

18.

Identify any and all repair estimates, invoices, quotes, receipts, or other documentation reflecting the cost or methodology to repair the damages at issue in this Claim, even if said item never left Your possession. In Your response, please describe in detail what each document depicts, when it was generated or obtained, why it was generated or obtained, and state the date when the item was created, received, or requested.

19.

Please identify each Person who assisted You in any way to provide responses to these Interrogatories. For each identified Person, please include the Person's name, place of employment, address, telephone number and relationship to you.

20.

State the good faith factual basis for Your Affirmative Defenses(s), and identify the date, type of document, author(s), recipient(s), and present custodian of every document known or believed by You to refer or relate in any way to the facts You contend support Your Affirmative Defense(s) and comprehensively describe all basis (factual and otherwise), documents, notes, memorandum, reports, or other documentation supporting Your responses to the paragraphs of Plaintiff's Complaint.

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.

All documents responsive to Plaintiff's Interrogatories identified in Your responses to Plaintiff's Interrogatories or otherwise reviewed or relied upon in responding to Plaintiff's Interrogatories.

2.

The entire claim file, claims notes, or other similar records from the home, regional, or local offices; third party adjusters or adjusting firms; or ladder assist Persons retained by You regarding the Claim. This request includes, but it not limited to, copies of the file jackets; "field" files and notes; and drafts of documents contained in the file.

To the extent that this request seeks documents from third-party adjusters/adjusting firms, ladder assists, or other Persons retained by the Defendant, this request is only seeking such documents that have been provided to, or are in the control of, the Defendant.

3.

A certified copy of the Policy or insurance policies possessed by Defendant pertaining to the Property involved in this suit.

4.

All documents and tangible things supporting the method You contend could be used to properly repair the damages sustained to the Property as a result of the Loss.

5.

Your written procedures, policies, guidelines, or other similar documentation (including document(s) maintained in electronic form) that pertain to the handling of Wind/Hail claims in the state of Georgia for the year preceding October 29, 2020 to present.

6.

Any and all weather reports in Your possession which concern the Property, regardless of whether You relied upon them in making Your claims decision in this matter, for the two years preceding October 29, 2020 to present.

7.

The Operation Guides which relate to the handling of Wind/Hail claims in the state of Georgia in effect for the year preceding October 29, 2020 to present.

8.

The field notes, measurements, electronic diary, file materials, or other similar records (including all electronic and paper notes) created, obtained, or maintained by the claims personnel,

contractors, adjusters, engineers, or any other Person who physically inspected the Property or adjusted the Claim.

9.

The emails, instant messages, internal or external correspondence, or any other communication between Defendant and any agent, representative, employee, or other Person pertaining to the Claim.

10.

Defendant's internal newsletters, bulletins, publications, or other memoranda internally circulated which relates to the policies and procedures relied upon in the handling of Wind/Hail claims in the state of Georgia that were issued one year preceding October 29, 2020 through the present, including, but not limited to, memoranda issued to claims adjusters.

11.

The price guidelines, price indexes, or other similar information utilized in the creation of any repair estimates prepared, edited, requested, or relied upon by the Defendant. In the event published guidelines of "off the shelf" software (including, but not limited to, Xactimate software) were utilized to inform pricing decisions, You may respond by simply identifying the name, version, and/or edition of the published guidelines used.

12.

Any "Summary of Loss," "Pay sheet," "Payment Log," copy of issued payments, or other similar list or record of payments made by Defendant in relation to the Claim. This includes, but is not limited to, all payments issued to Plaintiff or Plaintiff's agents and representatives; all payments issued to independent adjusters, ladder assists, engineers, or other Persons retained in

Your adjustment of this claim; all copies of any and all checks issued; and all expenses incurred by You in Your adjustment of this claim.

13.

The documents reflecting reserves applied to the Claim.

14.

The contract or agreement between the Defendant and any third-party Person retained in the investigation and adjustment of the Claim. This request includes, but is not limited to, contracts or agreements with ladder assists, independent adjusters, contractors, engineers, meteorologists, or hygienists involved in any way throughout the Claim.

15.

All documents submitted to, or received from, each Person You expect to call as an expert witness at trial. This request includes, but is not limited to: any agreement exchanged or entered into between Defendant and the witness (including proposals not agreed upon and counteroffers to the same); all reports generated by the witness (including drafts); a current *curriculum vitae* for the witness; a list of all other publications authored by the witness; a list of all other cases in which the witness has testified as an expert at trial or by deposition; an invoice showing the compensation paid or owed to the witness; and all documents and tangible things consulted by and relied upon by the witness in forming his or her expert opinion.

16.

All documents submitted to, or received from, each Person Defendant hired or consulted as an expert witness which Defendant does not intend to call as an expert witness at trial in this case. This request includes, but is not limited to: any agreement exchanged or entered into between Defendant and the witness (including proposals not agreed upon and counteroffers to the same);

all reports generated by the witness (including drafts); a current *curriculum vitae* for the witness; a list of all other publications authored by the witness; a list of all other cases in which the witness has testified as an expert at trial or by deposition; an invoice showing the compensation paid or owed to the witness; and all documents and tangible things consulted by and relied upon by the witness in forming his or her expert opinion.

17.

All documents in Your possession concerning the underwriting of the Policy issued for the Property. This request includes, but is not limited to, any risk reports for the Property and any Notice(s) of Cancellation or Notice(s) of Non-Renewal of the Policy for the Property.

18.

All repair estimates, invoices, quotes, receipts, or other documentation Defendant reviewed throughout the adjustment of the Claim which reflect the cost to repair any agreed upon, contested, or suspected damages at issue in the Claim. This request is inclusive of documents not transmitted to the Plaintiff through the adjustment of the Claim.

19.

Any and all photographs, audio recordings, video recordings, written statements taken, or other memorializing documentation obtained during the course of Your investigation of the claim. This request seeks the requested documentation to be produced in a format most similar to the original, in the highest quality version available, and in a format which retains the original metadata.

20.

A copy of the license, registration, certification, or other similar documentation for all Persons retained, employed, or consulted by the Defendant to inspect the Property and/or adjust the Claim.

21.

All evidence You intend to introduce at the trial of this matter.

It is requested that the above-requested responses be made within forty-five (45) days of service of this request at the offices of The Huggins Law Firm, LLC, 110 Norcross Street, Roswell, GA 30075.

Dated, this this 24th day of October, 2022.

RESPECTFULLY SUBMITTED,

**THE HUGGINS LAW FIRM, LLC**
110 Norcross Street
Roswell, GA 30075
(o) (770) 913-6229
(e) remington@lawhuggins.com
(e) mdturner@lawhuggins.com
(e) fpeebles@lawhuggins.com

J. Remington Huggins, Esq.
Georgia Bar No.: 348736
Michael D. Turner, Esq.
Georgia Bar No.: 216414
Foster L. Peebles, Esq.
Georgia Bar No.: 410852
*Attorneys for the Plaintiff*

E-FILED IN OFFICE - CE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
22-A-09170-6
10/21/2022 4:28 PM
TIANA P. GARNER, CLERK

# IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **PEACHTREE PLACE CONDOMINIUM ASSOCIATION, INC.,** )<br>**Plaintiff,** )<br> )<br>**v.** )<br> )<br>**QBE INSURANCE CORPORATION,** )<br>a foreign corporation, )<br> )<br>**Defendant.** )<br> ) | **CIVIL ACTION FILE NO.:**<br>_____<br><br>22-A-09170-6 |

## CERTIFICATE OF SERVICE

This is to certify that I have served the foregoing upon the Defendant QBE Insurance Corporation by serving them with the ***Summons, Complaint and Exhibits***, and ***Plaintiff's First Set of Interrogatories and Request for Production of Documents*** in accordance with the Court's rules to Defendant QBE Insurance Corporation at the address listed below:

**C T Corporation System**
**Registered Agent for Defendant QBE Insurance Corporation**
**289 S. Culver St.**
**Lawrenceville, GA 30046**

Respectfully submitted, this 21st day of October, 2022.

For: The Huggins Law Firm, LLC,

**The Huggins Law Firm, LLC**
110 Norcross Street
Roswell, GA 30075
(o) (770) 913-6229
(e) remington@lawhuggins.com
(e) mdturner@lawhuggins.com
(e) fpeebles@lawhuggins.com

J. Remington Huggins, Esq.
Georgia Bar No.: 348736
Michael D. Turner, Esq.
Georgia Bar No.: 216414
Foster L. Peebles, Esq.
Georgia Bar No.: 410852
*Attorneys for the Plaintiff*